# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL SECURITY COUNSELORS,

      Plaintiff,

      v.

CENTRAL INTELLIGENCE AGENCY, *et al.*,

      Defendants.

Civil Action Nos. 11-443, 11-444, 11-445 (BAH)

Judge Beryl A. Howell

## MEMORANDUM OPINION

      The plaintiff National Security Counselors ("NSC") brought these three related actions against six federal agencies pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, claiming that the defendant agencies have violated the FOIA in numerous ways.[1] NSC's claims run the gamut, including challenges to: the withholding of specific information; the adequacy of the agencies' search efforts; the refusal to process FOIA requests; the refusal to produce responsive records in an electronic format; and certain policies or practices which the plaintiff claims are ongoing and systematic FOIA violations. Although six agencies are named as defendants,[2] the vast majority of the plaintiff's claims relate to the actions of the Central Intelligence Agency ("CIA") in processing and responding to FOIA requests. The defendants previously moved to dismiss many of the plaintiff's claims, which this Court previously granted in part and denied in part. *See Nat'l Sec. Counselors v. CIA* ("*NSC I*"), 898 F. Supp. 2d 233

---

[1] The plaintiff filed each of these actions on the same day and notified the Court that all three cases are related to one another because they involve common factual and legal issues. *See* Notice of Related Case, No. 11-444, ECF No. 2; Notice of Related Case, No. 11-445, ECF No. 2. Although the Court has not formally consolidated these actions, due to their interrelated nature and in the interests of judicial economy the Court has adjudicated dispositive motions in the three cases in consolidated opinions. For these same reasons, the Court administratively stayed all three actions for approximately four months while the parties completed the briefing of summary judgment motions and cross-motions in each case. *See* Minute Order dated Mar. 21, 2013.

[2] The six defendants are: the Central Intelligence Agency ("CIA"), the Department of Justice ("DOJ"), the Defense Intelligence Agency ("DIA"), the Department of State ("State Department"), the National Security Agency ("NSA"), and the Office of the Director of National Intelligence ("ODNI").

(D.D.C. 2012). The defendants now move for summary judgment on all of the plaintiff's remaining claims, and the plaintiff has also cross-moved for summary judgment on a portion of those claims. Additionally, the plaintiff has filed a motion for sanctions in one of the related cases and a motion for leave to file an amended complaint in another. For the reasons discussed below, the Court grants in part and denies in part the defendants' motions for summary judgment, grants in part and denies in part the plaintiff's cross-motions for summary judgment, denies the plaintiff's motion for sanctions, and denies the plaintiff's motion for leave to file an amended complaint.

## Table of Contents

I. Background ................................................................................................................ 5

   A. 2009 FOIA Requests ........................................................................................... 6

     1. Count Twenty in No. 11-444: September 25, 2009 FOIA Request to the CIA .............. 6

     2. Count Eight in No. 11-445: October 22, 2009 FOIA Request to the DOJ ..................... 7

     3. Counts One, Five and Six in No. 11-445: December 1, 2009 FOIA Requests to the CIA, DIA, and ODNI .................................................................................................. 8

   B. 2010 FOIA Requests ......................................................................................... 10

     1. Counts Seven, Nine and Ten in No. 11-445: February 6, 2010 FOIA Requests to the CIA, State Department, and NSA ...................................................................... 10

     2. Counts Two and Three in No. 11-445: February 9, 2010 FOIA Requests to the CIA ... 12

     3. Count Seventeen in No. 11-444: May 4, 2010 FOIA Requests to the CIA .................. 14

     4. Count Three in No. 11-443: May 12, 2010 FOIA Request to the CIA ......................... 15

     5.    Count Nine in No. 11-444:  May 13, 2010 FOIA Request to the CIA ......................... 16

     6.    Count Eight in No. 11-444: July 5, 2010 FOIA Request to the CIA ............................. 18

     7.    Count One in No. 11-444: August 8, 2010 FOIA Requests to the CIA......................... 19

  C.  2011 FOIA Requests......................................................................................... 20

     1.    Count Eighteen in No. 11-444: January 26, 2011 FOIA Request to the CIA ............... 20

     2.    Count Thirteen in No. 11-445: February 11, 2011 FOIA Request to the CIA.............. 21

     3.    Count Ten in No. 11-444: February 16, 2011 FOIA Request to the CIA...................... 21

  D.  Facts Related to the Plaintiff's Motion for Sanctions........................................................ 22

  E.  Procedural History .................................................................................................. 26

II.  Legal Standards ........................................................................................................... 28

  A.  FOIA ....................................................................................................................... 28

  B.  Summary Judgment .............................................................................................. 31

  C.  Leave to File Amended Complaint ..................................................................... 32

III.  Discussion................................................................................................................... 33

  A.  Motion for Leave to Amend ................................................................................ 33

  B.  Motion for Sanctions............................................................................................ 36

  C.  Policies or Practices ............................................................................................. 38

     1.    Assignment of Rights Policy............................................................................. 38

     2.    Document-Level Exemption Policy ................................................................. 58

  D.  Adequacy of Search Efforts ................................................................................ 62

    1.   Count Eighteen in No. 11-444: January 26, 2011 FOIA Request to the CIA ............... 62

    2.   Count Twenty in No. 11-444: September 25, 2009 FOIA Request to the CIA ............. 65

    3.   Count Nine in No. 11-445: February 6, 2010 FOIA Request to the State Department . 67

    4.   Count Ten in No. 11-445: February 6, 2010 FOIA Request to the NSA ...................... 69

E.   Refusals to Process Requests ........................................................................... 71

    1.   Count Nine in No. 11-444: May 13, 2010 FOIA Request to the CIA ......................... 72

    2.   Count Eight in No. 11-444: July 5, 2010 FOIA Request to the CIA ........................... 74

    3.   Count One in No. 11-444: August 8, 2010 FOIA Requests to the CIA ....................... 77

    4.   Count Ten in No. 11-444: February 16, 2011 FOIA Request to the CIA ..................... 79

F.   Exemption 1 ..................................................................................................... 83

    1.   Exemption 1 Withholdings in No. 11-445 (CIA and DIA) ........................................ 84

    2.   Exemption 1 Withholdings in No. 11-443 .................................................................. 90

G.  Exemption 2 ..................................................................................................... 96

H.  Exemption 3 ..................................................................................................... 99

    1.   CIA ............................................................................................................................ 100

    2.   DIA ............................................................................................................................ 119

    3.   ODNI ......................................................................................................................... 120

J.   Exemption 5 ..................................................................................................... 122

    1.   Deliberative-Process Privilege ................................................................................. 123

    2.   Attorney-Client Privilege ......................................................................................... 131

    3. Attorney Work-Product Doctrine ................................................................................ 143

  K. Electronic Records .................................................................................................... 147

    1. CIA ................................................................................................................... 148

    2. State Department ............................................................................................... 151

  L. Segregability ........................................................................................................... 154

IV. Conclusion ....................................................................................................................... 157

## I.    BACKGROUND

      The plaintiff has twenty-four claims remaining in these related actions. Since twenty-one of the plaintiff's remaining claims relate to specific FOIA requests, the Court will briefly summarize the timing and content of those requests, the agency's processing of and response to those requests, and the aspects of the agency's processing and responses that are challenged by the plaintiff.[3] In summarizing the specific FOIA requests at issue, the Court will proceed in chronological order, rather than in the order the requests are pleaded in the plaintiff's complaints. In this regard, the Court will organize its discussion by the year in which the FOIA requests were first submitted. The Court will also discuss the factual and procedural background related to the plaintiff's motion for sanctions.

_____

[3] The Court will not summarize the factual background related to Count Twelve in No. 11-445 or Count Nineteen in No. 11-444 because the plaintiff has either conceded summary judgment or voluntarily withdrawn those claims. *See* Pl.'s Mem. in Opp'n to Def.'s Mot. Summ. J. on Counts 12 and 20 ("Pl.'s Second 445 Opp'n") at 2, No. 11-445, ECF No. 43; Pl.'s Opp'n to Def.'s Mot. Summ. J. on Counts 1, 8, 9, 10, 17, 18, and 20 ("Pl.'s First 444 Opp'n") at 1 n.2, No. 11-444, ECF No. 26.

The plaintiff's two other remaining claims relate to policies or practices of the CIA that the plaintiff alleges are in violation of the FOIA, which claims the Court summarized, along with other policy and practice claims, in its previous memorandum opinion in these related cases.[4] *See NSC I*, 898 F. Supp. 2d at 243–44, 248–49. Specifically, as labeled in the Court's previous opinion, the plaintiff challenges the CIA's Assignment of Rights Policy and its Document-Level Exemption Policy.[5] *See id.*

### A. 2009 FOIA Requests

#### 1. *Count Twenty in No. 11-444: September 25, 2009 FOIA Request to the CIA*

In a letter dated September 25, 2009, the plaintiff submitted a FOIA request to the CIA seeking "all [CIA] records, including cross-references, pertaining to guidelines for attorneys in the Office of General Counsel ('OGC') for the conduct of civil cases, especially pertaining to interactions between OGC attorneys and Department of Justice ('DOJ') attorneys." *See* Decl. of Martha M. Lutz (Dec. 13, 2011) ("First Lutz Decl.") Ex. T at 1, No. 11-444, ECF No. 20-4. By letter dated October 28, 2009, the CIA acknowledged this request and informed NSC that the CIA would "search for records existing through the date of this acceptance letter." First Lutz Decl. Ex. U at 1, No. 11-444, ECF No. 20-4. By letter dated January 10, 2011, the CIA provided a final response to the plaintiff's September 25, 2009 FOIA request, informing the plaintiff that "[w]e did not locate any records responsive to your request." First Lutz Decl. Ex. V at 1, No. 11-444, ECF No. 20-4. The plaintiff administratively appealed the adequacy of the CIA's search efforts with respect to this request by letter dated January 21, 2011. *See* First Lutz Decl. ¶ 57.

---

[4] The Court previously set forth all of the facts regarding the FOIA request that is the subject of Count One in 11-443, and the Court incorporates that discussion fully here. *See NSC I*, 898 F. Supp. 2d at 243–44.

[5] The Court will not address the facts underlying the plaintiff's challenge to the CIA's Cut-Off Date Policy in Count Twenty-One of No. 11-444 because the plaintiff has agreed to voluntarily withdraw that claim. *See* Pl.'s Opp'n to Def.'s Mot. Summ. J. on Counts Eight and Twenty-One ("Pl.'s Second 444 Opp'n") at 2, No. 11-444, ECF No. 46.

By letter dated March 15, 2011, the CIA's Agency Release Panel ("ARP") denied the plaintiff's

appeal, concluding that the CIA's search efforts were adequate. *See id.* ¶ 59. In Count Twenty

of No. 11-444, the plaintiff challenges the adequacy of the CIA's search efforts in response to the

plaintiff's September 25, 2009 request, including the CIA's use of an allegedly improper search

cut-off date. *See* First Am. Compl. ("444 FAC") ¶¶ 104–110, No. 11-444, ECF No. 6; Mem. in

Supp. Def.'s Mot. for Summ. J. on Counts 1, 8, 9, 10, 17, 18, & 20 ("Def.'s First 444 Mem.") at

10–11, No. 11-444, ECF No. 20.[6]

### 2. *Count Eight in No. 11-445: October 22, 2009 FOIA Request to the DOJ*

On October 22, 2009, the plaintiff submitted a FOIA request to the Department of Justice

("DOJ") Office of Legal Counsel ("OLC"), seeking "copies of all [DOJ] [OLC] opinions

concerning the FOIA or the Privacy Act." Decl. of Paul P. Colborn (Oct. 2, 2012) ("Colborn

Decl.") Ex. A, No. 11-445, ECF No. 29-11. By e-mail dated October 25, 2009, the plaintiff

expanded the scope of this request to include opinions concerning the Federal Records Act, the

Presidential Records Act, or agency records retention policies. *See* Colborn Decl. Ex. B, No. 11-

445, ECF No. 29-11. On March 27, 2012, the OLC provided a final response to the plaintiff's

FOIA request, producing twenty records in full and withholding all remaining responsive records

under FOIA Exemption 5 because "[t]hey are protected by the deliberative process and attorney-

client privileges." Colborn Decl. Ex. C, No. 11-445, ECF No. 29-11. On July 6, 2012, the OLC

sent another letter to the plaintiff, advising it that the OLC was "releasing . . . one of the withheld

records because [OLC] discovered that it was previously released." Colborn Decl. Ex. D, 11-

445, ECF No. 29-11. After releasing that one record, the OLC informed NSC that it continued to

---

[6] Because this opinion addresses the claims in three separate actions brought by the same plaintiff, for purposes of organizational clarity only, the Court will generally refer to each case by its civil case number, *e.g.*, "No. 11-443." Additionally, for the same reasons, the Court will refer to court filings in each case with a numerical prefix that corresponds to each civil case number. For example, the plaintiff's First Amended Complaint in No. 11–444, when cited in short form, will be referred to, for citation purposes only, as "444 FAC."

withhold fifty-eight records responsive to its request. *Id.* In Count Eight of No. 11-445, the plaintiff challenges the DOJ's determination to withhold sixteen of the responsive OLC opinions under FOIA Exemption 5. *See* First Am. Compl. ("445 FAC") ¶¶ 62–67, No. 11-445, ECF No. 7; Colborn Decl. Ex. F at 1, No. 11-445, ECF No. 29-11.

### 3. *Counts One, Five, and Six in No. 11-445: December 1, 2009 FOIA Requests to the CIA, DIA, and ODNI*

On December 1, 2009, the plaintiff submitted a FOIA request to the CIA for "all [CIA] records referencing FOIA and Privacy Act requests submitted by [ten listed parties] that contain remarks, comments, notes, explanations, etc. made by CIA personnel or contractors about the processing of these requests (and appeals, if appropriate), the invocations of exemptions, or related matters." *See* Decl. of Martha M. Lutz (Sept. 26, 2012) ("Third Lutz Decl.") Ex. A at 1, No. 11-445, ECF No. 52-1; *id.* Ex. B at 1, No. 11-445, ECF No. 52-1. On December 8, 2009, the plaintiff limited the scope of this request by notifying the CIA that it could "limit [its] search for requests submitted by Michael Ravnitzky to only requests submitted in 2006 and 2009" and that it could "limit [its] search to the last four years in which requests were received from [each] requester." *See* Third Lutz Decl. Ex. A. On September 22, 2010, the CIA produced seventy records to the plaintiff in part with redactions made pursuant to FOIA Exemptions 3 and/or 6, and the CIA also notified the plaintiff that the CIA was withholding seventy-four other responsive records in their entirety pursuant to FOIA Exemptions 1, 3, and/or 5. *See* Third Lutz Decl. Ex. B at 1. In Count One of No. 11-445, the plaintiff challenges all of the CIA's withholding determinations made under FOIA Exemptions 1, 3, and/or 5. *See* 445 FAC ¶¶ 10–17; Mem. in Supp. Defs.' Mot. Summ. J. on Counts 1, 2, 3, 5, 6, 7, 8, 9, 10, and 13 ("Defs.' First 445 Mem.") at 2, No. 11-445, ECF No. 29; Pl.'s Opp'n to Defs.' Mot. Summ. J. on Counts 1, 2, 3, 5, 6, 7, 8, 9, 10, and 13 ("Pl.'s First 445 Opp'n") at 23 n.19, No. 11-445, ECF No. 33.

Also on December 1, 2009, the plaintiff submitted FOIA requests to the Defense Intelligence Agency ("DIA") and the Office of the Director of National Intelligence ("ODNI") for substantially the same category of records sought in the December 1, 2009 FOIA request to the CIA. The only difference was that, instead of records containing processing notes from "CIA personnel or contractors," the request to the DIA sought processing notes from "DIA personnel or contractors" and the request to the ODNI sought processing notes from "NSA personnel or contractors." *See* Decl. of John F. Hackett (Oct. 1, 2012) ("Hackett Decl.") Ex. A at 1, No. 11-445, ECF No. 29-8; Decl. of Alesia Y. Williams (Oct. 1, 2012) ("First Williams Decl.") Ex. A at 1, No. 11-445, ECF No. 53-1. The plaintiff also narrowed its processing notes requests to the DIA and the ODNI on December 8, 2009 in the same manner it limited its processing notes request to the CIA. *See* Hackett Decl. Ex. B, No. 11-445, ECF No. 29-8; First Williams Decl. Ex. B, No. 11-445, ECF No. 53-1.

The ODNI produced responsive records to the plaintiff on May 27, 2010 and June 21, 2010, releasing a total of thirty-four pages, in part, with redactions made pursuant to FOIA Exemptions 2, 3, 5, and 6. *See* Hackett Decl. ¶¶ 11–12, No. 11-445, ECF No. 29-8. The DIA produced additional responsive records to the plaintiff in six separate releases from July 25, 2012 to September 28, 2012. *See* First Williams Decl. ¶¶ 8–13, No. 11-445, ECF No. 29-12. In total, the DIA released 86 records in full, released 215 records in part, and withheld 45 records in full, with withholdings made pursuant to FOIA Exemptions 3, 5, and/or 6. *See id.*; *see also* First Williams Decl. Exs. D–I, ECF No. 53-1. In Counts Five and Six of No. 11-445, the plaintiff challenges the DIA's and the ODNI's withholding determinations, respectively, made under

FOIA Exemptions 1, 2, 3, 5, and 6. *See* 445 FAC ¶¶ 38–54; Defs.' First 445 Mem. at 4–6; Pl.'s First 445 Opp'n at 6, 17–22, 24.[7]

### B. 2010 FOIA Requests

#### 1. *Counts Seven, Nine, and Ten in No. 11-445: February 6, 2010 FOIA Requests to the CIA, State Department, and NSA*

On February 6, 2010, the plaintiff submitted three substantially identical FOIA requests—one to the CIA, one to the State Department, and one to the National Security Agency ("NSA"). The request to the CIA sought "all current training handbooks, manuals, guidelines, checklists, worksheets, and similar documents provided to [CIA] FOIA and Privacy Act analysts (both agency employees and contractors)." *See* Third Lutz Decl. Ex. G at 1, No. 11-445, ECF No. 52-1. The plaintiff's requests to the State Department and the NSA were identical, except that they sought training materials provided to State Department and NSA FOIA and Privacy Act analysts, respectively. *See* Decl. of Sheryl L. Walter (Oct. 1, 2012) ("First Walter Decl.") Ex. 1, No. 11-445, ECF No. 29-10; Decl. of Pamela N. Phillips (Sept. 28, 2012) ("Phillips Decl.") Att. 1, No. 11-445, ECF No. 29-13. All three requests also limited the scope of the request to "documents in current use as of 6 February 2010." *See* Third Lutz Decl. Ex. G at 1; Walter Decl. Ex. 1, at 1; Phillips Decl. Ex. 1, at 1.

The first agency to issue a response to the plaintiff's requests was the CIA. On May 26, 2010, the CIA issued a final response to the plaintiff, in which it released two documents in full and withheld twenty-nine other responsive documents in full pursuant to FOIA Exemptions 1, 2, 3, and/or 5. *See* Third Lutz Decl. ¶ 11, No. 11-445, ECF No. 29-1. In Count Seven of No. 11-

---

[7] The DIA did not originally claim FOIA Exemption 1 in its release letters to the plaintiff, *see* Williams Decl. Exs. D–I, but the DIA does assert Exemption 1 in its *Vaughn* index, *see, e.g.*, Williams Decl. ¶ 19 ("[D]ocuments numbered V-274, V-276, and V-287 in the Vaughn index contain classified information . . . . and it is appropriately withheld under FOIA exemption (b)(1).").

445, the plaintiff challenges all of the CIA's withholding determinations under FOIA

Exemptions 1, 2, 3, and/or 5. *See* 445 FAC ¶¶ 55–61; Defs.' First 445 Mem. at 7.

The next agency to respond to the plaintiff's February 6, 2010 FOIA requests was the

NSA. On April 22, 2011, the NSA issued a final response to the plaintiff, in which it released, in

part, over 500 pages of responsive records, with redactions made pursuant to FOIA Exemptions

1, 3, 5, 6, and/or 7; the NSA also withheld one document in its entirety pursuant to FOIA

Exemption 5. *See* Phillips Decl. ¶ 7; Phillips Decl. Att. 3, No. 11-445, ECF No. 29-13. In Count

Ten of No. 11-445, the plaintiff challenges the adequacy of the NSA's search efforts in

responding to the February 6, 2010 FOIA request, and in particular the plaintiff challenges the

NSA's failure to locate templates that are responsive to the request. *See* 445 FAC ¶¶ 73–77;

Defs.' First 445 Mem. at 10.

The State Department was the final agency to respond to the plaintiff's February 6, 2010

FOIA requests. The State Department produced responsive records to the plaintiff in two initial

releases on October 20, 2011 and January 26, 2012. *See* First Walter Decl. ¶¶ 8–9. In these two

initial releases, the State Department produced a total of 103 records in whole or in part, with

redactions made to seven documents pursuant to FOIA Exemptions 3 and/or 6. *See* First Walter

Decl. Exs. 5–6, No. 11-445, ECF No. 29-10. By e-mail dated February 4, 2012, the plaintiff

requested that the State Department search for certain records referenced in a document

produced in the first two State Department releases. *See* First Walter Decl. Ex. 8, No. 11-445,

ECF No. 29-10. In response to this request, the State Department conducted further searching,

and on March 9, 2012 released sixteen responsive records to the plaintiff, in whole or in part.

*See* First Walter Decl. Ex. 9, No. 11-445, ECF No. 29-10. By letter dated September 26, 2012,

after "a further search," the State Department released one more responsive document to the plaintiff in full. *See* First Walter Decl. Ex. 10, No. 11-445, ECF No. 29-10.

These four productions, totaling the release, in whole or in part, of 120 records, however, were not the final correspondence from the State Department in response to the plaintiff's FOIA request. On March 1, 2013, the State Department's Bureau of Diplomatic Security responded to the plaintiff's February 6, 2010 FOIA request, releasing twenty-six responsive records which had not been previously released. *See* Notice of Recent Development Regarding Count 9, at 1, No. 11-445, ECF No. 49. According to the State Department, this was "an inadvertent release of records," which occurred because "at some point in the processing of Plaintiff's FOIA request, it was mistakenly sent to [the Bureau of Diplomatic Security]." *See* Third Decl. of Sheryl L. Walter (June 18, 2013) ("Third Walter Decl.") ¶ 3, No. 11-445, ECF No. 51-1. In Count Nine of No. 11-445, the plaintiff challenges three aspects of the State Department's response to its February 6, 2010 FOIA request: (1) the withholding of certain information from one responsive record pursuant to FOIA Exemption 3; (2) the adequacy of the State Department's search efforts; and (3) the failure of the State Department to release responsive records in an electronic format. *See* 445 FAC ¶¶ 68–72; Defs.' First 445 Mem. at 9.

### 2. Counts Two and Three in No. 11-445: February 9, 2010 FOIA Requests to the CIA

On February 4, 2010, the CIA informed the plaintiff that, with respect to his December 1, 2009 FOIA request for FOIA processing notes related to previous FOIA requests, the CIA could not retrieve FOIA requests by an organization's name, but only by a person's name. *See* Third Lutz Decl. Ex. C at 1, No. 11-445, ECF No. 52-1. In response, the plaintiff submitted a letter to the CIA on February 9, 2010, asking the CIA to search for records related to specific previous FOIA requests submitted by individuals associated with four organizations, including NSC and

the James Madison Project ("JMP"). *Id.* With respect to JMP, the plaintiff requested that the CIA search for records of processing notes related to twenty-seven specific FOIA requests submitted by Mark Zaid, Bradley Moss, and Kelly McClanahan. *Id.* Likewise, with respect to NSC, the plaintiff requested that the CIA search for records of processing notes related to seven specific FOIA requests submitted by Kelly McClanahan. *See* Third Lutz Decl. Ex. C at 1. The CIA considered these two new FOIA requests and assigned each of them a separate request identifier number. *See* Third Lutz Decl. ¶¶ 9–10.

On July 30, 2010, the CIA provided a final response to the plaintiff's request regarding previous FOIA requests submitted by Kelly McClanahan on behalf of NSC. *See* Third Lutz Decl. Ex. F, No. 11-445, ECF No. 52-1. The CIA released three responsive documents in full and thirty responsive documents in part, with redactions made pursuant to FOIA Exemptions 3, 5, and/or 6. Third Lutz Decl. ¶ 10. The CIA also withheld seventeen responsive documents in full pursuant to FOIA Exemptions 1, 3, 5, and/or 6. *Id.* In Count Three of No. 11-445, the plaintiff challenges the CIA's decision to withhold information responsive to this request pursuant to FOIA Exemptions 1, 3, and 5. *See* 445 FAC ¶¶ 25–31; Defs.' First 445 Mem. At 4; Pl.'s First 445 Opp'n at 23 n.19. On September 29, 2010, the CIA provided a final response to the plaintiff's request regarding previous FOIA requests submitted by Mark Zaid, Bradley Moss, and Kelly McClanahan on behalf of JMP. *See* Third Lutz Decl. Ex. D, No. 11-445, ECF No. 52-1. The CIA produced 14 responsive documents in full and 106 responsive documents in part, with redactions made pursuant to FOIA Exemptions 3, 5, and/or 6. Third Lutz Decl. ¶ 9. The CIA also withheld 215 responsive documents in full pursuant to FOIA Exemptions 1, 3, and/or 5. *Id.* In Count Two of No. 11-445, the plaintiff challenges the CIA's decision to withhold

information responsive to this request pursuant to FOIA Exemptions 1, 3, and 5. *See* 445 FAC

¶¶ 18–24; Defs.' First 445 Mem. At 3; Pl.'s First 445 Opp'n at 23 n.19.

### 3. *Count Seventeen in No. 11-444: May 4, 2010 FOIA Requests to the CIA*

By letter dated May 4, 2010, the plaintiff submitted a FOIA request to the CIA for two

categories of records: (1) "The 15 FOIA requests received by the [CIA] during Fiscal Year 2008

that were classified as 'full denials' because the 'Records were not Reasonably Described' in . . .

[the CIA's] 2008 Annual Report," and (2) "The 18 FOIA requests received by the CIA during

Fiscal Year 2006 that were classified as 'full denials' on the grounds of 'records not reasonably

described' in . . . [the CIA's] 2006 Annual Report." *See* First Lutz Decl. Ex. Y at 1, No. 11-444,

ECF No. 20-4. Also on May 4, 2010, the plaintiff submitted a second FOIA request to the CIA,

which sought three other categories of similar records: (1) "The 510 FOIA requests received by

the [CIA] during Fiscal Year 2009 that were classified as 'full denials' because they were

considered 'Improper FOIA Requests for Other Reasons' in . . . [the CIA's] 2009 Annual

Report," (2) "The 290 FOIA requests received by the CIA during Fiscal Year 2008 that were

classified as 'full denials' because they were considered 'Improper FOIA Requests for Other

Reasons' in . . . [the CIA's] 2008 Annual Report," and (3) "The 79 FOIA requests received by

the CIA during Fiscal Year 2006 that were classified as 'full denials' because they were

considered 'not proper FOIA requests for some other reason' in . . . [the CIA's] 2006 Annual

Report." First Lutz Decl. Ex. Z at 1, No. 11-444, ECF No. 20-4. For both of these requests, the

plaintiff specified that "[o]nly the initial request letters and the return CIA correspondence

stating that the requests do not reasonably describe the records sought should be considered

responsive to this request." First Lutz Decl. Exs. Y; *see id*. Ex. Z.

On August 7, 2010, the plaintiff's counsel sent a facsimile to the CIA stating "it would

probably be easier to just consolidate the two requests [submitted on May 4, 2010]" and "I would

not object if you chose to combine them and treat them as a single request." First Lutz Decl. Ex. AA, No. 11-444, ECF No. 20-4. Hence, on November 17, 2010, the CIA informed the plaintiff that the CIA was combining the two FOIA requests sent on May 4, 2010 into a single request. *See* First Lutz Decl. Ex. BB, No. 11-444, ECF No. 20-4. On August 31, 2011, the CIA provided a final response regarding this combined FOIA request, in which it released five responsive documents in full, released 1,010 responsive documents in part with redactions made pursuant to FOIA Exemptions 3, 5, and/or 6, and withheld three documents in full pursuant to FOIA Exemptions 3 and/or 6. *See* First Lutz Decl. Ex. CC at 2, No. 11-444, ECF No. 20-4; First Lutz Decl. ¶ 68.[8] After the plaintiff requested by e-mail to the DOJ that the CIA confirm the totality of its production, the CIA provided ten additional responsive documents in part with redactions made pursuant to FOIA Exemptions 3 and 6. *See* First Lutz Decl. ¶ 69. In Count Seventeen of No. 11-444, the plaintiff challenges the CIA's decision to withhold information responsive to this combined request pursuant to FOIA Exemptions 3 and 5. *See* 444 FAC ¶¶ 87–93; Def.'s First 444 Mem. at 8; Pl.'s Opp'n to Def.'s Mot. Summ. J. on Counts 1, 8, 9, 10, 17, 18, and 20 ("Pl.'s First 444 Opp'n") at 30–35, No. 11-444, ECF No. 26. In Count Seventeen, the plaintiff also challenges the failure of the CIA to release responsive records in an electronic format. *See* Pl.'s First 444 Opp'n at 39–40.

### 4. *Count Three in No. 11-443: May 12, 2010 FOIA Request to the CIA*

On May 12, 2010, the plaintiff submitted a FOIA request to the CIA, which sought "all Tables of Contents ('TOCs') from the [CIA] in-house journal *Studies in Intelligence*." *See* Decl. of Martha M. Lutz (Aug. 8, 2012) ("Second Lutz Decl.") Ex. A at 1, No. 11-443, ECF No. 27-1. Via telephone on June 4, 2010, the plaintiff clarified that it was requesting "all classified 'TOCs,'

---

[8] The CIA did not claim FOIA Exemption 5 in its August 31, 2011 final response, *see* First Lutz Decl. Ex. CC at 2, but the CIA is now claiming FOIA Exemption 5 in this litigation, *see* First Lutz Decl. ¶ 68.

and any unclassified 'TOCs,' that were not available on the CIA website." Second Lutz Decl.

Ex. B at 1, No. 11-443, ECF No. 27-1.  On December 5, 2011, the CIA provided a final response

to the plaintiff's May 12, 2010 FOIA request, releasing 43 responsive documents in full and 131

responsive documents in part, with redactions made pursuant to FOIA Exemptions 1 and/or 3.

*See* Second Lutz Decl. Ex. C at 1, No. 11-443, ECF No. 27-1.  By e-mail on December 30, 2011,

the plaintiff notified the CIA's counsel that it believed there were several records missing from

the CIA's production.  *See* Second Lutz Decl. ¶ 9, No. 11-443, ECF No. 27-1.  In response, the

CIA conducted a supplemental search and, by letters dated February 7, 2012 and February 14,

2012, the CIA released to the plaintiff twenty-nine additional responsive TOCs, in part, with

redactions made pursuant to FOIA Exemptions 1 and 3.  *See* Second Lutz Decl. ¶ 9; Second Lutz

Decl. Exs. D–E, No. 11-443, ECF No. 27-1.  In its February 7, 2012 communication, the CIA

also released to the plaintiff certain information that had been redacted from previously released

documents.  *See* Second Lutz Decl. Ex. D at 2.  In Count Three of No. 11-443, the plaintiff

challenges the CIA's withholding of information responsive to the May 12, 2010 FOIA request

under FOIA Exemptions 1 and 3.  *See* Compl. ("443 Compl.") ¶¶ 29–33, No. 11-443, ECF No.

1; Mem. in Supp. Def.'s Mot. Summ J. on Count Three ("Def.'s First 443 Mem.") at 1, ECF No.

27.[9]

### 5.    *Count Nine in No. 11-444:  May 13, 2010 FOIA Request to the CIA*

By letter dated May 13, 2010, the plaintiff submitted a FOIA request to the CIA, which

sought "a representative sample of [CIA] analytical reports and memoranda presenting

---

[9] The plaintiff also originally raised a challenge to the adequacy of the CIA's search in response to the FOIA request at issue in Count Three in No. 11-443.  *See* Pl.'s In Camera Opp'n to Def.'s Mot. Summ. J. on Count Three ("Pl.'s First 443 Opp'n") at 3–4, 20, No. 11-443, ECF No. 58.  Specifically, based on certain discrepancies between the produced articles and the articles present on the CIA's website, the plaintiff challenged the CIA's "refusal to search for the full Table of Contents for the June 2009 issue [of *Studies in Intelligence*] and the correct Table of Contents for the Summer 1973 issue."  *Id.* at 20.  In a subsequent filing, however, the plaintiff notified the Court that it "withdraws its challenge to the adequacy of [the CIA's] search" in No. 11-443.  *See* Notice of Clarification at 2, No. 11-443, ECF No. 60.

psychological analyses or profiles of foreign government officials, terrorist leaders, international criminals, business figures, and other intelligence targets prepared by the Medical and Psychological Analysis Center ('MPAC') or its predecessor Office of Leadership Analysis ('OLA')." First Lutz Decl. Ex. M, No. 11-444, ECF No. 20-3. In this letter, NSC provided "guidelines" to the CIA regarding "what we consider a 'representative sample,'" which included (1) "[o]nly final official reports or memoranda that discuss an MPAC/OLA analyst's conclusions about a target's psychology," (2) "[n]o more than twenty reports/memoranda for each year," (3) "[f]our reports/memoranda for each year (unless less were created that year) for individuals in each category of intelligence target," and (4) "[r]easonable variety in the intelligence targets wherever possible (e.g., foreign government officials should be from a variety of foreign governments, terrorist leaders should be from different terrorist organizations, etc.)." *Id.* at 1–2. As to the fourth guideline, NSC further stated that "[f]or the foreign government officials, we would also appreciate if possible a variety of the type of officials (e.g., some heads of state, some intelligence officials, some law enforcement officials, some financial officials, etc.)." *Id.* at 2. The plaintiff's letter also stated "[y]ou may limit your search to records created since 2000, but we do not have any particular intelligence targets in mind, since the purpose of this information is to analyze the style and methodology of the CIA's leadership analysts." *Id.* at 1.

The CIA provided a final response to the plaintiff's request on June 23, 2010, stating "[w]e cannot accept your FOIA request in its current form, because it would require the Agency to perform an unreasonably burdensome search." First Lutz Decl. Ex. N at 1, No. 11-444, ECF No. 20-3. Citing "the breadth and lack of specificity of [NSC's] request," the CIA informed the plaintiff that "[t]he FOIA does not provide a mechanism to perform research." *Id.* The CIA also "encourage[d] [NSC] to refine the scope of [its] request (such as including a narrower time frame

for, and more specific descriptions of, the information you seek) to enable [the CIA] to conduct a reasonable search for responsive information." *Id.* In Count Nine of No. 11-444, the plaintiff contends that the CIA improperly refused to process this May 13, 2010 FOIA request. *See* 444 FAC ¶¶ 46–50; Pl.'s First 444 Opp'n at 16–18.

### 6. *Count Eight in No. 11-444: July 5, 2010 FOIA Request to the CIA*

On July 5, 2010, the plaintiff submitted a FOIA request to the CIA for "a record that would indicate the ten individuals responsible for the most FOIA requests submitted (each) in Fiscal Years 2008, 2009, and 2010." *See* First Lutz Decl. Ex. K at 1, No. 11-444, ECF No. 20-2. "In other words," the plaintiff continued, "we seek a list, index, printout, or similar document from which we could determine which individual submitted the most FOIA requests each year, which individual submitted the second most FOIA requests each year, and so forth down to the tenth most prolific requester." *Id.* In addition to (1) an index of the ten most prolific FOIA requesters, the plaintiff also proposed to the CIA three alternative means by which to obtain the same information: (2) "[a]n index including all requesters for each year," (3) "FOIA request letters from the ten most prolific requesters for each year," or (4) "[a]ll FOIA request letters submitted to the CIA for each year." *Id.* at 1–2. On July 22, 2010, the CIA responded to this request, stating "[w]e . . . have determined that our record systems are not configured in a way that would allow us to perform a search reasonably calculated to lead to the responsive record without an unreasonable effort." First Lutz Decl. Ex. L at 1, No. 11-444, ECF No. 20-3. As a result, the CIA informed the plaintiff "we must decline to process this request." *Id.*

On February 29, 2012, however, "the CIA advised plaintiff that it reconsidered [the July 5, 2010 FOIA request]," and "advised that it could process plaintiff's fourth option, *i.e.*, all FOIA requests submitted to the Agency for each of the three requested years, in paper form." Decl. of Martha M. Lutz (Mar. 18, 2013) ("Seventh Lutz Decl.") ¶ 7, No. 11-444, ECF No. 43-1. The

CIA also "determined that NSC constituted an 'all other' requester for fee category purposes and stated that . . . plaintiff would be required to pay the duplication costs associated with processing the request, which were estimated to exceed $950." *Id.* In connection with these duplication costs, "[t]he Agency advised plaintiff that a commitment to pay fees and an advance payment of $250 were required '*prior* to the processing of [its] request.'" *Id.* (emphasis in original). Finally, the CIA's letter stated that "if the Agency did not received the fee commitment and advance payment within 45 days it would administratively close the request." *Id.* NSC never provided a fee commitment or an advance payment, and therefore the CIA closed the request. *Id.* In Count Eight of No. 11-444, the plaintiff challenges the CIA's refusal "to produce the record requested as 'option 2' in NSC's request," *i.e.*, "an index including all requesters for each year." *See* Pl.'s Opp'n to Def.'s Mot. Summ. J. on Counts Eight & Twenty-One ("Pl.'s Second 444 Opp'n") at 3-4, No. 11-444, ECF No. 46; *see also* 444 FAC ¶¶ 41–45.

### 7. *Count One in No. 11-444: August 8, 2010 FOIA Requests to the CIA*

By letters dated August 8, 2010, the plaintiff submitted four FOIA requests to the CIA, seeking "a database listing of all the FOIA requesters from FY 2008–present that [the CIA has] classified as" either "educational or scientific," "commercial," "all other," or "news media." *See* First Lutz Decl. Exs. A–D, No. 11-444, ECF No. 20-2. Each request sought a database listing as to each of the four fee requester categories. *See id.* By letters dated September 30, 2010, the CIA refused to process these requests, stating that "[t]he FOIA does not require federal agencies to create a record, collect information, conduct research, or analyze data." *See* First Lutz Decl. Exs. E–H, No. 11-444, ECF No. 20-2. By facsimile dated October 2, 2010, the plaintiff administratively appealed the CIA's refusal to process these four FOIA requests, contending "the CIA has already tacitly admitted that it possesses the ability to sort its FOIA database by requester category, as evidenced by the publication in its FOIA Electronic Reading Room of the

FY 2003 'commercial' requesters."  *See* First Lutz Decl. Ex. I at 1, No. 11-444, ECF No. 20-2.

The CIA responded on October 21, 2010, stating for each of the four FOIA requests that, "since

we did not provide you with appeal rights, we cannot accept your appeal."  First Lutz Decl. Ex.

J, No. 11-444, ECF No. 20-2.  In Count One of No. 11-444, the plaintiff challenges the CIA's

refusal to process its August 8, 2010 FOIA requests.  *See* 444 FAC ¶¶ 5–10; Pl.'s First 444

Opp'n at 10–14.

     **C.**     **2011 FOIA Requests**

          **1.**     ***Count Eighteen in No. 11-444: January 26, 2011 FOIA Request to the CIA***

By letter dated January 26, 2011, the plaintiff submitted a FOIA request to the CIA

seeking "a copy of all [CIA] records pertaining to the search tools and indices available to the

Office of Information Management Services ('IMS') for conducting searches of its own records

in response to FOIA requests."  See First Lutz Decl. Ex. Q at 1, No. 11-444, ECF No. 20-3.  The

plaintiff clarified later in this request that it was seeking "records that describe or discuss the

search tools and indices that the IMS (as a CIA component) can choose between when devising a

search strategy for IMS records."  *Id.*  The plaintiff further specified that the request was "limited

to only those search tools and indices that would be personally used by IMS personnel to search

IMS records systems."  *Id.*  Finally, the plaintiff specified two categories of records that would

be responsive to the request:  (1) "Records which describe the search tools and indices," and (2)

"The actual contents of the indices."  *Id.*  On May 26, 2011, the CIA provided a final response to

the plaintiff's request.  See First Lutz Decl. Ex. S, No. 11-444, ECF No. 20-3.  The CIA located

three documents responsive to the plaintiff's request, one of which it released in full, and two of

which it released in part, with redactions made pursuant to FOIA Exemption 3.  *See id.*  In Count

Eighteen of No. 11-444, the plaintiff challenges three aspects of the CIA's response to the

plaintiff's January 26, 2011 FOIA request: (1) the decision to withhold information under FOIA Exemption 3; (2) the adequacy of the CIA's search efforts; and (3) the failure of the CIA to release responsive records in an electronic format, as requested. *See* 444 FAC ¶¶ 94–98; Pl.'s First 444 Opp'n at 24–26, 35–40.

### 2. *Count Thirteen in No. 11-445: February 11, 2011 FOIA Request to the CIA*

On February 11, 2011, the plaintiff submitted a FOIA request to the CIA, which sought "all [CIA] records associated with the administrative processing of [two specific FOIA requests], which were referred to the CIA by the Federal Bureau of Investigation." *See* Third Lutz Decl. Ex. I at 1, No. 11-445, ECF No. 52-1. On October 7, 2011, the CIA provided a final response to this request, releasing two responsive records in part, with redactions made pursuant to FOIA Exemption 3, and withholding seven responsive records in full pursuant to FOIA Exemptions 3 and 5. *See* Third Lutz Decl. ¶ 12; Third Lutz Decl. Ex. J at 1, No. 11-445, ECF No. 52-1. In Count Thirteen of No. 11-445, the plaintiff challenges the CIA's decision to withhold responsive information pursuant to FOIA Exemptions 3 and 5. *See* 445 FAC ¶¶ 88–92; Defs.' First 445 Mem. at 10-11.

### 3. *Count Ten in No. 11-444: February 16, 2011 FOIA Request to the CIA*

Finally, by letter dated February 16, 2011, the plaintiff submitted a FOIA request to the CIA, seeking "a copy of all [CIA] records pertaining to the IBM supercomputer 'Watson.'" First Lutz Decl. Ex. O at 1, No. 11-444, ECF No. 20-3. On March 2, 2011, the CIA responded to the plaintiff that "[w]e cannot accept your FOIA request in its current form because it would require the Agency to perform an unreasonably burdensome search." *See* First Lutz Decl. Ex. P, No. 11-444, ECF No. 20-3. Citing "the breadth and lack of specificity of [the plaintiff's] request" and "the way in which [the CIA's] records systems are configured," the CIA concluded that "the

Agency cannot conduct a reasonable search for information responsive to your request." *Id.* The CIA "encourage[d] [the plaintiff] to refine the scope of [its] request (such as contracts, if they exist, which would explain records pertaining to 'Watson') to enable [the CIA] to conduct a reasonable search for responsive information." *Id.* In Count Ten of No. 11-444, the plaintiff challenges the CIA's refusal to process it February 16, 2011 FOIA request. *See* 444 FAC ¶¶ 51–55; Pl.'s First 444 Opp'n at 19–24.

### D. Facts Related to the Plaintiff's Motion for Sanctions

In December 2011, an unidentified third party provided the plaintiff's counsel with two CIA documents, which counsel concluded may contain classified information. *See* Pl.'s Mot. to Compel Production ("Pl.'s First Mot. to Compel") at 1, No. 11-443, ECF No. 26. Since the documents were ostensibly relevant to the plaintiff's claim in Count Three of No. 11-443, challenging the CIA's withholding of responsive information from tables of contents for the CIA's in-house journal *Studies in Intelligence*, *see supra* Part I.B.4, plaintiff's counsel contacted government counsel for the CIA, who referred plaintiff's counsel to the FBI. *See* Pl.'s First Mot. to Compel at 1. In January 2012, an FBI field agent met with plaintiff's counsel, at which time plaintiff's counsel signed a non-disclosure agreement as to any classified material contained in the two CIA documents and also turned over paper and electronic versions of the two records to the FBI. *See id.* at 2. In that meeting, plaintiff's counsel requested that the FBI return to him redacted versions of the two documents, with all classified information deleted. *Id.* In a later meeting held in June 2012, the FBI informed plaintiff's counsel that they would not be releasing redacted versions of the documents to him. *See id.* Since plaintiff's counsel wished to submit the non-classified portions of the two documents to the Court, the plaintiff filed a motion on August 3, 2012 to compel the CIA to "provid[e] [plaintiff's counsel] with redacted copies" of the two documents in question. *See id.* at 4. The CIA opposed the relief sought by the plaintiff,

contending that "[plaintiff's counsel's] alleged interactions with the FBI are well outside the scope of this action" since "[t]he FBI is not a party to this case" and "the FBI's interactions were with [plaintiff's counsel] in his individual capacity." Def.'s Opp'n to Pl.'s Mot. to Compel at 1–2, No. 11-443, ECF No. 28.

On August 15, 2012, the Court granted the plaintiff's motion to compel over the CIA's objection and directed the CIA to provide the plaintiff "a copy of each of the two CIA documents referenced in the plaintiff's motion, if possible, with all classified information redacted therefrom." *See* Minute Order dated Aug. 15, 2012, No. 11-443. On September 3, 2012, the plaintiff filed a motion, asking the Court "to compel CIA to comply with [the Court's] earlier Order." *See* Pl.'s Mot. to Compel Compliance with Court's 15 Aug. 2012 Order ("Pl.'s Second Mot. to Compel") at 2, No. 11-443, ECF No. 31. In that motion, the plaintiff stated that "[i]nstead of redacting only the classified information," the CIA "redacted all information it considered exempt under [FOIA] Exemptions (b)(1) and/or (b)(3)." *Id.* at 1–2. Therefore, the plaintiff asked the Court to order the CIA to produce "copies of these records with only the classified information redacted, as the Court ordered." *Id.* at 2. On September 21, 2012, the Court granted the plaintiff's motion in part and ordered the CIA to produce redacted versions of the two documents to the plaintiff, clearly indicating on each document which portions of the document were classified—and therefore redacted pursuant to FOIA Exemption 1—and which portions were redacted pursuant to FOIA Exemption 3. *See* Order dated Sept. 21, 2012. The Court did not order the CIA to release any information from these two documents that the CIA believed were protected from disclosure by the CIA Act or by Executive Order 13,525 as classified in the interest of national security.

The CIA produced redacted versions of the two documents as instructed, yet the parties continued to disagree about whether the CIA had complied with the Court's Order. *See* Joint Status Report at 1, No. 11-443, ECF No. 35. Specifically, the plaintiff complained, on September 3, 2012, that the CIA had marked certain information as being exempt under Exemption 3, which the CIA's *Vaughn* index had stated was classified, and vice-versa. *See id.* at 2–3. Plaintiff's counsel had notified the CIA's counsel of this inconsistency in an e-mail five days before the plaintiff brought the issue to the attention of the Court. *See* Pl.'s Reply to Opp. To Mot. To Compel Ex. D, No. 11-443, ECF No. 33-2 (Aug. 29, 2012 e-mail from plaintiff's counsel to CIA's counsel stating "I think you must have [the classified material and the CIA Act redactions] backwards"). The CIA, however, maintained that "[t]he documents the CIA produced in response to the Court's order reflect the current status of the information they contain." *See* Joint Status Report at 2. In light of the apparent discrepancy, the plaintiff once again asked for relief, seeking an order directing the CIA "to take whatever steps are necessary to make its redactions in these releases consistent with its previous presentations to the Court." *Id.* at 4.

To resolve this ongoing dispute, the Court held a status conference on October 12, 2012. At that status conference, plaintiff's counsel once again asserted that the CIA had gotten the two categories of redactions "backwards." *See* Tr. of Status Conference (Oct. 12, 2012) at 13:1–2, No. 11-443, ECF No. 69; *see also id.* at 16:9–12 ("[E]verything that is listed as classified in the documents is listed as unclassified [in the *Vaughn* index]. It looks like it was a simple administrative error."). The CIA's counsel, however, maintained once again that "we've clearly identified for [plaintiff's counsel] in our *Vaughn* index and in the two documents that we produced pursuant to the Court's order exactly what's classified and what's subject to the CIA

Act." *Id.* at 19:15–19. The Court asked the CIA's counsel in this regard: "Do you need to update your *Vaughn* index?" to which he replied "I need to check with my client agency, but I don't believe so." *Id.* at 26:18–21. The Court further stated, "[a]s officers of the court, if [the CIA's lawyers] find out that some information that's been presented is incorrect, they have an ongoing and continuing obligation to correct themselves." *Id.* at 26:1–4. Following the October 12, 2012 status conference, and based on CIA counsel's representations that the redactions were correctly designated, the Court entered a minute order stating that "the plaintiff is entitled to rely on the designations of information in the two . . . indices at issue, as provided by the defendant, regarding whether redacted information in those documents is either classified or subject to protection under the CIA Act." Minute Order dated Oct. 12, 2012, No. 11-443.

On October 22, 2012, the CIA submitted a notice to the Court, stating that "[i]n [the CIA's] earlier production, redactions were marked with either a '1' or '2,' which appears to have created some confusion as to whether the redacted information was withheld because it is classified, subject to the CIA Act, or both." *See* Notice at 1, No. 11-443, ECF No. 40. Thus, ostensibly "[i]n order to clarify the issue and provide Plaintiff's counsel with clear documents upon which he can rely . . . [the CIA] now produced copies of the two records with each redaction marked clearly as 'Classified' or 'CIA Act' protected." *Id.* The CIA stated that it was "hopeful the updated marking will resolve any lingering confusion." *Id.* at 1. In the versions of the two documents attached to the CIA's October 22, 2012 notice, however, the CIA had reversed its designations, as compared to its September 27, 2012 filing. *Compare* ECF Nos. 35-1, 35-2, *with* ECF Nos. 40-1, 40-2. The CIA's notice did now acknowledge that its previous representations had been in error but, just as plaintiff's counsel had warned two months earlier,

information that had earlier been marked as classified was now marked as withheld under the CIA Act, and vice-versa. *See id.*

As a result, the plaintiff filed a motion for sanctions against the CIA, contending that the CIA had "engaged in an extended campaign of misrepresentation to both [the plaintiff] and the Court regarding the nature of the information it redacted from the two documents at issue." *See* Pl.'s Mot. for Sanctions at 1, No. 11-443, ECF No. 50. The CIA opposed the motion and submitted, at the Court's direction, two sworn declarations explaining what had caused the CIA mistakenly for weeks to defend the accuracy of its designations. Specifically, the CIA's chief of its Litigation Support Unit, Martha Lutz, stated that the CIA's error "was the product of internal miscommunication rather than bad faith." *See* Decl. of Martha M. Lutz (Feb. 25, 2013) ("Sixth Lutz Decl.") ¶ 4, No. 11-443, ECF No. 61-1. Ms. Lutz explained that, when the CIA's information review officer ("IRO") reviewed the two documents in question, she used a notation system in which she wrote "(b)(3) methods" in the margins of the documents next to certain redacted information. *See id.* ¶ 7. These notations were intended to convey that the specified redactions were protected under the National Security Act as classified intelligence sources or methods—and thus also protected by FOIA Exemption 1 as classified information—but the CIA's counsel "interpreted this notation system to mean that redactions marked . . . as '(b)(3) methods' were those protected by FOIA Exemption (b)(3)" under the CIA Act. *See id.* ¶¶ 7–8. "Based on this misunderstanding, the CIA attorney incorrectly cited some of the justifications for redacting the material to the DOJ attorney, who in turn shared that information with plaintiff." *Id.* ¶ 9.

### E.    Procedural History

The plaintiff filed the Complaints in each of these three actions on February 28, 2011, and, shortly thereafter, filed a First Amended Complaint in Nos. 11-444 and 11-445 on March

21, 2011.  On May 20, May 27, and June 3, 2011, the CIA filed partial motions to dismiss in No.

11-443, 11-444, and 11-445, respectively.  These three motions, filed pursuant to Federal Rules

of Civil Procedure 12(b)(1) and 12(b)(6), collectively moved for dismissal of twenty-five of the

forty-five claims originally alleged by the plaintiff, and the motions became ripe on July 21,

2011.  While these three motions to dismiss were pending, the Court ruled on ten other, non-

dispositive motions, including motions to stay, to compel, and to bifurcate.

On October 17, 2012, in a lengthy opinion, the Court granted in part and denied in part

the CIA' three partial motions to dismiss.  *See NSC I*, 898 F. Supp. 2d 233.  Specifically, the

Court dismissed all but three of the plaintiff's twenty-four policy-or-practice claims—including

all of the plaintiff's claims under the Mandamus Act and the Administrative Procedure Act.  *See

id.* at 290.  In addition to denying the government's motion to dismiss with respect to three of the

plaintiff's policy-or-practice claims (the Assignment of Rights Policy, the Cut-Off Date Policy,

and Document-Level Exemption Policy), the Court also denied the government's motion to

dismiss with respect to Count One in No. 11-443, which challenged the CIA's refusal to process

a FOIA request that was assigned to the plaintiff by an organization called the James Madison

Project.  *See id.* at 290–91.

On March 21, 2013, this Court stayed all three actions until all dispositive motions were

fully briefed.  Between December 20, 2011 and May 17, 2013, a total of eight motions or cross-

motions for summary judgment were filed across these three related actions by all parties.  The

last of these motions became ripe on June 11, 2013.  Additionally, on November 21, 2012, the

plaintiff filed a motion for leave to file a second amended complaint in No. 11-445, and on

January 11, 2013, the plaintiff filed a motion for sanctions in No. 11-443.  Thus, currently

pending before the Court in these related actions are ten motions: eight motions or cross-motions

for summary judgment, one motion for leave to file a second amended complaint, and one motion for sanctions.  For the reasons discussed below, the Court grants in part and denies in part the defendants' six motions for summary judgment, grants the plaintiff's cross-motions for summary judgment, denies the plaintiff's motion for leave to file a second amended complaint, and denies the plaintiff's motion for sanctions.[10]

## II.    LEGAL STANDARDS

### A.    FOIA

Congress enacted the FOIA, 5 U.S.C. § 552, "'to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny.'"  *Am. Civil Liberties Union v. U.S. Dep't of Justice*, 655 F.3d 1, 5 (D.C. Cir. 2011) (quoting *Dep't of the Air Force v. Rose*, 425 U.S. 352, 361 (1976)).  The Supreme Court has explained that the FOIA is "a means for citizens to know 'what their Government is up to.'  This phrase should not be dismissed as a convenient formalism.  It defines a structural necessity in a real democracy."  *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 171–172 (2004) (citation and internal quotation marks omitted).  "The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed."  *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978).  As a result, the FOIA requires federal agencies to release all records responsive to a request for production.  *See* 5 U.S.C. § 552(a)(3)(A).  Federal courts are authorized under the FOIA "to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant."  *Id.* § 552(a)(4)(B).

---

[10] In support or opposition to these ten pending motions, the six agency defendants have collectively submitted a total of nineteen sworn declarations.  These include eleven declarations from the CIA (including eight separate declarations authored by Martha M. Lutz), three declarations from the State Department, two declarations from the DIA, and one declaration each from the DOJ, ODNI, and NSA.

This strong interest in transparency must be tempered, however, by the "legitimate governmental and private interests [that] could be harmed by release of certain types of information." *United Techs. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557, 559 (D.C. Cir. 2010) (internal quotation marks omitted); *see also Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 872 (D.C. Cir. 1992) (en banc). Accordingly, Congress included nine exemptions permitting agencies to withhold information from FOIA disclosure. *See* 5 U.S.C. § 552(b). "These exemptions are explicitly made exclusive, and must be narrowly construed." *Milner v. Dep't of the Navy*, 131 S. Ct. 1259, 1262 (2011) (citations and internal quotation marks omitted); *see also Pub. Citizen, Inc. v. Office of Mgmt. & Budget*, 598 F.3d 865, 869 (D.C. Cir. 2010) ("FOIA allows agencies to withhold only those documents that fall under one of nine specific exemptions, which are construed narrowly in keeping with FOIA's presumption in favor of disclosure." (citations omitted)). When a FOIA requester properly exhausts its administrative remedies, it may file a civil action challenging an agency's response to its request. *See* 5 U.S.C. § 552(a)(4)(B); *Wilbur v. CIA*, 355 F.3d 675, 677 (D.C. Cir. 2004). Once such an action is filed, the agency generally has the burden of demonstrating that its response to the plaintiff's FOIA request was appropriate.

When an agency's response to a FOIA request is to withhold responsive records, either in whole or in part, the agency "bears the burden of proving the applicability of claimed exemptions." *Am. Civil Liberties Union v. U.S. Dep't of Def.* ("*ACLU/DOD*"), 628 F.3d 612, 619 (D.C. Cir. 2011). "The government may satisfy its burden of establishing its right to withhold information from the public by submitting appropriate declarations and, where necessary, an index of the information withheld." *Am. Immigration Lawyers Ass'n v. U.S. Dep't of Homeland Sec.*, 852 F. Supp. 2d 66, 72 (D.D.C. 2012) (citing *Vaughn v. Rosen*, 484 F.2d 820,

827–28 (D.C. Cir. 1973)). "If an agency's affidavit describes the justifications for withholding the information with specific detail, demonstrates that the information withheld logically falls within the claimed exemption," and "is not contradicted by contrary evidence in the record or by evidence of the agency's bad faith, then summary judgment is warranted on the basis of the affidavit alone." *ACLU/DOD*, 628 F.3d at 619. "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical or 'plausible.'" *Id.* (internal quotation marks omitted) (quoting *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009)).

When a requester challenges an agency's response based on the adequacy of the search performed, "[t]o prevail on summary judgment . . . the defending 'agency must show beyond material doubt . . . that it has conducted a search reasonably calculated to uncover all relevant documents.'" *Morley v. CIA*, 508 F.3d 1108, 1114 (D.C. Cir. 2007) (quoting *Weisberg v. U.S. Dep't of Justice*, 705 F.2d 1344, 1351 (D.C. Cir. 1983)). "In order to obtain summary judgment the agency must show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990). "Summary judgment may be based on affidavit, if the declaration sets forth sufficiently detailed information 'for a court to determine if the search was adequate.'" *Students Against Genocide v. Dep't of State*, 257 F.3d 828, 838 (D.C. Cir. 2001) (quoting *Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995)).

Finally, the D.C. Circuit has recognized that, separate from claims seeking relief for specific requests made under the FOIA, requesting parties may also assert a "claim that an agency *policy or practice* will impair the party's lawful access to information in the future." *Payne Enters., Inc. v. United States*, 837 F.2d 486, 491 (D.C. Cir. 1988) (emphasis in original);

*accord Newport Aeronautical Sales v. Dep't of the Air Force*, 684 F.3d 160, 164 (D.C. Cir. 2012). The Court in *Payne* held that a policy-or-practice claim is viable "[s]o long as an agency's refusal to supply information evidences a policy or practice of delayed disclosure or some other failure to abide by the terms of the FOIA, and not merely isolated mistakes by agency officials." *Payne*, 837 F.2d at 491.

### B.    Summary Judgment

"'FOIA cases typically and appropriately are decided on motions for summary judgment.'" *Georgacarakos v. FBI*, 908 F. Supp. 2d 176, 180 (D.D.C. 2012) (quoting *Defenders of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009)). With respect to the applicability of exemptions and the adequacy of an agency's search efforts, summary judgment may be based solely on information provided in the agency's supporting declarations. *See, e.g.*, *ACLU/DOD*, 628 F.3d at 619; *Students Against Genocide*, 257 F.3d at 838. With respect to policy-or-practice claims, the moving party must establish "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is properly granted against a party who, "after adequate time for discovery and upon motion, . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The burden is on the moving party to demonstrate that there is an "absence of a genuine issue of material fact" in dispute. *Id.* at 323.

In ruling on a motion for summary judgment, the Court must draw all justifiable inferences in favor of the nonmoving party and shall accept the nonmoving party's evidence as true. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court is only required to consider the materials explicitly cited by the parties, but may on its own accord consider "other materials in the record." Fed. R. Civ. P. 56(c)(3). For a factual dispute to be "genuine," the

nonmoving party must establish more than "[t]he mere existence of a scintilla of evidence in support of [its] position," *Liberty Lobby*, 477 U.S. at 252, and cannot rely on "mere allegations" or conclusory statements, *see Veitch v. England*, 471 F.3d 124, 134 (D.C. Cir. 2006); *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999); *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993); *accord* FED. R. CIV. P. 56(e). Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *See, e.g.*, FED. R. CIV. P. 56(c)(1). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249–50 (citations omitted).

### C.    Leave to File Amended Complaint

Federal Rule of Civil Procedure 15 provides that, if more than twenty-one days have passed since the filing of an original complaint, "a party may amend its [complaint] only with the opposing party's written consent or the court's leave." FED. R. CIV. P. 15(a)(2). "The court should freely give leave when justice so requires." *Id.* The D.C. Circuit has held that "it is an abuse of discretion to deny leave to amend unless there is sufficient reason, such as 'undue delay, bad faith or dilatory motive[,] repeated failure to cure deficiencies by [previous] amendments[,] or futility of amendment." *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996) (internal quotation marks omitted). In this regard, "[c]ourts will properly deny a motion to amend when it appears that the plaintiff is using Rule 15 to make the complaint a moving target, to salvage a lost case by untimely suggestion of new theories of recovery, [or] to present theories seriatim in an effort to avoid dismissal." *Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1206 (10th Cir. 2006) (citations and internal quotation marks omitted). When a plaintiff seeks leave to amend its complaint in "an attempt to evade the effect of [the Court's] Memorandum Opinion and Order dismissing the plaintiff's claims against the moving defendants, the request will be denied." *See Kurtz v. United States*, No. 10-1270, 2011 WL 2457923, at *1 n.1 (D.D.C. June 20, 2011) (citing

*Brown v. FBI*, 744 F. Supp. 2d 120, 123 (D.D.C. 2010)); *see also Becker v. District of Columbia*, 258 F.R.D. 182, 185 (D.D.C. 2009) ("Waiting to move to amend until after the close of discovery and after the filing of or ruling upon dispositive motions has been considered an undue delay.").

## III.    DISCUSSION

A wide variety of issues have been presented to the Court in the ten motions currently pending.  The Court will begin by explaining why it denies the plaintiff's motion for leave to file a second amended complaint in No. 11-445.  The Court will then discuss the plaintiff's Motion for Sanctions, filed in No. 11-443.  Third, the Court will address the plaintiff's two remaining policy-or-practice claims, which challenge the CIA's Assignment of Rights Policy and Document-Level Exemption Policy.  Fourth, the Court will discuss the plaintiff's claims relating to the adequacy of the CIA's, the State Department's, and the NSA's search efforts in response to specific FOIA requests.  Fifth, the Court will discuss the plaintiff's claims regarding the CIA's refusal to process certain FOIA requests.  Sixth, the Court will discuss the plaintiff's claims regarding the defendants' decisions to withhold certain information pursuant to FOIA Exemptions 1, 2, 3, 5, and 6.  Seventh, the Court will discuss the plaintiff's claim that the State Department and the CIA should have provided it with electronic versions of responsive records.  Finally, the Court will determine whether the defendants have satisfied their burden to produce all non-exempt, reasonably segregable material to the plaintiff.

### A.    <u>Motion for Leave to Amend</u>

In its motion for leave to file an amended complaint, the plaintiff seeks to make two modifications to its First Amended Complaint in No. 11-445 "to correct deficiencies identified by the Court in its 17 October 2012 Memorandum Opinion."  *See* Pl.'s Mot. for Leave to File a Second Am. Compl. ("Pl.'s Amendment Mem.") at 3, No. 11-445, ECF No. 36.  First, as to

Count Fifteen—which challenged the CIA's alleged policy of refusing to provide estimated dates of completion for FOIA requests (the "Non-Provision of Completion Date Policy")—the Court dismissed that claim for lack of standing because the plaintiff had not alleged that it had been subject to the policy in question. *See NSC I*, 898 F. Supp. 2d at 263. The plaintiff now seeks to amend its complaint by adding allegations that it has *become* subject to that alleged policy, by virtue of FOIA requests submitted *after* the Court issued its October 17, 2012 opinion. *See* Pl.'s Amendment Mem. at 3; *see also* Proposed Second Am. Compl. ¶ 106, No. 11-445, ECF No. 36-1 (alleging refusals to provide estimated dates of completion on October 18, October 24, and November 3, 2012).

The Court concludes that this proposed amended must be denied for undue delay. *See, e.g.*, *Firestone*, 76 F.3d at 1208. As alleged in the plaintiff's First Amended Complaint, the plaintiff first became aware of the alleged Non-Provision of Completion Date Policy in November 2010—approximately three months before filing the original complaint in No. 11-445, and approximately four months before filing the First Amended Complaint in No. 11-445. *See* 445 FAC ¶ 102. Further, the defendants specifically challenged the plaintiff's standing to bring this claim in its motion to dismiss, filed on June 3, 2011. *See* Mem. in Supp. Defs.' Partial Mot. to Dismiss at 6–9, No. 11-445, ECF No. 10-1. Thus, the plaintiff not only had ample opportunity to allege that it had been subject to the alleged policy when it filed its first two complaints in No. 11-445, it also had *over sixteen months* to seek an amendment to its complaint after the CIA raised the standing issue in its motion to dismiss. The plaintiff chose not to do so, waiting until five weeks after the Court ruled on the motion to dismiss to seek such an amendment. This, in the Court's view, constitutes undue delay.

With respect to Count Eighteen in No. 11-445—which challenges the CIA's alleged policy of refusing to identify responsive records withheld in their entirety at the administrative stage (the "Withheld Document Non-Identification Policy")—the Court dismissed that claim in its October 17, 2012 opinion for failure to state a claim. *See NSC I*, 898 F. Supp. 2d at 285. In so ruling, the Court simply concluded that, during administrative processing, the FOIA "does not require agencies to provide a list of withheld documents, but only to make a reasonable effort to estimate the volume of the documents withheld.'" *Id.* (quoting *Mobley v. Dep't of Justice*, 845 F. Supp. 2d 120, 124 (D.D.C. 2012)). The plaintiff now asks to "rewrite[e] Count 18 to allege a policy, pattern, or practice of refusing to provide estimates of the volume of records withheld in full." *See* Pl.'s Amendment Mem. at 3–4. This is an entirely different claim than the one alleged in the First Amended Complaint, and once again, the plaintiff's belated attempt to reshape the nature of its claims constitutes an undue delay. The plaintiff clearly "is using Rule 15 to make the complaint a moving target, to salvage a lost case by untimely suggestion of new theories of recovery." *See Minter*, 451 F.3d at 1206. This is a naked "attempt to evade the effect of [the Court's] Memorandum Opinion and Order dismissing the plaintiff's claim[]," and therefore "the request will be denied." *See Kurtz*, 2011 WL 2457923, at *1 n.1.

In sum, the plaintiff's motion to amend its complaint "to correct deficiencies identified by the Court in its 17 October 2012 Memorandum Opinion," *see* Pl.'s Amendment Mem. at 3, is not a proper use of Rule 15. The defects in Counts Fifteen and Eighteen in No. 11-445 were identified by the CIA in moving to dismiss those claims, yet the plaintiff did not seek an amendment upon being alerted to these defects. Instead, the plaintiff waited until after the Court granted the defendants' motion regarding these claims.[11] The plaintiff does not claim that it

---

[11] The plaintiff stated in its reply brief that it would "not address the meritless allegation that it should have immediately conceded and amended its complaint the moment Defendants opposed it . . . especially in light of the

would have been incapable of seeking amendment to its complaint much earlier,[12] and if amendment were permitted now, the CIA would be prejudiced by having to file yet another responsive motion regarding the newly reshaped claims—nearly a year after the Court already granted its prior motion to dismiss in relevant part. Therefore, the Court denies the plaintiff's motion for leave to file a second amended complaint in No. 11-445.

## B.   Motion for Sanctions

In its motion for sanctions in No. 11-443, the plaintiff contends that the CIA "engaged in an extended campaign of misrepresentation . . . regarding the nature of the information it redacted from the two documents at issue." *See* Pl.'s Mot. Sanctions ("Pl.'s Sanctions Mem.") at 1, No. 11-443, ECF No. 50. The plaintiff relies on three bases in moving for sanctions: (1) 28 U.S.C. § 1927, (2) Federal Rule of Civil Procedure 11, and (3) the inherent power of the Court.

---

minor technicalities which resulted in the Court's granting Defendants' Motion to Dismiss with respect to the two counts in question." Pl.'s Reply in Supp. Mot. for Leave to File Second Am. Compl. at 3 n.2, No. 11-445, ECF No. 40. The argument referenced by the plaintiff is not "meritless," however. When faced with a motion to dismiss, a plaintiff is faced with a choice—oppose the motion on the merits or amend the complaint to address the deficiencies raised in the motion. When a plaintiff elects to oppose a motion to dismiss on the merits, the plaintiff assumes the risk that the court will grant the motion and the plaintiff's claims will be dismissed. A plaintiff is not entitled simply to have its proverbial cake and eat it too by first opposing a motion to dismiss on the merits (thereby forcing the court to resolve the motion to dismiss), and then, upon losing the motion, amend its complaint to correct the very deficiencies it refused to acknowledge previously. *See, e.g.*, 6 CHARLES ALAN WRIGHT, ET AL FEDERAL PRACTICE & PROCEDURE § 1488 (3d ed. 2013) (observing that "a motion to amend should be made as soon as the necessity for altering the pleading becomes apparent" and "[a] party who delays in seeking an amendment is acting contrary to the spirit of the rule and runs the risk of the court denying permission because of the passage of time").

[12] The plaintiff attempts to sidestep the "undue delay issue" by focusing on the five weeks that passed between the filing of the Court's opinion and the filing of the motion to amend. *See* Pl.'s Amendment Mem. at 4; Pl.'s Reply in Supp. Mot. for Leave to File Second Am. Compl. at 3, No. 11-445, ECF No. 40. The relevant time period for undue delay, however, is the time that passed between the filing of the defendant's motion to dismiss and the filing of the plaintiff's motion for leave to amend. If the plaintiff "needed to make several requests for estimated dates of completion . . . and give CIA a reasonable time to respond before it could sufficiently allege to the Court's satisfaction that it was still being affected by CIA's practice," *see* Pl.'s Amendment Mem. at 4, then the time to submit those requests was either before filing the First Amended Complaint or, at the very least, in the sixteen months between the defendant's motion to dismiss and the Court's October 17, 2012 opinion. In any event, the plaintiff continues to misunderstand the deficiency in its allegations. The problem is not, as the plaintiff states, that it did not "allege to the Court's satisfaction that it was *still being affected* by CIA's practice." *Id.* (emphasis added). The problem, as the Court stated in its October 17, 2012 opinion, is that the plaintiff had not alleged that it was *ever* subject to the policy in question. *See NSC I*, 898 F. Supp. 2d at 263. *That* allegation could easily have been added to the plaintiff's Complaint before or after the defendant's motion to dismiss was filed, but it never was. The plaintiff, it should also be noted, does not address the undue delay issue with respect to Count Eighteen at all.

*See id.* at 6–7.  Regardless of the source of the sanctions, the plaintiff contends that "the evidence is clear that CIA's counsel intentionally, unreasonably, vexatiously, and in bad faith misrepresented the nature of the withheld information in the two Indices for two months, bringing the orderly progression of the case to a screeching halt." *Id.* at 8.  In this regard, the plaintiff clarifies that it "is not maintaining that CIA's opposition to the initial Motion to Compel was sanctionable conduct, nor is [it] saying that the making of the mistake in the first place was sanctionable conduct." *Id.*  Rather, according to the plaintiff, "[i]t was not until CIA refused to acknowledge the mistake, forced the extensive subsequent arguments, and repeatedly represented to the Court that its assessment was correct and the undersigned was wrong that the actions of its counsel became worthy of sanction." *Id.*

To impose sanctions under the Court's inherent power, "it is settled that a finding of bad faith is required." *United States v. Wallace*, 964 F.2d 1214, 1219 (D.C. Cir. 1992).  With respect to 28 U.S.C. § 1927, which permits a court to impose sanctions against an attorney "who so multiplies the proceedings in any case unreasonably and vexatiously," the D.C. Circuit "has not established whether the standard [for unreasonable and vexatious conduct] should be recklessness or the more stringent bad faith." *See LaPrade v. Kidder Peabody & Co.*, 146 F.3d 899, 905 (D.C. Cir. 1998).  Finally, Rule 11 requires that when an attorney "present[s] to the court a pleading, written motion, or other paper," such a representation may not be "presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation." FED. R. CIV. P. 11(b).  Rule 11 "imposes on any party who signs a pleading, motion, or other paper . . . an affirmative duty to conduct a reasonable inquiry into the facts and the law before filing, and the applicable standard is one of reasonableness under the

circumstances." *Bus. Guides, Inc. v. Chromatic Commc'ns Enterprises, Inc.*, 498 U.S. 533, 551 (1991).

Based on the CIA's submissions, the Court is satisfied that sanctions are not warranted in this case. In particular, the CIA's explanation of the circumstances that led to the inaccurate representations by CIA's counsel establishes that no sanctionable conduct occurred. Of particular importance is the revelation in the CIA's declaration that the CIA's information review officer ("IRO") used a confusing and easily misunderstood notation system when classifying the redactions made to the two documents in question. *See* Sixth Lutz Decl. ¶¶ 6–8. It was objectively reasonable for the CIA's counsel to rely on the IRO's statements, though unfortunately that reliance turned out to be misplaced. Although the plaintiff is correct to assert that the CIA's inaccurate representations "br[ought] the orderly progression of the case to a screeching halt," Pl.'s Sanctions Mem. at 8, the conduct on the part of the CIA's counsel was not sanctionable because it appears to have been premised on a reasonable, good-faith belief that the representations were correct at the time. The CIA is admonished to engage in clearer internal communication before making representations to the Court about the agency's positions in the future, but in this particular instance the Court denies the plaintiff's Motion for Sanctions.

## C. <u>Policies or Practices</u>

The Court next turns to the plaintiff's remaining policy-or-practice claims. Although both of these claims were summarized in the Court's previous opinion, *see NSC I*, 898 F. Supp. 2d at 243–44, 248–49, the Court will briefly summarize those claims here to aid the clarity of the Court's analysis.

### 1. *Assignment of Rights Policy*

In Count Two of No. 11-443, the plaintiff complains that the CIA has a policy of refusing to recognize the assignment of rights related to FOIA requests (the "Assignment of Rights

Policy"). *See* 443 Compl. ¶¶ 18–28. This policy-or-practice claim is closely connected to Count

One of No. 11-443, in which the plaintiff alleges that the CIA refused to permit NSC to

participate in the administrative appeal proceedings related to a FOIA request that had been

assigned to NSC by an organization called the James Madison Project ("JMP").[13] *See id.* ¶¶ 5–

17. The CIA openly admits that it has a policy of not recognizing the assignment of FOIA

requests, *see* Mem. in Supp. Def.'s Mot. Summ. J. on Counts One & Two ("Def.'s Second 443

Mem.") at 2, No. 11-443, ECF No. 54 ("The CIA has adopted a categorical policy against

recognizing the assignment of FOIA claims . . . ."), and the plaintiff contends that such a policy

violates the FOIA, *see* Pl.'s Mem. in Opp'n to Def.'s Mot. Summ. J. on Counts One & Two & in

Supp. Pl.'s Cross-Mot. Partial Summ. J. on Counts One & Two ("Pl.'s 443 Cross-Mot. Mem.")

at 6–7, No. 11-443, ECF No. 57.

The question presented by the Assignment of Rights Policy is as follows: Is it a violation

of the FOIA for an agency to refuse to recognize a valid assignment of the rights attached to a

FOIA request? The CIA says that a policy of not recognizing assignments does not violate the

FOIA, relying on the conclusory assertion that "[a]gencies are not required by the FOIA to

recognize the assignment of FOIA requests." Def.'s Second 443 Mem. at 5. The CIA elaborates

its interpretation of the statute by pointing to several provisions of the FOIA "that require

agencies to make determinations based on the identity of the FOIA requester," such as the fee-

waiver provision, *see* 5 U.S.C. § 552(a)(4)(A)(ii), the expedited processing provision, *see id.*

§ 552(a)(6)(E)(i)(I), and Exemptions 6 and 7(C), *see id.* § 552(b)(6), 552(b)(7)(C). *See* Def.'s

Second 443 Mem. at 5–6. The CIA contends that such "requester-specific provisions . . . would

---

[13] Indeed, the only argument offered by the CIA in support of summary judgment on Count One in No. 11-443 is that "the FOIA does not require agencies to recognize the assignment of FOIA requests." *See* Mem. in Supp. Def.'s Mot. Summ. J. on Counts One & Two ("Def.'s Second 443 Mem.") at 12, No. 11-443, ECF No. 54. Therefore, the merits of Count One rise or fall with the merits of the policy challenged in Count Two.

be frustrated if agencies were required to recognize the assignment of FOIA requests." *Id.* at 6–7. Finally, the CIA contends—as a policy matter—that requiring it to recognize assignments of FOIA requests would impose an "undue burden," and would not result in any added benefit to requesters. *See id.* at 8–12. In particular, the CIA contends that refusing to recognize assignments "does not prejudice parties . . . that claim to have been assigned FOIA claims" because "'[r]equests for previously requested records are processed on an accelerated basis'" and therefore "[b]y filing new requests, professional requesters can receive the records they seek at the same time they would if they were assigned the original requests." *Id.* at 11–12.

The plaintiff responds by focusing on the factual underpinnings of the CIA's policy arguments—in particular the CIA's contentions about "undue burden." *See* Pl.'s 443 Cross-Mot. Mem. at 2–7. For example, the plaintiff points out that the CIA waives FOIA fees "'as an act of administrative discretion' . . . in the overwhelming majority of requests," which the plaintiff says "further exemplifies the lack of any fee-related burden that assignments could possibly impose." *Id.* at 3–4. The plaintiff also quibbles that the CIA has "consistently classified JMP as an 'all other' requester," and that the CIA's classification of JMP as a "representative of the news media" with regard to the one FOIA requests assigned to the plaintiff was an "anomaly." *Id.* at 4.[14] As a final example, the plaintiff argues that the CIA's policy of "'piggybacking' a later request on an earlier request . . . has no bearing on whether recognizing assignments would impose an undue burden." *Id.* at 6. Indeed, the plaintiff argues that such a "piggybacking" policy "puts the lie to all of [the CIA's] arguments regarding why assignments should not be recognized," since a piggy-backed request "free-rides" off the earlier request in the same way an assignee would arguably "free-ride" off an assigned request. *See id.* at 6.

---

[14] Although JMP assigned five FOIA requests to the plaintiff, *see* Fifth Lutz Decl. Ex. A, No. 11-443, ECF No. 54-1, the plaintiff only challenges the CIA's refusal to process one of those requests (F-2008-01105) in Count One of No. 11-443, *see* 443 Compl. ¶¶ 5–7.

At the outset, both an argument posited by the plaintiff and another argument by the CIA warrant discussion. First, the plaintiff is under the misimpression that the Court already decided the merits of the claim regarding the Assignment of Rights Policy, and in making that assumption the plaintiff mistakenly claims victory in its cross-motion for summary judgment. *See* Pl.'s 443 Cross-Mot. Mem. at 2 ("[T]he Court made it very clear that it was resolving [that the CIA's policy violate the FOIA] on the merits in NSC's favor."). To the contrary, the Court did not decide the merits of this claim in its prior decision. Rather, in ruling on the CIA's motion to dismiss Counts One and Two in No. 11-443, the Court simply made two holdings: (1) the plaintiff has standing to bring both claims; and (2) in both claims, the plaintiff stated claims upon which relief may be granted. *See NSC I*, 898 F. Supp. 2d at 259. The Court made no determination at that time about whether the plaintiff was entitled to any relief, and such a determination would have been unwarranted since the plaintiff had not yet sought judgment on its claim through an appropriate motion.

Second, in support of summary judgment on the Assignment of Rights Policy, the CIA contends that "NSC's purported assignments . . . underscore the reasonableness of the CIA's decision not to recognize the assignment of FOIA requests." Def.'s Second 443 Mem. at 13. In this vein, the CIA attempts to argue that NSC and JMP have "dissimilar objectives" because JMP "'holds itself out as a non-profit organization under the laws of the District of Columbia,'" while NSC "'is a for-profit entity located in the Commonwealth of Virginia." *Id.* (quoting Fifth Lutz Decl. ¶ 14). By making this argument, perhaps swept up in litigation fervor, the CIA is bending the record in this case in a highly misleading way. The Court has previously discussed "the common bonds connecting JMP and NSC," and how their identity of interests "establishes that their relationship 'is such that [NSC] would protect [JMP's] interests if their interests diverge.'"

*NSC I*, 898 F. Supp. 2d at 257-58 (alteration in original) (quoting *Feinman v. FBI*, 680 F. Supp. 2d 169, 175 (D.D.C. 2010)).  The Court also observed in the first sentence of the Background section of its opinion that "[t]he plaintiff in these related actions is a not-for-profit organization." *Id.* at 242.  The CIA appears to conclude that NSC is a for-profit entity based on the fact that "its website appears to solicit paying customers."  Def.'s Reply in Supp. Mot. Summ. J. on Counts One & Two ("Def.'s Second 443 Reply") at 7 n.2, No. 11-443, ECF No. 64.  The mere earning of income, however, is not at all an indication that an entity is organized for profit.  Even non-profit organizations must pay their bills.  The government, of all entities, should know that the difference between a for-profit corporation and a non-profit organization is not whether the entity earns income (or even whether it earns income at a profit).  Rather, "[i]n contrast to a for-profit corporation, a non-profit organization must utilize its earnings to finance the continued provision of the goods or services it furnishes, and may not distribute any surplus to the owners." *Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 344 (1987) (Brennan, J., concurring).  The CIA's shameless twisting of the factual record in this case to portray their assignment of rights position in a better light falls short of the level of representation that this Court expects of a United States government agency.  The CIA should know better than to make such an obviously unfounded argument, particularly in light of the many allegations of bad faith that have been leveled by the plaintiff in these cases, including allegations that prompted a nonfrivolous motion for sanctions.  *See supra* Part III.B; *infra* Parts III.F, III.H.1.

With these preliminary matters put to rest, the Court will now turn to answering the legal question raised by the CIA's Assignment of Rights Policy.  To answer that question, the Court must look to the FOIA itself.  The Court is mindful that the D.C. Circuit has expressly held that a

policy-or-practice claim under the FOIA may only survive "[s]o long as an agency's refusal to supply information evidences a policy or practice of *delayed disclosure* or some *other failure to abide by the terms of the FOIA*, and not merely isolated mistakes by agency officials." *Payne*, 837 F.2d at 491 (emphasis added); *accord* 5 U.S.C. § 552(4)(B) (conferring to federal district courts "jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant"). Accordingly, under *Payne*, the Court must determine, based on the undisputed facts, whether the CIA's refusal to recognize assignments of the rights attached to FOIA requests (1) results in "delayed disclosure" of information; or (2) reflects a "failure to abide by the terms of the FOIA." *See Payne*, 837 F.2d at 491.

a)    *The Plaintiff Has Standing to Challenge the Assignment of Rights Policy.*

Before addressing the merits, however, the Court must briefly address a renewed standing argument put forth by the CIA with respect to Counts One and Two in No. 11-443. The CIA argues "[b]ecause NSC could file new, duplicate FOIA requests and receive the requested records at the same time it would if the CIA recognized assignments, NSC cannot show that it is harmed by the CIA's assignment policy and, therefore, does not have standing to bring Counts One and Two." *See* Def.'s Second 443 Reply at 9–10. The CIA recognizes that "the Court did not accept the CIA's standing arguments at the motion to dismiss stage," but it nevertheless "respectfully requests that the Court reexamine the issue." *Id.* at 10 n.3. The plaintiff's response to the CIA's renewed standing argument is that such an argument "is . . . staggeringly improper," and therefore the plaintiff has elected to "not even address it." *See* Pl.'s Corrected Reply in Supp. Cross-Mot. Partial Summ. J. on Counts One & Two ("Pl.'s 443 Reply") at 3 n.1, No. 11-443, ECF No. 66-1. The plaintiff also vaguely states that it is aware of and "can provide several

examples of cases in which" the CIA has not piggy-backed duplicate FOIA requests, which presumably would demonstrate a delayed disclosure of information.  *See id.*

Despite the plaintiff's refusal to address the issue, and even assuming that the CIA's purported policy of piggy-backing duplicate FOIA requests eliminates any delay in the processing of duplicate FOIA requests as compared with assigned FOIA requests, the absence of delay would not deprive the plaintiff of standing to challenge the CIA's Assignment of Rights Policy.  The CIA narrowly frames the plaintiff's injury as a delay in receiving information under the FOIA, *see* Def.'s Second 443 Reply at 9–10, but the Court has already held that the plaintiff's injury is something different in kind:  the inability to exercise the statutory rights validly assigned to it by JMP, *see NSC I*, 898 F. Supp. 2d at 259.  Although the Court previously addressed this issue in the context of statutory, rather than constitutional, standing to sue in its previous opinion, *see id.* at 254 ("[T]he CIA's argument presents a question of statutory, rather than Article III standing."), the Court's previous analysis also establishes that a legally protected interest of the plaintiff has been harmed.  *See, e.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  The logic of this conclusion is simple: (1) the plaintiff's assignment is valid and enforceable, *see NSC I*, 898 F. Supp. 2d at 259; (2) the CIA will not permit the plaintiff to enforce the assignment, *see* Def.'s Second 443 Mem. at 2; and thus (3) the CIA is harming the plaintiff's legally protected interest.  There is also no question that the relevant injury— interference with the plaintiff's legally protected interest in exercising statutory rights validly assigned to it—was caused by the CIA's policy and would be redressed by a judgment invalidating that policy.  *See, e.g.*, *Lujan*, 504 U.S. at 560–61.  Thus, the CIA's standing argument is unavailing now, just as it was unavailing in its motion to dismiss.

b)        *The CIA's Assignment of Rights Policy Violates the FOIA.*

As to the merits, the Court concludes that the categorical Assignment of Rights Policy constitutes a "failure to abide by the terms of the FOIA."  *See Payne*, 837 F.2d at 491.  This conclusion follows ineluctably from the Court's previous holding that "the plaintiff's Assignment is valid and enforceable."  *See NSC I*, 898 F. Supp. 2d at 259.  The Supreme Court has observed that "[a]ssignees of a claim . . . have long been permitted to bring suit."  *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 275 (2008).  Indeed, "[a] statutory right of action is generally assignable, except where it is conferred on one of a particular class, in the nature of a personal privilege, or penalty available to him or her alone."  6A C.J.S. ASSIGNMENTS § 49 (2013).  "[T]he general rules concerning assignability control in determining whether [a statutory right of action] is assignable," *id.* (footnote omitted), and "[t]he traditional test for assignability of a cause of action . . . is whether the cause of action survives the assignor and passes to his or her personal representative; if it does, the cause of action is assignable," *id.* § 44; *accord Accrued Fin. Servs., Inc. v. Prime Retail, Inc.*, 298 F.3d 291, 296 (4th Cir. 2002) ("[S]tandard principles of assignment law . . . recognize the legality of assigning both existing and potential choses in action, so long as the causes of action survive the death of the assignor.").[15]  Since the D.C. Circuit has held that FOIA claims survive death and can be transferred to a deceased requester's legal representative, *see Sinito v. U.S. Dep't of Justice*, 176 F.3d 512, 517 (D.C. Cir. 1999), it stands to reason that at least some FOIA requests are properly

---

[15] Numerous other kinds of federal statutory claims have been held to be assignable, such as claims under the Miller Act, *see United States ex rel. Sherman v. Carter*, 353 U.S. 210, 220 (1957) ("The trustees stand in the shoes of the employees and are entitled to enforce their rights."); claims for welfare benefits under the Employee Retirement Income Security Act ("ERISA"), *see, e.g.*, *Misic v. Bldg. Serv. Emps. Health & Welfare Trust*, 789 F.2d 1374, 1379 (9th Cir. 1986); antitrust claims, *see, e.g.*, *Martin v. Morgan Drive Away, Inc.*, 665 F.2d 598, 603 n.3 (5th Cir. Unit A 1982) ("It is well settled in the federal courts that antitrust claims are assignable."); and civil claims under the Racketeer Influenced and Corrupt Organizations ("RICO") Act, *see Lerman v. Joyce Int'l, Inc.*, 10 F.3d 106, 113 (3d Cir. 1993).

assignable, and thus a categorical policy of refusing to recognize assignments violates the FOIA.[16]

Indeed, the CIA does not appear to contest the fact that the plaintiff has been validly assigned the rights to JMP's FOIA requests. Rather, the CIA relies on two aspects of the FOIA to justify its Assignment of Rights Policy: (1) the FOIA's silence with respect to assignments; and (2) the FOIA's "requester-specific provisions." *See* Def.'s Second 443 Mem. at 5–7. The FOIA's silence regarding assignments, however, supports the plaintiff's position, if it supports either position at all. "'Congress is understood to legislate against a background of common-law adjudicatory principles.'" *Mohamad v. Palestinian Auth.*, 132 S. Ct. 1702, 1709 (2012) (quoting *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991)). It is a well-established "canon of construction that statutes should be interpreted consistently with the common law." *See Samantar v. Yousuf*, 130 S. Ct. 2278, 2289 (2010); *accord Solimino*, 501 U.S. at 108 ("[W]here a common-law principle is well established . . . the courts may take it as given that Congress has legislated with an expectation that the principle will apply except when a statutory purpose to the contrary is evident." (internal quotation marks omitted)). "'In order to abrogate a common-law principle, [a] statute must speak directly to the question addressed by the common law.'" *Manoharan v. Rajapaksa*, 711 F.3d 178, 179–80 (D.C. Cir. 2013) (internal quotation marks omitted) (quoting *United States v. Texas*, 507 U.S. 529, 534 (1993)). Thus, absent a statement from Congress in the FOIA regarding assignments, the common-law principles regarding the recognition of assignments presumably apply, and, as discussed above, under

---

[16] Since the CIA's Assignment of Rights Policy is categorical, the Court need not decide in what circumstances an agency can, consistent with the FOIA, refuse to recognize the assignment of a particular request. The answer to that question likely will depend upon, *inter alia*, the identity of interests between the two parties and the stage at which the request is being processed at the time of assignment. *See Sinito*, 176 F.3d at 516–17 (limitations on substitution for FOIA claims "assuage[es] the government's concern that allowing a FOIA case to survive the death of the requester would allow 'any person' to step into the shoes of the decedent" (citation omitted)); *NSC I*, 898 F. Supp. 2d at 257–58 (discussing identity of interests between assignor and assignee of FOIA request).

common-law principles, "[a] statutory right of action is generally assignable."  6A C.J.S. ASSIGNMENTS § 49.[17]

The assignability of FOIA requests is also consistent with the animating principle behind the FOIA, which is "to increase the *public's* access to governmental information."  *Blazy v. Tenet*, 194 F.3d 90, 97 (D.C. Cir. 1999) (emphasis in original) (quoting *Greentree v. U.S. Customs Serv.*, 674 F.2d 74, 76 (D.C. Cir. 1982)).  Indeed, it is curious that the CIA's declarant attempts to justify the Assignment of Rights Policy by contending that "accepting the assignment and substituting a motivated assignee for a passive requester . . . would increase [the CIA's] exposure to litigation."  *See* Decl. of Martha M. Lutz (Jan. 30, 2013) ("Fifth Lutz Decl.") ¶ 9, No. 11-443, ECF No. 54-1.  All else equal, a "motivated assignee" would actually be *preferred* to a "passive requester," *see id.*, because the former would be more likely "to increase the public's access to governmental information," *Blazy*, 194 F.3d at 96, and thereby further the purpose of the FOIA.  The CIA would have the Court believe that, due to the CIA's policy of "'piggyback[ing]'" a subsequent duplicative request to its corresponding initial request, the non-recognition of assignments of FOIA requests will not diminish or delay the public's access to information.  *See, e.g.*, Fifth Lutz Decl. ¶ 12.  Although the Court addresses this issue more fully below in discussing the CIA's "undue burden" arguments, *see infra* Part III.B.1(c), it suffices to say that, at least in some circumstances, the refusal to recognize assignments of FOIA requests

---

[17] The Court assumes without deciding that principles of federal common law, rather than state-law principles, would apply to whether FOIA requests are assignable.  Since the release of government records through the FOIA undoubtedly "touch[es] the rights and duties of the United States," *see Bank of Am. Nat'l Trust & Sav. Ass'n v. Parnell*, 352 U.S. 29, 33 (1956), it therefore likely qualifies as one of the "few areas . . . involving 'uniquely federal interests'" that requires the development of federal common law principles, *see Boyle v. United Techs. Corp.*, 487 U.S. 500, 504 (1988) (quoting *Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640 (1981)).  *Cf., e.g.*, *Cincom Sys., Inc. v. Novelis Corp.*, 581 F.3d 431, 436 (6th Cir. 2009) ("Federal common law governs 'questions with respect to the assignability of a patent or copyright license.'" (quoting *PPG Indus., Inc. v. Guardian Indus. Corp.*, 597 F.2d 1090, 1093 (6th Cir. 1979)).

will indeed diminish or delay the public's access to information. Therefore, a *categorical* refusal to recognize the assignment of FOIA requests is at odds with the statute's purpose.

As to the "requester-specific provisions" of the FOIA, the CIA is correct to assert that certain rights or privileges conferred under the FOIA are non-assignable. For example, the right to (1) a public-interest fee waiver, (2) the expedited processing of a request, or (3) the release of information that implicates personal privacy, all are personal to a requester and thus cannot be assigned. *See, e.g.*, *RTC Commercial Loan Trust 1995-NP1A v. Winthrop Mgmt.*, 923 F. Supp. 83, 88 (E.D. Va. 1996) (holding that "certain rights are purely personal and cannot be assigned"). Hence, the CIA is correct that these personal rights and privileges could not be assigned. The plaintiff, however, does not contend that wholesale assignment is what the FOIA requires. The plaintiff, for example, does not contend that the CIA is required to allow an assignee FOIA requester to stand in the shoes of its assignor with regard to fee status. Therefore, the CIA jabs at a straw man in contending that a requirement upon agencies to recognize the assignment of FOIA requests would frustrate the purposes behind the aforementioned "requester-specific provisions" of the FOIA. *See* Def.'s Second 443 Mem. at 6–7. Furthermore, agency recognition of assignments of FOIA requests would, at most, merely transfer some administrative steps to the processing of a pending FOIA request that would already be taken with respect to a new, duplicative FOIA request; it would not necessitate that the "the purpose behind [the requester-specific provisions] . . . be frustrated." *See id.* at 7.

        c)     *Recognizing the Assignment of FOIA Requests Would Impose No Categorically Undue Burden on the CIA.*

The CIA devotes a substantial portion of its briefing and the majority of the Fifth Lutz Declaration to the contention that recognizing assignments would place an undue burden on the CIA's FOIA administrators. *See* Def.'s Second 443 Mem. at 7–10; Fifth Lutz Decl. ¶¶ 5–13. In

this vein, the CIA enumerates several ways in which "[a]ssignment of FOIA rights would prejudice the Agency both at the administrative processing stage and in litigation." Fifth Lutz Decl. ¶ 5. Rather than recognize assignments, the CIA proposes that having putative assignee requesters simply submit a new, duplicative FOIA request would entail less prejudice to the agency and no prejudice to the requester. *See id.* ¶ 13. The Court disagrees.

First, according to the CIA, assignment of FOIA rights would "complicate [the CIA's Public Information Programs Division's] adjudication of requests for fee waivers, expedited processing, and placement in a given fee category." *Id.* ¶ 5. With respect to this first argument, the CIA essentially contends that, if a FOIA request is assigned to another person, the CIA "would be required to stop processing the request" and decide whether the assignee requester (1) is entitled to expedited processing or (2) shares the original requester's same fee category. *Id.* The CIA adds that, in the event of assignment, it "would also have to resolve the question as to whether fees should be charged retroactively for assignees that do not qualify for the assignor's fee waiver or preferential fee category." *Id.* ¶ 6. Similarly, the CIA complains, "where the assignor submitted a privacy waiver of a third party . . . issues of consent would arise," and the assigned request "would require the submission of a new privacy waiver." *Id.* ¶ 7.

There is no question that, if a FOIA request were assigned by the original requester, the CIA would need to assess the applicability of the "requester-specific provisions" of the FOIA, discussed above, to the assignee requester. *See supra* Part III.B.1(b). What the CIA does not explain, however, is why such an effort would "prejudice" the agency, given the fact that the CIA would have to make the *exact same* assessment if the assignee were to submit a new FOIA request instead of pursuing the assigned FOIA request. Hence, the assignment of a FOIA request would not add to the agency's burden in administering the requester-specific provisions of the

statute, as compared to the submission of a new FOIA request: Both a new FOIA request and an assigned FOIA request would require *de novo* determinations regarding fee status, fee waivers, expedited processing, and the applicability of Exemptions 6 and 7(C). As to the CIA's complaint about needing to decide "whether fees should be charged retroactively," *see* Fifth Lutz Decl. ¶ 6, this is hardly a burden, let alone an "undue" one. First, to the extent the recognition of an assignment would permit the CIA to charge FOIA fees to the assignee when it would not have been able to charge fees to the original requester, a policy of recognizing assignments represents a net gain to the agency, not a burden. Second, the CIA is free to charge fees to any assignee FOIA requester who does not qualify for a fee waiver, just as it would be free to do if the same requester had filed a new request. Again, the administrative burdens between the two scenarios are identical.[18]

Second, the CIA fears that "assignment of rights presents the potential for abuse." *See id.* ¶ 8. The CIA asserts in this regard that it "does not have the resources to inquire into the validity of the requesters' consent and assignees' acceptance or to evaluate whether the assignment comports with [the] law of the state where the assignment was conferred." *Id.* (footnote omitted). First, as to the state-law question, it is likely that federal common law, not state law, would govern whether the assignment of a FOIA request were valid. *Cf. Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 425, 437 (3d Cir. 1993) ("[T]he validity of the assignment of an antitrust claim is a matter of federal common law."). The FOIA has been held to preempt other state-law doctrines regarding rights of access to information. *See, e.g., Ctr. for*

---

[18] This would also not be a "retroactive[]" assessment of fees, since the conduct that would trigger the fee assessment would be the *assignment* of the request, not the initial *submission* of the request. *See, e.g., Quantum Entertainment Ltd. v. U.S. Dep't of Interior*, 714 F.3d 1338, 1343 (D.C. Cir. 2013) ("[T]he application of a new statute is . . . retroactive only if it would 'impair rights a party possessed when it acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed.'" (quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994))).

*Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 936 (D.C. Cir. 2003) (common-law

right of access); *see also Hartford Fire Ins. Co. v. United States*, 857 F. Supp. 2d 1356, 1365 (Ct.

Int'l Trade 2012) ("Because FOIA establishes a comprehensive statutory framework for

disclosure of agency records, when it conflicts with existing common law rights to disclosure,

such rights are preempted.").  Thus, arguably, since the validity of a FOIA assignment affects the

putative assignee's right to access information from the federal government, the question of

validity is an "issue[] closely interwoven with a broad scheme of federal statutory regulation,"

which requires the development of interstitial federal common law.  *See Gulfstream*, 995 F.2d at

438.

        Even if state law did apply to the validity of the assignment of a FOIA request, the CIA

has failed to explain why it would need to "inquire into the validity" of every such assignment.

*See* Fifth Lutz Decl. ¶ 8.  The Court addressed this issue in its previous opinion, saying that

"[a]gencies can and should shift the vast majority of any burden to the assignees themselves,

requiring them to submit whatever documentation the agency deems sufficient to validate an

assignment."  *NSC I*, 898 F. Supp. 2d at 259.  The CIA already does this in the context of third-

party consent for the release of personal information.  *See* CIA FOIA, FOIA Helpful Hints,

http://www.foia.cia.gov/foia-helpful-hints (last visited August 11, 2013) (requiring requesters

who seek "records on an individual other than yourself" to provide "[a] signed notarized

statement from the other individual authorizing release of personal information").  It defies all

logic to say that the CIA can accept standardized third-party information releases but would need

to "inquire into the validity of [each] requester['s] consent and assignee['s] acceptance."  *See*

Fifth Lutz Decl. ¶ 8.  The CIA's purported investigatory burden in this regard is largely

imaginary and would certainly not be undue or categorical in nature.

Third, and as referenced above, the CIA argues that the assignment of FOIA requests would "increase its exposure to litigation" by "substituting a motivated assignee for a passive requester." *See* Fifth Lutz Decl. ¶ 9. As discussed above, to the extent that the Assignment of Rights Policy is aimed at keeping otherwise meritorious FOIA claims out of federal courts, it is at odds with the purposes of the FOIA. *See supra* Part III.B.1(b). Furthermore, the CIA's contention that "the assignee would be placed in a better position to litigate the assigned request than if they had submitted a new request on the same subject," Fifth Lutz Decl. ¶ 9, implicitly confirms that the Assignment of Rights Policy tends to prejudice requesters. To the extent an "assignee would be placed in a better position to litigate the assigned request than if they had submitted a new request on the same subject," *id.*, then a FOIA requester "submit[ing] a new request on the same subject" would be in a *worse* position to litigate the assigned request, presumably because the requester would be less likely to be able to take advantage of the FOIA's constructive exhaustion provision, 5 U.S.C. § 552(a)(6)(C)(i).[19]

Frankly, the CIA's argument in this regard appears to boil down to a concern with ensuring that the agency can present a rosier picture of its compliance with the time limits of the FOIA, rather than with any concern regarding an undue burden.[20] *See, e.g.*, Fifth Lutz Decl. ¶ 9 (without having to recognize assignments, the CIA "can more easily comply within the statutory timeframe established by the FOIA"). It may be that refusing to recognize assignments would "minimize[]" the CIA's litigation risk, *see id.*, by allowing the agency to restart the clock with a

---

[19] It is not clear what the CIA means by "placed in a better position to litigate the assigned request." *See* Fifth Lutz Decl. ¶ 9. The only potential difference between assignees and non-assignees with regard to litigation, as the Court observes above, is that a non-assignee may be less likely to be able to take advantage of the FOIA's constructive exhaustion provision, 5 U.S.C. § 552(a)(6)(C)(i). This fact, if true, would only mean that an assignee would be able to litigate a request more *quickly* than a non-assignee in some instances, but it would not mean that the assignee's claims in litigation would be any more or less meritorious than those of non-assignees.

[20] The FOIA requires that an agency make a "determination" regarding a FOIA request within twenty business days of the receipt of the request, and it also requires that an agency make a "determination" regarding any administrative appeal within twenty business days of the receipt of the appeal. *See* 5 U.S.C. § 552(a)(6)(A).

new FOIA request, rather than having to respond to the initial request within the statutory timeframe. Compliance with the statutory timeframe, however, is not an undue burden; it is a burden that Congress expects agencies to bear. *See, e.g.*, *Citizens for Responsibility & Ethics in Wash. v. FEC*, 711 F.3d 180, 189–90 (D.C. Cir. 2013).

Fourth, the CIA relatedly argues that "an assignee may attempt to seek an award of attorney fees and costs citing work completed pre-assignment." Fifth Lutz Decl. ¶ 10. The CIA likewise asserts that "[i]n certain cases, a requester would not be eligible for any award 'but for' an assignment." *Id.* ¶ 11. With respect to the latter assertion, the CIA provides two examples: (1) "were the Agency to comply with a request within the FOIA's time limits, a requester would [be] ineligible for attorney's fees," and (2) "a requester seeking already disclosed records would not satisfy the attorney fees entitlement factor that considers the public benefit derived from the case." Fifth Lutz Decl. ¶ 11. Both of these examples, however, present problematic support for the agency's position. As to the first, a simple review of the statutory language demonstrates that the CIA's conclusion is dead wrong. The FOIA provides that a "court may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case under this section in which the complainant has substantially prevailed." 5 U.S.C. § 552(a)(4)(E)(i). Therefore, in the circumstance where (1) an agency timely responds to a FOIA request and (2) withholds responsive records, but (3) the requester later secures a judgment from a court ordering the agency to disclose the responsive records that were withheld, the requester has "substantially prevailed" and would therefore be eligible for attorney's fees, despite the fact that the agency responded to the request in a timely fashion. *See id.* § 552(a)(4)(E)(ii) (defining "substantially prevailed" as, *inter alia*, "a judicial order or enforceable written agreement or consent decree"). Indeed, such a plaintiff would be eligible for

attorney's fees even without a court disclosure order, so long as the plaintiff's "lawsuit substantially caused the agency to release the requested records." *See Davis v. U.S. Dep't of Justice*, 610 F.3d 750, 752 (D.C. Cir. 2010). The legal basis for the CIA's assertion that merely responding within the statutory timeframe immunizes it from claims for attorney's fees is unclear.

As to the second example provided by the CIA, it is totally implausible that "a requester seeking already disclosed records" would ever substantially prevail in a FOIA lawsuit. *See* Fifth Lutz Decl. ¶ 11. Assuming that, by "already disclosed," the CIA means already officially disclosed, the only way this could occur would be if the agency in question refused to provide the requester with the "already disclosed records," thus necessitating a court order. This scenario is particularly implausible because the CIA asserts later in its declaration that processing "requests for previously requested records" is simple and expedient because "the legwork for the request has been completed." *Id.* ¶ 12. Presumably, processing a FOIA request for "already *disclosed* records" would be even simpler and more expedient, requiring nothing more than duplication of the records that have already been processed and released. How such a scenario would ever approach the question of attorney's fees is a puzzle the CIA's argument leaves unsolved.

In short, the two examples provided by the CIA with regard to attorney's fees do not come close to establishing any kind of "undue burden" that would result from the recognition of assignments. The same is true of the CIA's concern that "an assignee may attempt to seek an award of attorney fees and costs citing work completed pre-assignment." *See* Fifth Lutz Decl. ¶ 10. Similar to the litigation burden argument addressed above, requiring the CIA to incur attorney's fees—including attorney's fees for work completed pre-assignment—is not an undue

burden. Attorney's fees are the price exacted from agencies by the FOIA, designed to "remove the incentive for administrative resistance to disclosure requests based . . . on the knowledge that many FOIA plaintiffs do not have the financial resources or economic incentives to pursue their requests through expensive litigation.'" *Davy v. CIA*, 550 F.3d 1155, 1158 (D.C. Cir. 2008) (quoting *Nationwide Bldg. Maint., Inc. v. Sampson*, 559 F.2d 704, 711 (D.C. Cir. 1977)). It is thus telling that the CIA discusses "an incentive . . . to litigate requests that would otherwise not be pursued" as if it were something the FOIA seeks to discourage. *See* Fifth Lutz Decl. ¶ 11.

Finally, the CIA claims that "no prejudice [would] result[] from requiring individuals to submit a [new and duplicative] FOIA request." *Id.* ¶ 12. Embedded within this contention, however, is yet another inconsistency. As discussed above, the CIA contends that having to reassess the applicability of the FOIA's "requester-specific provisions" for an assigned request would be an undue burden. *See id.* ¶¶ 5–7. Yet, when the CIA must perform that same reassessment for a new, duplicative FOIA request, it says that the task is simple and that it "often result[s] in a response to a requester within the statutory timeframe." *Id.* ¶ 12. Both positions cannot simultaneously be accurate.

Furthermore, the CIA only considers two factual circumstances in its declaration: (1) "requests for previously requested records," and (2) "a request for the same subject as an outstanding request." *Id.* Yet, the facts of the instant case fall into a third category: an assignee requester seeks to step into the shoes of an original requester while the request in question is making its way through the administrative appeal process. *See NSC I*, 898 F. Supp. 2d at 244 (discussing how JMP assigned request to NSC nearly six months after JMP had filed administrative appeal). Indeed, in this case, NSC sought to amend the pending administrative appeal with respect to the assigned request over a year after the administrative appeal had been

filed.  *See id.*  In light of this factual predicate, the CIA does not explain how requiring NSC to

file a new FOIA request would have resulted in no delay.  The CIA would have first needed to

process the new request, and although "the legwork for the request ha[d] [already] been

completed," Fifth Lutz Decl. ¶ 12, the CIA would have admittedly had to assess NSC's fee status

and right to expedited processing, *see id.* ¶ 5.  Then, NSC would have had to file an

administrative appeal from scratch.

The CIA does not state whether it also "piggybacks" administrative appeals for the same

information, nor does the CIA say whether such appellate "piggybacking" would be feasible,

since even multiple requests for the same information are liable to raise distinct and separate

issues in their administrative appeals.[21]  The CIA nevertheless concludes—ignoring the

procedural posture of the specific request at issue in this case—that "if plaintiff were to request

the same information, his request would be joined with the existing request and the Agency

would respond to both requests at the same time."  *Id.* ¶ 16.  As demonstrated above, however, it

is not a simple matter of "join[ing] with the existing request" because the original request had

already traveled almost entirely through the administrative process at the time of assignment.

How the process of catching the new request up with the original request would result in no

delay whatsoever defies reality, particularly in a case like the instant one where the original

administrative appeal had been pending for over a year when the assignee attempted to modify it.

Thus, even assuming that the CIA uniformly implements its "piggybacking" policy, such a

---

[21] The risk of delay would be even more acute if a FOIA request were assigned after the administrative appeal
process had already been completed.  At that point, the second requester (in this case NSC) would need to file a new
FOIA request, file a new administrative appeal, and exhaust the entire administrative process before it would be in
the same position as the original requester.

policy would still inevitably result in delay to requesters, particularly with respect to FOIA requests that are far along into the administrative process.[22]

In sum, the Court concludes that the CIA's admitted Assignment of Rights Policy constitutes a "failure to abide by the terms of the FOIA." *See Payne*, 837 F.2d at 491. The Court likewise concludes that the CIA's ongoing failure is not excused by the presence of any undue burden that would result from recognizing the assignment of rights associated with FOIA requests. Thus, the CIA may no longer categorically refuse to recognize the assignment of FOIA requests, and the Court will grant summary judgment to the plaintiff on Count Two in No. 11-443.

Additionally and relatedly, since the CIA cites only the Assignment of Rights Policy as the justification for not providing any final administrative response to the plaintiff regarding FOIA request No. F-2008-01105 (the request assigned by JMP to the plaintiff), the CIA has not met its burden at summary judgment. Since the Assignment of Rights Policy is invalid and thus clearly not sufficient to justify the CIA's refusal to permit the plaintiff to pursue its administrative appeal, the Court will grant summary judgment to the plaintiff on Count One in No. 11-443 as well. The current status of the FOIA request at issue in Count One, however, is not clear. The CIA stated in January 2013 that this request was "still pending." *See* Fifth Lutz Decl. ¶ 4. Likewise, the plaintiff states in its Complaint that the FOIA request was administratively appealed prior to the assignment being issued. *See* 443 Compl. ¶¶ 9–13. Thus, although the plaintiff requests the Court to "order CIA to immediately release all currently withheld information responsive to . . . the FOIA request at issue in Count 1," *see* Pl.'s 443 Cross-Mot. Mem. at 2, the Court will remand this matter to the agency rather than order the

---

[22] The "piggybacking" policy would presumably be much less likely to result in delay if an assignment of rights were to take place early on in the FOIA request process, such that the two requests could be joined prior to any significant amount of work being done with respect to either request.

release of responsive records.  On remand, the CIA must permit the plaintiff to exhaust its

administrative remedies through the administrative appeals process as an assignee of the FOIA

request in question.[23]

### 2. *Document-Level Exemption Policy*

In Count Twenty of No. 11-445, the plaintiff complains that the CIA has a policy or

practice "of refus[ing] to invoke exemptions with particularity."  *See* 445 FAC ¶ 131.

Specifically, the plaintiff alleges that the CIA's policy is to "invoke[] [FOIA] exemptions on a

document-level without indicating which exemptions applied to which particular redactions."  *Id.*

¶ 129.  In its previous opinion, the Court dubbed this the "Document-Level Exemption Policy."

*See NSC I*, 898 F. Supp. 2d at 243.  The FOIA requires that, when an agency releases segregable

portions of a record, "the exemption under which the deletion is made, shall be indicated on the

released portion of the record, unless including that indication would harm an interest protected

by the exemption . . . under which the deletion is made."  5 U.S.C. § 552(b).  In this regard, the

FOIA also states, "[i]f technically feasible, . . . the exemption under which the deletion is made,

shall be indicated at the place in the record where such deletion is made."  *Id.*  Finally, the FOIA

provides that "a court shall accord substantial weight to an affidavit of an agency concerning the

agency's determination as to technical feasibility under . . . subsection (b)."  *Id.* § 552(a)(4)(B).

In the instant case, the CIA defends its Document-Level Exemption Policy by contending

that "it is not currently technically feasible for the Agency to assert exemptions on the redaction

level."  Def.'s Mem. in Supp. Mot. Summ. J. on Counts Twelve & Twenty ("Def.'s Second 445

---

[23] The CIA indicates that "if the Court were to order the CIA to begin recognizing assignments, the Agency would have to determine whether NSC's purported assignment comports with state law and was legitimately obtained and address potential fee and personal privacy issues before it could proceed to litigate the underlying request."  Def.'s Second 443 Reply at 11.  The Court will leave these matters to the agency on remand, but cautions that the CIA's legal position regarding the validity of an assignment resting on state law is highly questionable and, furthermore, may be inconsistent with the law of this case.  *See NSC I*, 898 F. Supp. 2d at 259 ("The Court holds that the plaintiff's Assignment is valid and enforceable . . . .").

Mem.") at 2, No. 11-445, ECF No. 42. To support this contention, the CIA has submitted the sworn declaration of Michele Meeks, who is the chief of the CIA's Public Information Programs Division ("PIPD") and also the CIA Information and Privacy Coordinator ("IPC"). *See* Decl. of Michele L. Meeks (Apr. 29, 2013) ("Meeks Decl.") ¶ 1, No. 11-445, ECF No. 42-1. In that declaration, Ms. Meeks explains that "[t]he CIA's [FOIA] review process is decentralized whereby each of the [CIA's] five directorates . . . maintains an [Information Review Officer, or 'IRO'] staff that reviews Agency records and makes public release determinations with an eye toward evaluating directorate-specific equities." *Id.* ¶ 4. Ms. Meeks also explains that "records frequently involve the equities of multiple directorates," and "[w]hen records implicate the operational interests of multiple directorates, the reviews are conducted by the relevant IROs simultaneously." *Id.* ¶¶ 5–6. Within each directorate, "IRO staffers electronically redact any protectable material and indicate the basis for the redaction on the page," and each directorate maintains "a separate electronic version of the document." *Id.* ¶ 6.

Once all relevant directorates have completed their reviews, Ms. Meeks explains, the CIA "then consolidates the redactions generated by the reviewing IRO staffs into a single document." *Id.* ¶ 7. In this regard, Ms. Meeks states that "there is frequently variation as to what is redacted by the different directorates," and in that circumstance, "[CIA] staffers compile the redactions made by each directorate and merge all of the redactions into a final version in preparation for public release." *Id.* This preparation of the "final version" occurs on the CIA's Automated Declassification and Release Environment ("CADRE), which "does not have similar capability with respect to exemptions and other document markings." *Id.* ¶ 8. In CADRE, Ms. Meeks states, "[t]he merge function pulls the underlying justification for the redaction, but, due to the substantial overlap of the redactions in each of the directorate's versions, the exemptions appear

on top of one another and are unreadable." *Id.* Therefore, "[t]he staff involved in the merging cannot, without conducting extensive, time consuming manual review, parse out which exemptions apply to a specific redaction and notate as appropriate." *Id.*

The Court is mindful that it has a statutory obligation to "accord substantial weight" to Ms. Meeks' statements regarding the CIA's determination of technical feasibility, *see* 5 U.S.C. § 552(a)(4)(B), but Ms. Meeks' explanation of the purported technical infeasibility of noting redaction-level exemptions has several unexplained gaps and inconsistencies. It should be noted again at the outset that the CIA's Document-Level Exemption Policy is, like the Assignment of Rights Policy, categorical in nature. *See* Meeks Decl. ¶ 8 ("[A]t present, the Agency indicates all the applicable exemptions in the top corner of the released document."). This characteristic of the policy is notable, considering that the basis for the Document-Level Exemption Policy is that, when multiple directorates review a record, "the exemptions appear on top of one another and are unreadable." *Id.* ¶ 8. Yet, Ms. Meeks explicitly concedes that records only "*frequently* involve the equities of multiple directorates." *Id.* ¶ 5 (emphasis added). That this situation occurs frequently is no justification for imposing the policy categorically, regardless of whether indicating redaction-specific exemptions is technically feasible when multiple directorates review the same document. Hence, when, for example, only one directorate reviews a given record or only one directorate indicates a redaction on a given record, the CIA's Document-Level Exemption Policy is clearly unsupported and contrary to the FOIA.

Furthermore, Ms. Meeks' explanation of technical infeasibility is perplexing. The CIA's process of redacting information, as explained by Ms. Meeks, only makes sense up until she explains what happens when the various electronic versions of a record are "merge[d]," after each directorate has reviewed it. *See id.* ¶¶ 7–8. First, Ms. Meeks states on the one hand that

"there is frequently *variation* as to what is redacted by the different directorates," implying that there is frequently no overlap between the directorates' redactions. *See id.* ¶ 7 (emphasis added). Indeed, this makes sense because, as Ms. Meeks points out, each directorate has "separate operational equities at issue." *See id.* Yet, in the very next paragraph of her declaration, Ms. Meeks reverses course, stating that "the exemptions appear on top of one another and are unreadable" due to "the *substantial overlap of the redactions* in each of the directorate's versions." *Id.* ¶ 8 (emphasis added).

Of course, "frequent[] variation" and "substantial overlap" are not mutually exclusive, but the CIA's declaration does not explain why exemptions cannot be indicated next to a redaction that was made by only one directorate. It would be one thing if the CIA were to aver that every single redaction is always made by at least two directorates, but the CIA does not even suggest that to be the case. In fact, it would appear *not* to be the case because Ms. Meeks' declaration strongly implies that, at least sometimes, an entire document is reviewed by only one directorate, *see id.* ¶ 5, and thus necessarily every redaction made to such a document would be made by only the one reviewing directorate. In such a circumstance—which the CIA suggests is uncommon but nevertheless extant—indicating the claimed exemption "at the place in the record where such deletion is made" appears to be technically feasible based on the CIA's own explanation of how its redaction process works. *See* 5 U.S.C. § 552(b).

Therefore, even according the "substantial weight" due to the CIA's declaration on the issue of technical feasibility, *see* 5 U.S.C. § 552(a)(4)(B), the Court concludes that the CIA's categorical Document-Level Exemption Policy constitutes a "failure to abide by the terms of the FOIA." *See Payne*, 837 F.2d at 491. The CIA must make a case-by-case determination regarding the technical feasibility of indicating a claimed exemption associated with a deletion

"at the place in the record where such deletion is made."  *See* 5 U.S.C. § 552(b).  Additionally, based on the CIA's representations, the CIA can only possibly claim technical infeasibility if the same redaction in question was made by more than one directorate within the CIA.  The Court will thus grant summary judgment to the plaintiff with respect to Count Twenty in No. 11-445.[24]

### D.   Adequacy of Search Efforts

Next, the Court will discuss the plaintiff's challenges to the adequacy of the search efforts of defendants CIA, State Department, and NSA in responding to four separate FOIA requests.  The Court will address the considerations related to each request in turn.

### 1.   *Count Eighteen in No. 11-444: January 26, 2011 FOIA Request to the CIA*

In response to the plaintiff's January 26, 2011 FOIA request seeking "all [CIA] records pertaining to the search tools and indices available to the Office of Information Management Services ('IMS') for conducting searches of its own records in response to FOIA requests," the CIA determined that the Director's Area was the only directorate within the CIA reasonably likely to have records responsive to the request.  *See* First Lutz Decl. ¶ 48.  The stated reason for this determination is that the request sought records "available to IMS," and "IMS is a component within the Director's Area."  *See id.*  The CIA avers that the plaintiff's request "was sent to IMS professionals who had personal knowledge of what search tools and indices were available and personally used by IMS personnel to search IMS records systems because they themselves use the search tools and indices references in the request."  *Id.* ¶ 50.  The IMS

---

[24] To be clear, the Court is not ordering the CIA to make any modifications to its current document-redaction system, even if such a modification would make the agency's processing of requests more FOIA-compliant.  The plaintiffs advocates for an affirmative injunction against the CIA, requiring it to "correct" a perceived "technical problem" with CIA's system.  *See* Pl.'s Second 445 Opp'n at 6.  The plaintiff's challenge, however, was to the CIA's categorical policy of refusing to indicate exemptions next to specific redactions.  *See* 445 FAC ¶¶ 129–31.  The Court holds that that policy is invalid.  Whether or not the FOIA requires the CIA to *broaden* the universe of records for which it can feasibly claim exemptions for deletions "at the place in the record where such deletion is made" by, for example, changing its technical process for redacting records, is not at issue here.

personnel "electronically searched the IMS records system as well as manually searched for independently known records that were responsive to Plaintiff's request." *Id.* ¶ 51.

The plaintiff raises two objections to the adequacy of the CIA's search in response to the January 26, 2011 FOIA request. First, the plaintiff states that "the request asked for the indices *themselves*, in addition to records *about* them," yet the CIA merely "provided three records which *described* indices." *See* Pl.'s First 444 Opp'n at 24 (emphasis in original). Second, the plaintiff complains that, in a separate pending case, the CIA's declarant, Ms. Lutz, referenced the existence of several IMS systems of records which were not referenced in the documents released to the plaintiff in this case. *See id.* at 25. Specifically, the records released to the plaintiff in the instant case only reference two records systems: SMART2 and CADRE. *See* First Lutz Decl. ¶ 51. Yet, the plaintiff points to language in Ms. Lutz's declaration in a separate pending case (Civil Case No. 11-442), in which she "identified at least three more systems of records which exist 'within IMS' and for which records should have been released." *See* Pl.'s Mot. for Leave to File Additional Evidence at 3, No. 11-444, ECF No. 44. Hence, the plaintiff asserts that the "CIA fails to explain with particularity why it identified no responsive records about these 'other systems of records within IMS' in particular." *Id.* at 4.

It is true that "the agency's failure to turn up a particular document, or mere speculation that as yet uncovered documents might exist, does not undermine the determination that the agency conducted an adequate search for the requested records." *Wilbur*, 355 F.3d at 678. At the same time, however, agency affidavits must "'explain in reasonable detail the scope and method of the search conducted by the agency." *See Morley*, 508 F.3d at 1121 (quoting *Perry v. Block*, 684 F.2d 121, 127 (D.C. Cir. 1982)). In particular, in order to satisfy its burden of establishing the adequacy of its search, an agency's affidavit must "describe in . . . detail what

records were searched, by whom, and through what process." *Steinberg v. U.S. Dep't of Justice*, 23 F.3d 548, 552 (D.C. Cir. 1994). "A reasonably detailed affidavit, setting forth the search terms and the type of search performed . . . is necessary to afford a FOIA requester an opportunity to challenge the adequacy of the search and to allow the district court to determine if the search was adequate in order to grant summary judgment." *Oglesby*, 920 F.2d at 68.

The CIA has failed to meet its burden in this case. Critically, the CIA's declaration does not state what parameters were used to accomplish the search, *i.e.*, whether the CIA searched for the indices themselves or what search terms the CIA used to identify responsive records. The CIA's declaration merely states in conclusory fashion that "IMS employees . . . conducted an adequate search for records responsive to Plaintiff's request" by "search[ing] electronically for responsive documents and manually search[ing] for independently known responsive documents." First Lutz Decl. ¶ 53. The CIA is correct that the plaintiff's specific arguments improperly focus on "the agency's failure to turn up . . . particular document[s]," *i.e.*, the search indices themselves, and offer "mere speculation that as yet uncovered documents might exist," *i.e.*, documents about other records systems. *See Wilbur*, 355 F.3d at 678. Even so, the plaintiff's arguments underscore the more fundamental deficiency in the CIA's declaration, which is that the CIA does not provide sufficient information for the Court to conclude that its search *methods* were "reasonably calculated to uncover all relevant documents." *See Morley*, 508 F.3d at 1114. Based on the vague and conclusory assertions in the CIA's declaration, the Court would be required to speculate in order to conclude that the agency's search efforts "us[ed] methods which can be reasonably expected to produce the information requested." *Oglesby*, 920 F.2d at 68. The Court will therefore deny summary judgment to the CIA on Count Eighteen in No. 11-444 with respect to the adequacy of the agency's search.

### 2. *Count Twenty in No. 11-444: September 25, 2009 FOIA Request to the CIA*

As stated above, the plaintiff submitted a FOIA request to the CIA on September 25, 2009, seeking "all [CIA] records, including cross-references, pertaining to guidelines for attorneys in the Office of General Counsel ('OGC') for the conduct of civil cases, especially pertaining to interactions between OGC attorneys and Department of Justice ('DOJ') attorneys." First Lutz Decl. Ex. T at 1. In response to this request, the CIA's declarant avers that "IMS professionals determined that the Director's Area was the only directorate reasonably likely to have" responsive records. First Lutz Decl. ¶ 60. The Director's Area then "tasked the [OGC] to search for records responsive to the Plaintiff's request." *Id.* ¶ 61. The OGC in turn "searched relevant records systems containing all files reasonably likely to contain responsive materials and located no records responsive to Plaintiff's request." *Id.* ¶ 62. OGC further "consulted [the CIA's] Litigation Division management regarding this request" because the Litigation Division "is the component within OGC that interacts most frequently with DOJ attorneys, usually on a daily basis." *Id.* According to the CIA's declarant, "Litigation Division management confirmed that as of [December 2010], no documents responsive to Plaintiff's request existed." *Id.*

The plaintiff again raises two objections to the adequacy of the CIA's search. First, the plaintiff raises what it refers to as "an existential problem—it is completely unfathomable that the [OGC] would have no records pertaining to guidelines for the conduct of civil cases." Def.'s First 444 Opp'n at 26. Second, the plaintiff raises the "issue of cut-off dates." *Id.* at 27. The plaintiff states that the CIA "has a practice of assigning a cut-off date to every request of the date the acknowledgement letter is written." *Id.* Neither of these contentions is sufficient to defeat summary judgment. As to the first, and as noted above, "the agency's failure to turn up a particular document, or mere speculation that as yet uncovered documents might exist, does not

undermine the determination that the agency conducted an adequate search for the requested records." *Wilbur*, 355 F.3d at 678. The plaintiff's incredulity regarding the absence of responsive records is insufficient to overcome an otherwise adequate search.

The second objection is premised on a semantic hair-splitting of the CIA's declaration. In particular, the plaintiff notes ambiguous language in the CIA's declaration that could suggest that the CIA did not search for any records created after the date the CIA accepted the plaintiff's FOIA request. *See* Pl.'s First 444 Opp'n at 6–7, 27–28. The plaintiff's suspicions aside, the Court reads the CIA's declaration to state that the CIA searched for records referenced in the plaintiff's September 25, 2009 FOIA request as late as December 2011. *See* First Lutz Decl. ¶ 62. This is not an unreasonable cut-off date. *See, e.g.*, *Public Citizen v. Dep't of State*, 276 F.3d 634, 644 (D.C. Cir. 2002) (implicitly approving as reasonable a "date-of-search cut-off [date]").

Although neither of the grounds raised by the plaintiff is sufficient to defeat summary judgment, the Court nevertheless cannot grant summary judgment to the CIA because the CIA's declaration fails to satisfy the minimal burden under the FOIA to establish the adequacy of the search. It is axiomatic that, for an agency to win summary judgment in a FOIA case, the agency's justifications for its actions must be "specific" and "non-conclusory." *See, e.g.*, *Am. Civil Liberties Union v. CIA*, 710 F.3d 422, 426 (D.C. Cir. 2013). The CIA's declaration regarding its search efforts in response to the plaintiff's September 25, 2009 FOIA request, however, are neither. The declaration, for example, uses amorphous terms like "relevant records systems" and "all files reasonably likely to contain responsive materials," without any explanation of how the agency determined *which* records systems and files were relevant or reasonably likely to contain responsive materials. *See* First Lutz Decl. ¶ 62. The CIA also does

not offer any reasoning for its conclusion that "the Director's Area was the only directorate reasonably likely to have" responsive records. *Id.* ¶ 60. Finally, the CIA provides no description of the search parameters it used to locate responsive records. *See, e.g.*, *Oglesby*, 920 F.2d at 68. The Court cannot fill in these gaps for the agency under the auspices of good-faith deference. It is the agency's burden to supply this information to secure summary judgment, and the CIA has failed to meet that burden. Accordingly, the Court will deny summary judgment to the CIA on Count Twenty in No. 11-444 with regard to the adequacy of the agency's search.

### 3. *Count Nine in No. 11-445: February 6, 2010 FOIA Request to the State Department*

As discussed above, on February 6, 2010, the plaintiff submitted a FOIA request to the State Department, seeking "copies of all current training handbooks, manuals, guidelines, checklists, worksheets, and similar documents provided to [State Department] FOIA and Privacy Act analysts (both agency employees and contractors)." First Walter Decl. Ex. 1, at 1. In response, the State Department "determined that the office that was reasonably likely to have responsive documents was the Bureau of Administration's Office of Information Programs and Services ['IPS']." First Walter Decl. ¶ 16. The State Department's declarant explains: "Because the request sought training materials provided to the [State] Department's 'FOIA and Privacy Act analysts (both agency employees and contractors),' the [State] Department only searched IPS branches that employ FOIA and/or Privacy Act analysts because only those components were reasonably likely to have documents responsive to the subject request." *Id.* ¶ 18. In all, the seven branches of IPS that employ FOIA or Privacy Act analysts were searched, and those searches yielded 122 responsive records. *See id.* ¶¶ 18–24.

Also as discussed above, the State Department's Bureau of Diplomatic Security ("DS") independently responded to the plaintiffs' request on March 1, 2013, releasing twenty-six

responsive records that had not been released by IPS. *See* Notice of Recent Development

Regarding Count 9, at 1. As the State Department's declarant explains, "IPS delegates limited

authority to certain [State] Department components, including DS [and four other State

Department components], to assist with the processing of [FOIA or Privacy Act] requests for

purposes of administrative expediency and efficiency." Third Walter Decl. ¶ 3. Indeed, the

State Department's declarant explains that these five State Department components, including

DS, "conduct their own FOIA/Privacy Act reviews and respond directly to requesters," despite

the fact that "IPS is the [State] Department's central office for the processing of FOIA/Privacy

Act requests and the development of FOIA policies and training." *Id.* ¶ 4. Despite the fact that

DS released numerous, unique responsive records, "the [State] Department stands by its decision

to limits its search . . . to IPS." *Id.*

Although the State Department appears unphased by the independent response of DS to

the plaintiff's FOIA request, the Court views the matter differently. It is clear from the State

Department's initial declaration that the reason the seven IPS components were selected as being

likely to contain responsive material is that they were the only branches of IPS "that employ

FOIA and/or Privacy Act analysts." *See* First Walter Decl. ¶ 18. Yet, it is equally clear from the

State Department's subsequent declaration that several other components of the State

Department employ FOIA or Privacy Act analysts. Indeed, the fact that five other components

of the State Department "conduct their own FOIA/Privacy Act reviews and respond directly to

requesters," *see* Third Walter Decl. ¶ 4, establishes that IPS is *not* the only State Department

component likely to contain records responsive to the plaintiff's February 6, 2010 FOIA request.

Therefore, since the State Department "stands by its decision to limits its search . . . to IPS," *id.*,

the State Department has failed to satisfy its burden of establishing that it conducted an adequate

search under the FOIA. *See, e.g.*, *Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 514 (D.C. Cir. 2011) (agency's affidavit must "aver[] that all files likely to contain responsive materials (if such records exist) were searched" (internal quotation marks omitted)).[25] Accordingly, the Court will deny summary judgment to the State Department on Count Nine in No. 11-445 in regard to the adequacy of the agency's search.

4. ***Count Ten in No. 11-445: February 6, 2010 FOIA Request to the NSA***

Also on February 6, 2010, the plaintiff submitted a substantially identical FOIA request to the NSA. The only difference was that the request to the NSA sought training materials used by *NSA* FOIA and Privacy Act analysts, rather than those from the State Department. *See* Phillips Decl. Att. 1, at 2. The plaintiff raises only a narrow challenge to the adequacy of the NSA's search efforts, arguing that "many of the records released by NSA explicitly referenced templates to be used for various FOIA letters by file name." *See* Pl.'s First 445 Opp'n at 36. The plaintiff argues that the NSA's failure to search for and produce such templates renders the

---

[25] The plaintiff also specifically takes issue with the fact that the State Department "refused to search for . . . and process" three specific documents that the plaintiff believes "would be responsive to [its] requests." *See* Pl.'s First 445 Opp'n at 36. To support its contention, the plaintiff relies on the fact that it sent an e-mail to the State Department's counsel on May 27, 2012—over four months after the State Department had provided a final response to the plaintiff—requesting that the State Department search its Systematic Review Program ("SRP") (a branch within the ISP) for three specific documents that the plaintiffs believed were "clearly responsive" but had not been released. *See id.* at 35. The plaintiff contends that this e-mail was a "clear lead" that the State Department failed to follow, in violation of the FOIA. *See id.* at 35–36 (citing *Halperin v. FBI*, 181 F.3d 279, 288 (2d Cir. 1999)). The plaintiff's arguments in this regard do not demonstrate a deficiency in the State Department's search efforts, however, for three reasons. First, the State Department *did* search the SRP for responsive material. *See* First Walter Decl. ¶ 23. Indeed, the SRP was searched both electronically and manually, using the keywords "training," "guidance," "procedures," and "processing." *Id.* Second, the plaintiff has not demonstrated that the three documents it seeks would in fact have been responsive to its FOIA request. In particular, the plaintiff has not made any showing that the three documents in question were "in current use as of 6 February 2010," which was an explicit limitation on the scope of the request. *See* First Walter Decl. Ex. 1, at 1. Finally, and most fundamentally, the State Department had no obligation to continue searching its records systems based on a "lead" provided by the requester several months after the agency had already completed its search efforts. *See, e.g. Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 28 (D.C. Cir. 1998) ("[T]he court evaluates the reasonableness of an agency's search based on what the agency knew at its conclusion rather than what the agency speculated at its inception."); *see also Iturralde v. Comptroller of the Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003) ("[T]he adequacy of a FOIA search is generally determined not by the fruits of the search, but by the appropriateness of the methods used to carry out the search."); *Mobley v. CIA*, No. 11-2072, 2013 WL 452932, at *13 n.14 (D.D.C. Feb. 7, 2013) (holding FBI had "no obligation to follow up on any leads contained in" records that FBI was not aware of "before the conclusion of the FBI's search process").

agency's search efforts inadequate because "such templates fall clearly within the scope of 'all current training handbooks, manuals, guidelines, checklists, worksheets, *and similar documents*,' especially given the clarification that this request was for 'material used . . . to *train personnel*.'" *Id.* at 36–37 (emphasis in original). The NSA, on the other hand, contends that these templates were not responsive to the plaintiff's FOIA request, stating that "[t]he templates are boilerplate paragraphs, they do not contain any analysis, guidance, policy, or procedure for the NSA employee to consider or evaluate when processing a FOIA request." Phillips Decl. ¶ 8.

The D.C. Circuit has established that an agency "has a duty to construe a FOIA request liberally," *Nation Magazine*, 71 F.3d at 890, and is "bound to read it as drafted" not as "agency officials . . . might wish it was drafted," *Miller v. Casey*, 730 F.2d 773, 777 (D.C. Cir. 1984). In this regard, it is clear that, for example, when a FOIA requester "seek[s] all of a certain set of documents" while also "evincing a heightened interest in a specific subset thereof," such a request "is reasonably susceptible to the broader reading" of seeking the entire set of documents despite the fact that a specific subset of documents is named. *LaCedra v. Exec. Office for U.S. Attorneys*, 317 F.3d 345, 348 (D.C. Cir. 2003); *see also Nation Magazine*, 71 F.3d at 890 (holding that FOIA request seeking records "'pertaining to' [Ross] Perot" and specifically "ask[ing] for records indexed under Perot's name" was "sufficient to alert the agency that appellants sought information about Perot, even if it was not indexed under his name"). The question presented regarding the adequacy of the NSA's search is simply whether templates, which appear to be used primarily as boilerplate language to respond to FOIA requesters, should have been considered responsive to the plaintiff's request for training materials.

The Court concludes that, reading the plaintiff's FOIA request "liberally," *Nation Magazine*, 71 F.3d at 890, the templates referred to are responsive to the plaintiff's request.

Templates used by agency personnel to respond properly and uniformly to FOIA requesters are "material used . . . to train [FOIA] personnel," which is the material for which the NSA ostensibly searched. *See* Phillips Decl. Att. 2, No. 11-445, ECF No. 29-13. Such templates are the functional equivalent of a guidance document instructing FOIA analysts what to say to requesters in certain situations, and thus should have been considered "similar documents," as described in the plaintiff's request. *See* Phillips Decl. Ex. 1, at 1. Indeed, the templates appear to play an important role in the guidance documents that the NSA provides to its FOIA analysts. *See, e.g.*, Pl.'s First 445 Opp'n Ex. R at 2, No. 11-445, ECF No. 33-18 ("If no records are located, the proper response letter to use is a PA Negative GLOMAR."); *id.* at 3 ("If the requester only requests records pertaining to these types of activities being used against him/her, then the Case Officer should use the FOIA_Directed Energy letter and MR templates, and no search request to Security is required."). As a result, the Court denies summary judgment to the NSA on Count Ten in No. 11-445.

\* \* \*

In sum, the Court denies summary judgment to the CIA on Counts Eighteen and Twenty in No. 11-444 with regard to the adequacy of the CIA's search efforts. The Court further denies summary judgment to the State Department and the NSA on Counts Nine and Ten in No. 11-445, respectively, with respect to the adequacy of those agencies' search efforts.

### E. Refusals to Process Requests

As discussed above, the CIA refused to process seven FOIA requests submitted by the plaintiff, and the plaintiff challenges those refusals here in four separate counts. The Court will discuss the material requested in each of the seven requests and discuss whether it was permissible for the CIA to refuse to process them.

1.      *Count Nine in No. 11-444: May 13, 2010 FOIA Request to the CIA*

First, the CIA refused to process the plaintiff's FOIA request which sought "a representative sample of [CIA] analytical reports and memoranda presenting psychological analyses or profiles of foreign government officials, terrorist leaders, international criminals, business figures, and other intelligence targets prepared by the Medical and Psychological Analysis Center ('MPAC') or its predecessor Office of Leadership Analysis ('OLA')."  *See* First Lutz Decl. Ex. M at 1.  As discussed above, *see supra* Part I.B.5, the plaintiff provided four "guidelines" to the CIA regarding "what we consider a 'representative sample,'" which included (1) "[o]nly final official reports or memoranda that discuss an MPAC/OLA analyst's conclusions about a target's psychology," (2) "[n]o more than twenty reports/memoranda for each year," (3) "[f]our reports/memoranda for each year (unless less were created that year) for individuals in each category of intelligence target," and (4) "[r]easonable variety in the intelligence targets wherever possible (e.g., foreign government officials should be from a variety of foreign governments, terrorist leaders should be from different terrorist organizations, etc.)."  *Id.* at 1–2.  As to the fourth guideline, NSC further stated that "[f]or the foreign government officials, we would also appreciate if possible a variety of the type of officials (e.g., some heads of state, some intelligence officials, some law enforcement officials, some financial officials, etc.)."  *Id.* at 2.

Citing "the breadth and lack of specificity of [NSC's] request," the CIA refused to process this request "because it would require the Agency to perform an unreasonably burdensome search."  First Lutz Decl. Ex. N at 1.  In assessing this response, the Court is guided by two principles: First, "if an agency has not previously segregated the requested class of records[,] production may be required only where the agency can identify that material with reasonable effort."  *Goland v. CIA*, 607 F.2d 339, 353 (D.C. Cir. 1978) (internal quotation marks omitted).  Second, "[a]n agency need not honor a request that requires 'an unreasonably

72

burdensome search.'" *Am. Fed'n of Gov't Emps., Local 2782 v. U.S. Dep't of Commerce*, 907 F.2d 203, 209 (D.C. Cir. 1990) (quoting *Goland*, 607 F.2d at 353). In this case, the CIA was justified in refusing to process the plaintiff's May 13, 2010 FOIA request because it did not "reasonably describe[]" the records sought. *See* 5 U.S.C. § 552(a)(3)(A). The D.C. Circuit has held that "[t]he linchpin inquiry" in determining whether a request "reasonably describes" the records sought is "whether the agency is able to determine 'precisely what records are being requested.'" *Yeager v. DEA*, 678 F.2d 315, 326 (D.C. Cir. 1982) (quoting S. Rep. No. 93-854, at 10 (1974)).

Although the plaintiff provided "guidelines" to describe the category of records it sought, those guidelines still left a significant amount of ambiguity about "precisely what records [were] being requested." *Id.* (internal quotation marks omitted). Notably, although the plaintiff limited the date range and number of reports requested, the plaintiff's request would still place an unreasonable search burden for two primary reasons. First, the plaintiff's guideline asking for "[f]our reports/memoranda for each year (unless less were created that year) for individuals in each category of intelligence target," *see* First Lutz Decl. Ex. M at 1, would require the agency to examine and sift through a larger body of records to ensure that only one report/memorandum from a given category were included from any given year. This sort of sifting and analysis is not a burden that the FOIA imposes on federal agencies. *See, e.g.*, *Assassination Archives & Research Ctr. v. CIA*, 720 F. Supp. 217, 219 (D.D.C 1989) ("FOIA was not intended to reduce government agencies to full-time investigators."). Second, the plaintiff's request asked the CIA to provide "[r]easonable variety in the intelligence targets," and also asked for "a variety of the type of officials." *See id.* at 2. This sort of request is inherently burdensome because it requires the agency to weigh whether the variety it has provided is "reasonable" or not, which

superimposes a layer of subjective analysis onto the agency's response effort which the FOIA does not require.[26]

The Court appreciates the fact that this request was made because the CIA "refused to process a previous request for all official final psychological profiles produced by the offices in question," *see* Pl.'s First 444 Opp'n at 18, but the plaintiff has taken one step forward and two steps back with this most recent iteration of its request. The plaintiff was correct to begin limiting its request by time and subject matter, but attempting to limit its request with vague and malleable terms like "reasonable variety" is not, as the plaintiff contends, a "narrow and rigid definition of what constitutes a representative sample." *See id.* at 17. Such terms only cloaked the plaintiff's request in more uncertainty, and the CIA was not obligated to respond to it. The Court will grant summary judgment to the CIA on Count Nine in No. 11-444.

### 2. *Count Eight in No. 11-444: July 5, 2010 FOIA Request to the CIA*

Second, the CIA (partially) refused to process the plaintiff's request for "a record that would indicate the ten individuals responsible for the most FOIA requests submitted (each) in Fiscal Years 2008, 2009, and 2010." *See* First Lutz Decl. Ex. K at 1. In its request letter, the plaintiff laid out four methods by which the CIA could provide the information requested: (1) "[a]n index including only the ten most prolific requesters for each year," (2) "[a]n index including all requesters for each year," (3) "FOIA request letters from the ten most prolific requesters for each year," or (4) "[a]ll FOIA request letters submitted to the CIA for each year." *Id.* at 1–2. The CIA eventually agreed to process the fourth option, but after the plaintiff refused

---

[26] Additionally, requiring agencies to respond to FOIA requests like this would open them up to a whole new category of legal challenges regarding the adequacy of their search efforts. For example, a requester could later claim that an agency did not search broadly enough because the records provided by the agency were not sufficiently varied. Such a claim would pose difficulties to both agencies and courts in deciding what level of "variety" is "reasonable" and what sort of search efforts are required to meet such a standard of reasonable variety. It was precisely this sort of inquiry that the "reasonably describes" requirement in the FOIA was intended to avoid. *See* 5 U.S.C. § 552(a)(3)(A).

to commit to pay the substantial duplication fees that would be required to satisfy the fourth option (*i.e.*, all FOIA request letters submitted from 2008–2010), the CIA closed the request. *See* Seventh Lutz Decl. ¶ 7. The plaintiff narrowly challenges the "CIA's refusal to produce the record requested as 'option 2' in NSC's request." Pl.'s Second 444 Opp'n at 3. In this regard, the plaintiff "concedes . . . that options 1 and 3 are not viable," but the plaintiff nevertheless maintains that "option 2 . . . is." *See id.* at 3–4.

To support its contention about the feasibility of the CIA providing "[a]n index including all requesters for each year," the plaintiff points to "CADRE processing material" that was included in a recent release made to a FOIA requester that is not a party to this lawsuit. *See id.* at 4. These materials, the plaintiff states, "show[] that the results of a CADRE search can be sorted by FOIA request number," and therefore "all that would need to be done to satisfy NSC's request would be to conduct a search of CADRE that yielded all requests, sort the results by Case Id, and print those pages that contained the entries for 2008–2010." *Id.* In this same vein, the plaintiff contends that "there is no rule that says that an agency does not have to manually manipulate database information if it is not unduly burdensome to do so, such as typing in a search term, sorting the results, and printing them." *Id.* at 4–5. According to the plaintiff, "[d]oing so is not considered 'creating a record.'" *Id.* at 5.

The Court has already addressed this question in its previous opinion. "[T]he FOIA imposes no duty on the agency to create records." *Forsham v. Harris*, 445 U.S. 169, 186 (1980); *accord Yeager*, 678 F.2d at 321 ("It is well settled that an agency is not required by FOIA to create a document that does not exist in order to satisfy a request."). In this regard, "[e]lectronic database searches are . . . not regarded as involving the creation of new records." *People for the Am. Way Found. v. U.S. Dep't of Justice*, 451 F. Supp. 2d 6, 14 (D.D.C. 2006); *accord NSC I*,

898 F. Supp. 2d at 270 ("[S]orting a pre-existing database of information to make information intelligible does not involve the creation of a new record . . . ."). "Producing a listing or index of records, however, is different than producing particular points of data (*i.e.*, the records themselves)." *NSC I*, 898 F. Supp. 2d at 271. "[A] FOIA request for a listing or index of a database's contents that does not seek the contents of the database, but instead essentially seeks information about those contents, is a request that requires the creation of a new record, insofar as the agency has not previously created and retained such a listing or index." *Id.*; *accord People for the American Way*, 451 F. Supp. 2d at 15 (producing a "list of records returned from [a database] search" is "something that FOIA does not mandate" because "the list was not previously created or obtained by the agency" and "an order that defendant produce such a list would be tantamount to requiring defendant to create an agency record").

Thus, the CIA is correct that "NSC's argument ignores this Court's decision" in contending that the production of an index is not the creation of a record, where that index had not been previously created and retained. *See* Reply in Supp. Def.'s Mot. Summ. J. on Counts Eight and Twenty-One ("Def.'s Second 444 Reply") at 3, No. 11-444, ECF No. 47. The CIA avers that it "does not maintain an 'index file' of requesters." *See* Seventh Lutz Decl. ¶ 8.[27] By pointing to CADRE's capability to sort search results by requester identity, the plaintiff merely establishes that the CIA is *capable* of creating the record that the plaintiff seeks. That showing, however, is insufficient to require the agency to produce such a record because that record is still

---

[27] The CIA does say that it creates "FOIA case logs," which "detail certain information about requests received by the CIA on a quarterly basis (namely, the date that the FOIA request was opened, the request number, the subject of the request)." Seventh Lutz Decl. ¶ 8 n.4. These case logs, however, do not appear to be the type of index that the plaintiff seeks.

not one "that [the CIA] has in fact chosen to create and retain." *See Yeager*, 678 F.2d at 321. As a result, the Court will grant summary judgment to the CIA on Count Eight in No. 11-444.[28]

### 3. *Count One in No. 11-444: August 8, 2010 FOIA Requests to the CIA*

Third, the CIA refused to process the plaintiff's request for "a database listing of all the FOIA requesters from FY 2008–present that [the CIA has] classified as" either "educational or scientific," "commercial," "all other," or "news media." *See* First Lutz Decl. Exs. A–D. The

---

[28] As the Court's extensive discussion in its prior opinion underscores, distinguishing between (1) searching an electronic database, which is required under the FOIA if it is reasonably likely to locate records responsive to a request, and (2) creating new records or performing research, which agencies are not required to do by the FOIA, "remains somewhat muddled." *See NSC I*, 898 F. Supp. 2d at 270. It may seem a matter of legal hair-splitting to conclude that producing a listing of search results or a listing that summarizes or describes the contents of an electronic database is akin to the creation of a record, rather than being akin to conducting a search. This conclusion, however, is weighty—steeped in myriad complexity and fraught with tension—and in the Court's view, this conclusion has significant implications for the scope of the FOIA. The Court will further discuss the two-fold reasoning that leads to this result.

First, permitting a member of the public to request from an agency a listing of search results or a listing that summarizes or describes the contents of an electronic database would permit the public to requisition the resources of government agencies in a way that the FOIA did not intend. The FOIA was intended to provide access to records held by federal agencies, nothing more. The FOIA was *not* intended to provide access to the mechanisms that agencies use to retrieve or aggregate information. Although the FOIA is a powerful and necessary statute, it was not intended to permit the public to commandeer agency employees as research assistants, including with respect to performing queries in electronic databases. *See Assassination Archives & Research Ctr.*, 720 F. Supp. at 219 ("FOIA was not intended to reduce government agencies to full-time investigators.").

The second premise of the Court's holding focuses on the question of how the FOIA's definition of a "record" applies to information held in a database like the one at issue in Count Eight in No. 11-445, which holds information extracted from FOIA requests and is used, *inter alia*, to locate and manage those underlying records. The statute's definition is only moderately helpful and largely circular, defining "record" in relevant part as "any information that would be an agency record subject to the requirements of this section when maintained by an agency in any format, including an electronic format." 5 U.S.C. § 552(f)(2)(A). The obvious question left open by this statutory definition is: What "would be an agency record subject to the requirements of this section"? *See id.* As applied to this case, a difficulty arises because, when a database is queried, the listing which results from that query is essentially a unique permutation of smaller, individual pieces of information. These individual pieces of information—for example, the data points that populate a given field of the database—are records under the FOIA. It is for this reason, as the Court previously noted, that "[t]he FOIA requires agencies to disclose all non-exempt data points that it retains in electronic databases." *NSC I*, 898 F. Supp. 2d at 272. The crux of the Court's reasoning, however, is that when those individual data points are uniquely arrayed—for example, when a query returns a list of search results—that unique array (or "aggregation") of the individual data points constitutes a distinct record. It is a distinct record because the particular arrangement of data conveys a unique set of information—information that is distinct from what the individual data points can convey when they are arranged differently or when they are not arranged in any particular way at all. Thus, unless the agency has "chosen to create and retain" this unique aggregation or arrangement of data points, production of such an aggregation or arrangement of data involves the creation of a new record. *See Yeager*, 678 F.2d at 321. *Yeager's* use of the word "retain" is crucial. An agency may have previously run a search identical to the one for which a requester now seeks a listing of search results, and in doing so the agency would have chosen to "create" the record in question already. Unless the agency in some way "retains" the unique aggregation of data, however, that record, in its unique form, is not preserved in the agency's electronic version of a file cabinet.

CIA explains its refusal to process this request by saying that it "does not have the capability to sort its incoming FOIA requests based on fee categories." First Lutz Decl. ¶ 11. The CIA's declarant also states that "this information [*i.e.*, fee category] is not included in the electronic system," though the CIA's declarant also avers that "[f]ee category is not a mandatory field," and thus "this information is often not included in a FOIA request record." *Id.* The plaintiff focuses on the ambiguities in these statements, contending that (1) the word "incoming" is unclear, and (2) the fact that fee information is only "often not included" is an indication that it is sometimes included. *See* Pl.'s First 444 Opp'n at 10–11.

These ambiguities, however, only address the CIA's capability of sorting FOIA requests by fee category—they do not speak to whether the CIA has chosen to create and retain the "database listings" that the plaintiff seeks. As to this latter issue, the principles outlined above regarding the creation of records apply. *See supra* Part III.D.2. It is clear from the CIA's declaration that the agency has not chosen to create and retain such database listings, *see* First Lutz Decl. ¶ 11 ("FOIA analysts would then be required to create new records that identify each request by fee category and provide these newly created records to the Plaintiff."), and the FOIA does not obligate the CIA to create such database listings, *see, e.g.*, *Forsham*, 445 U.S. at 186. The plaintiff does not contest this, and in fact the plaintiff appears to recognize that creating a new record would be required to respond to these requests. *See* Pl.'s First 444 Opp'n at 12 ("All that a CIA FOIA analyst would have to do to fill these four requests is . . . [*inter alia* ] *print out the remaining entries into four documents*, one for each category." (emphasis added)). These "four documents" the plaintiff seeks are not documents the CIA "has in fact chosen to create and retain." *See Yeager*, 678 F.2d at 321. Since the CIA was not required to create such records in

response to the plaintiff's FOIA request, the Court will grant summary judgment to the CIA on Count One in No. 11-444.

**4.      *Count Ten in No. 11-444: February 16, 2011 FOIA Request to the CIA***

Finally, the CIA refused to process the plaintiff's FOIA request that sought "a copy of all [CIA] records pertaining to the IBM supercomputer 'Watson.'"  *See* First Lutz Decl. Ex. O at 1. The CIA says that it refused to process this request because it "does not specify what type of information it seeks relating to Watson; instead, the request generally seeks *all* information on Watson."  First Lutz Decl. ¶ 29 (emphasis in original).  Furthermore, the CIA's declarant states that "it is difficult to determine where responsive information would likely be located within the Agency because the request is so general," and therefore "the CIA would be required to search every office for any documents containing the word 'Watson.'"  *Id.* ¶31

The plaintiff opposes a grant of summary judgment to the CIA with respect to this request, contending that the CIA is applying "the misguided rule that any request that contains the word 'pertaining to,' 'related to,' or 'relating to' is automatically overbroad whenever [the CIA] does not feel like processing it."  Pl.'s First 444 Opp'n at 19.  The plaintiff then spends several pages of its brief interpreting a case cited by the CIA from the District of Massachusetts, which said that "[a] request for all documents 'relating to' a subject is usually subject to criticism as overbroad since life, like law, is 'a seamless web,' and all documents 'relate' to all others in some remote fashion."  *See Mass. Dep't of Pub. Welfare v. U.S. Dep't of Health & Human Servs.*, 727 F. Supp. 35, 36 n.2 (D. Mass. 1989) (Young, J.).  The plaintiff concludes its exegesis by hyperbolically asserting that "[the CIA's] own exemption arguments would categorically exempt all of its records from FOIA if Judge Young's *dicta* became the law."  Pl.'s First 444 Opp'n at 22.  Finally, the plaintiff argues that "[a]ny CIA professional who was familiar with the subject area of the request (computer science or, more specifically, artificial intelligence) would

be able to easily determine which [CIA] components were likely to have responsive records." *Id.* at 23. In support of this latter assertion, the plaintiff cites the fact that "the NSA was able to quickly search for and retrieve records responsive to an identical request." *Id.* at 23 n.9.[29]

With respect to the plaintiff's contention about the CIA's alleged "misguided rule," this Court previously dismissed the plaintiff's related policy-or-practice claim, which alleged that the CIA had "a policy or practice of applying a definition of the FOIA's 'reasonably describes' requirement that 'is significantly and consistently broader than is allowed by FOIA.'" *NSC I,* 898 F. Supp. 2d at 273 (quoting 444 FAC ¶ 58). As the Court previously stated, "the question of whether a particular FOIA request 'reasonably describes' the records sought is a highly context-specific inquiry, ill-suited to abstract analysis." *Id.* at 278. Thus, the Court will focus on the specific context of the plaintiff's FOIA request for "all [CIA] records pertaining to the IBM supercomputer 'Watson.'"

The plaintiff's arguments regarding "the misguided rule" regarding requests that contain the terms "relating to" or "pertaining to"—as well as the plaintiff's related discussion of Judge Young's opinion in *Mass. Dep't of Pub. Welfare*—miss the point. As the CIA clarifies in its reply brief, "[t]he CIA determined that NSC's request for all documents pertaining to Watson was overly broad because the request did not allow CIA FOIA analysts to reasonably determine where responsive records were likely to be located, not because the request contained the phrase 'pertaining to.'" Def.'s First Reply to Opp. to Mot. for Summ. J. ("Def's First 444 Reply) at 8, 11-444, ECF No. 27. Indeed, as the CIA's declarant states, the CIA refused to process this request because it would require the CIA "to search every office for any documents containing

---

[29] The plaintiff also takes a pot shot at the CIA in this regard, stating that "the NSA FOIA Office proves capable of FOIA processing feats only dreamt of at the CIA." Pl.'s First 444 Opp'n at 23 n.9.

the word 'Watson," which the CIA characterizes as "a massive undertaking."  First Lutz Decl. ¶ 31.

The plaintiff only barely addresses this burden issue by contending that "[a]ny CIA professional who was familiar with the subject area of the request (computer science or, more specifically, artificial intelligence) would be able to easily determine which [CIA] components were likely to have responsive records."  Pl.'s First 444 Opp'n at 23.  Yet, the plaintiff's assertion begs the very question that underlies the CIA's reason for refusing to process the request in the first place.  The plaintiff states that "the subject area of the request" is "computer science or, more specifically, artificial intelligence," *see id.*, but that is not what the request itself states.  The request broadly seeks "all [CIA] records pertaining to the IBM supercomputer 'Watson.'"  *See* First Lutz Decl. Ex. O at 1.  Such a request certainly contemplates records related to the computing technology used to develop "Watson," but the request also appears to contemplate records that have very little or nothing to do with computer science, such as records about business dealings involving "Watson," or even informal e-mail exchanges among CIA employees about "Watson's" appearance on the television program *Jeopardy!*.  All of these other documents would be responsive to the plaintiff's broad request as well, even if the plaintiff is not interested in them.  It is for this reason that the CIA "cannot reasonably formulate a search of [its] decentralized records system to locate responsive records."  First Lutz Decl. ¶ 31.

Relatedly, although the plaintiff focuses on the oft-cited requirement that a request must "'enable[] a professional agency employee familiar with the subject area to locate the record with a reasonable amount of effort,'" *see* Pl.'s First 444 Opp'n at 23 (quoting *Judicial Watch v. Exp.-Imp. Bank*, 108 F. Supp. 2d 19, 27 (D.D.C. 2000)), the plaintiff fails to recognize that this is a necessary, but not sufficient, condition of adequacy.  Even where a request "identif[ies] the

documents requested with sufficient precision to enable the agency to identify them," the request may still fail to "reasonably describe[]" the records sought if it is "so broad as to impose an unreasonable burden upon the agency." *See Am. Fed'n of Gov't Emps.*, 907 F.2d at 209.[30]  The plaintiff's February 26, 2011 FOIA request to the CIA was overly broad because it would require the CIA to "search every office for any documents containing the word 'Watson'" because "any component is equally likely to have responsive records."  First Lutz Decl. ¶ 31; *see, e.g.*, *Oglesby*, 920 F.2d at 68 ("There is no requirement that an agency search every record system."); *Marks v. U.S. Dep't of Justice*, 578 F.2d 261, 263 (9th Cir. 1978) (holding that "the FOIA does not mandate that [an agency] comply" with a request that would require "an all-encompassing search of the records of every field office").  Therefore, the Court will grant summary judgment to the CIA on Count Ten in No. 11-444.[31]

\* \* \*

---

[30] For example, if a FOIA requester sought "all CIA records printed in the English language," the agency certainly would know what the requester was asking the agency to produce.  The problem with such a request, however, is its breadth, rather than its opaqueness.

[31] The plaintiff also asserts in its briefing that the CIA failed to comply with its own regulation in refusing to process each of these seven FOIA requests.  *See* Pl.'s First 444 Opp'n at 9.  That regulation, discussed in the Court's previous opinion, states: "Communications which do not meet the[] requirements [of reasonably describing the records sought and not requiring an unreasonable search] will be considered an expression of interest and the Agency will work with, and offer suggestions to, the potential requester in order to define a request properly."  32 C.F.R. § 1900.12(c).  The plaintiff contends that the CIA "never 'worked with' NSC on any of these requests; it never even *contacted* NSC before mailing its summary cancellation letters."  Pl.'s First 444 Opp'n at 9 (emphasis in original).  The plaintiff further contends that "if the Court finds that Defendant violated 32 C.F.R. § 1900.12(c) by not contacting NSC prior to cancelling its requests, Defendant is not entitled to summary judgment on Counts 1, 8, 9, and 10."  *Id.*  These arguments raise two issues: (1) whether the CIA violated 32 C.F.R. § 1900.12(c); and (2) whether such a violation is a basis to deny summary judgment to the CIA under the FOIA.  As to the first issue, the CIA arguably did "work with, and offer suggestions to," the plaintiff in response to some of its "expression[s] of interest."  *See* 32 C.F.R. § 1900.12(c).  For three of the seven requests in question, the CIA "encourage[d] [NSC] to refine the scope of [its] request," and provided specific ways in which the request could be refined in a way that would enable the agency to process it.  *See* First Lutz Decl. Exs. N, P.  Even if the CIA did violate 32 C.F.R. § 1900.12(c) in responding to the plaintiff's other FOIA requests, however, that is not a basis to deny summary judgment to the CIA under the FOIA.  As the Court noted in its previous opinion, a violation of an agency's own regulations (even if those regulations are related to the FOIA) are not violations of the FOIA itself and "are properly addressed under the APA," not the FOIA.  *See NSC I*, 898 F. Supp. 2d at 266 (citing *Muttitt v. U.S. Cent. Command*, 813 F. Supp. 2d 221, 229 (D.D.C. 2011)).

In sum, the Court grants summary judgment to the CIA on Counts One, Eight, Nine, and Ten in No. 11-444.

The Court will next discuss the challenges that the plaintiff makes to certain decisions by the defendants to withhold responsive information under the FOIA's statutory exemptions. The plaintiff raises challenges to withholding determinations made pursuant to FOIA Exemptions 1, 2, 3, 5, and 6. The Court will discuss the arguments made about each exemption in turn.

## F.    Exemption 1

The plaintiff challenges Exemption 1 withholding determinations made by defendants DIA and CIA. As to the CIA, the plaintiff specifically challenges the withholding pursuant to Exemption 1 of (1) sixteen responsive records in full under Counts One, Two, Three, and Seven in No. 11-445, and (2) article titles from 105 responsive records under Count Three in No. 11-443. *See* Pl.'s First 445 Opp'n at 5; Pl.'s In Camera Opp'n to Def.'s Mot. Summ. J. on Count Three ("Pl.'s First 443 Opp'n") at 11–14, No. 11-443, ECF No. 58.[32] As to the DIA, the plaintiff challenges the withholding pursuant to Exemption 1 of two documents in full related to Count Five in No. 11-445. Pl.'s First 445 Opp'n at 6. The Court will begin by discussing the legal standard applicable to Exemption 1 withholding determinations. The Court will then discuss the Exemption 1 issues raised in No. 11-445 before turning to No. 11-443.

As discussed above, the general rule in FOIA cases is that "[i]f an agency's affidavit describes the justifications for withholding the information with specific detail, demonstrates that the information withheld logically falls within the claimed exemption," and "is not contradicted by contrary evidence in the record or by evidence of the agency's bad faith, then summary

_____

[32] The plaintiff appears to assert categorical opposition to the CIA's Exemption 1 withholdings with respect to article titles in records responsive to the FOIA request in Count Three in No. 11-443, though the plaintiff does "concede[] that some of the information withheld under Exemption (b)(1) is properly classified." *See* Pl.'s First 443 Opp'n at 11. The plaintiff contends that "the Court has no way of knowing which of the withheld information actually meets the criteria for classification, because CIA's *Vaughn* index entries consist generally of nothing more informative than a parroting of the statutory standard." *See id.* at 11–12.

judgment is warranted on the basis of the affidavit alone." *ACLU/DOD*, 628 F.3d at 619. FOIA

Exemption 1 provides that "matters that are" either "specifically authorized under criteria

established by an Executive order to be kept secret in the interest of national defense or foreign

policy" or "are in fact properly classified pursuant to such Executive order" are exempt from

production under the FOIA. *See* 5 U.S.C. § 552(b)(1). "[I]n the FOIA context, [the D.C. Circuit

has] consistently deferred to executive affidavits predicting harm to the national security, and

have found it unwise to undertake searching judicial review." *Ctr. for Nat'l Sec. Studies*, 331

F.3d at 927. "The CIA's arguments need only be both 'plausible' and 'logical' to justify the

invocation of a FOIA exemption in the national security context." *ACLU/DOD*, 628 F.3d at 624

(quoting *Wolf v. CIA*, 473 F.3d 370, 374–75 (D.C. Cir. 2007)); *accord Morley*, 508 F.3d at 1124

("[T]he text of Exemption 1 itself suggests that little proof or explanation is required beyond a

plausible assertion that information is properly classified.").

### 1.    *Exemption 1 Withholdings in No. 11-445 (CIA and DIA)*

In No. 11-445, the plaintiff broadly argues that the declarations offered by the CIA and

the DIA to establish the applicability of Exemption 1 are insufficient because they only contain

"a simple recitation of the statutory standard." *See* Pl.'s First 445 Opp'n at 7; *accord id.* at 8–9

("Simply stating without any support that information is related to intelligence sources and

methods is not sufficient, regardless of the deference given to agencies in national security

matters."). In this regard, the plaintiff asks the Court to "order [the CIA and DIA] to promptly

file a more sufficient *Vaughn* index consisting of something more than a parroting of the

statutory standards." *Id.* at 9. The plaintiff contends that this "something more" should, *inter*

*alia*, "include the date of classification of each document and the person who classified it, to

ensure that the information was classified in accordance with Executive Order 13526." *Id.*

The CIA's declarant explains that information withheld under Exemption 1 in No. 11-445 falls into two categories: (1) "information on unacknowledged persons and activities," or (2) "the specifics of FOIA requests referred from other government agencies for which the CIA sought non-attribution." Third Lutz Decl. ¶ 27. The CIA's declarant clarifies that both categories of information "implicat[e] intelligence activities," and the documents in question specifically contain (1) "acronyms which disclose the CIA's involvement in geographic locations and intelligence operations not officially acknowledged," and (2) "information that would disclose the fact that the CIA collected intelligence on certain individuals and event[s] which have not been officially acknowledged." *Id.* ¶ 28, 30. The CIA has also provided a document-by-document *Vaughn* index, which describes the general character of each withheld document and the exemption or exemptions claimed for each. *See* Third Lutz Decl. Ex. K, No. 11-445, ECF Nos. 29-2 through 29-7. With respect to the two documents withheld under Exemption 1 by the DIA, the agency states in its *Vaughn* index that both documents "consist[] of a work tasking within the Intelligence Community on a classified subject matter" and "would reveal an intelligence sources and methods [sic] and would therefore compromise the intelligence information collection mission effectiveness of the intelligence community." *See* Supp. Decl. of Alesia Y. Williams (Nov. 8, 2012) ("Second Williams Decl.") Ex. A at 18, 24, No. 11-445, ECF No. 35-1.

Upon consideration of the sworn declarations and accompanying *Vaughn* indices provided by the CIA and DIA, the Court is satisfied that both agencies have provided "a plausible assertion that information is properly classified." *See Morley*, 508 F.3d at 1124. It is reasonably clear from the materials provided by both agencies that the information withheld pursuant to Exemption 1 is properly classified because it would compromise important

intelligence-gathering activities if it were disclosed.  As to the CIA, the plaintiff concedes that "[t]o the extent the withheld information" contains (1) "acronyms which disclose the CIA's involvement in geographic locations and intelligence operations not officially acknowledged," and (2) "information that would disclose the fact that the CIA collected intelligence on certain individuals and event[s] which have not been officially acknowledged," the plaintiff "does not challenge CIA's withholdings under Exemption 1."  *See* Pl's First 445 Opp'n. at 6.  The plaintiff nevertheless maintains that "the Court has no way of knowing which of the withheld information actually does fall within these criteria."  *Id.*

The Court disagrees.  The plaintiff is reading the CIA's declaration and *Vaughn* index in isolation, rather than reading both documents together.  Although the CIA's *Vaughn* index only states, for example, that information was withheld because it "contains classified information disclosing intelligence sources and methods," *see, e.g.*, Third Lutz Decl. Ex. K pt. 1, at 109, No. 11-445, ECF No. 29-2, the CIA's declaration explains in much more detail what is meant by "intelligence sources and methods" or "intelligence activities," *see* Third Lutz Decl. ¶¶ 29–30. Hence, reading all of the CIA's materials together, the CIA has plausibly established that the information withheld contains information about intelligence-gathering activities, and given that conclusion, the plaintiff appears to concede that the CIA's Exemption 1 withholdings are entitled to summary judgment.  *See* Pl.'s First 445 Opp'n at 6 ("To the extent the withheld information falls within one of these two criteria, NSC does not challenge CIA's withholdings under Exemption (b)(1).").

The same is true of the DIA's declaration, though the DIA's declaration provides less detail about the nature of the classified information that was withheld.  As discussed above, the DIA's *Vaughn* index states that each of the two documents withheld under Exemption 1 are

"document[s] consist[ing] of a work tasking within the Intelligence Community on a classified subject matter," which "would reveal . . . intelligence sources and methods and would therefore compromise the intelligence information collection mission effectiveness of the intelligence community." Second Williams Decl. Ex. A at 18, 24. This is undoubtedly "something more than a parroting of the statutory standards." *See* Pl.'s First 445 Opp'n at 9. Although many details of these two documents remain unknown, the DIA's declaration plausibly establishes that the withheld information relates to sensitive operations within the Intelligence Community, the substance of which is properly classified in the interest of national security. That is sufficient to grant summary judgment. *See Morley*, 508 F.3d at 1124.

The plaintiff asserts that "something more" is required to warrant summary judgment under FOIA Exemption 1, and suggests two specific pieces of information in this regard: (1) "the date of classification of each document," and (2) "the person who classified it." Pl.'s First 445 Opp'n at 9. The plaintiff's reason for demanding this information is that it is necessary "to ensure that the information was classified in accordance with Executive Order 13526." *Id.* The Court construes the plaintiff to assert that the CIA and DIA have not complied with the procedural requirements of Executive Order 13,526, and in particular § 1.7(d) of that Executive Order. That provision states that information sought through a FOIA request may be classified after the request is submitted, but "only if such classification . . . is accomplished on a document-by-document basis with the personal participation or under the direction of the agency head, the deputy agency head, or the senior agency official." Exec. Order 13,526 § 1.7(d).

At the outset, Executive Order 13,526 does not require that a classifying authority indicate when information is originally classified. *See, e.g.*, *Judicial Watch, Inc. v. U.S. Dep't of Def.*, 857 F. Supp. 2d 44, 58 (D.D.C. 2012) (observing that "[Executive Order] 13526 does not

require that the date of classification be indicated on the records themselves"). Likewise, Executive Order 13,526 does not require that a classifying authority indicate "the person who classified" the information in question, as the plaintiff asserts. *See* Pl.'s First 445 Opp'n at 9. Rather, with regard to the identity of the party classifying information, the Executive Order only requires that an "original classification authority is classifying the information," *see* Exec. Order 13,526 § 1.1(a), and the plaintiff does not contend that the information withheld by either the DIA or the CIA was classified by someone other than an "original classification authority."

The crux of the plaintiff's somewhat veiled procedural argument is that the CIA and the DIA were required to provide the date of classification and the identity of the classifying authority in order to ensure that those agencies complied with § 1.7(d). Section 1.7(d), however, only applies when information is "classified or reclassified after an agency has received a request for it under the [FOIA]" or other similar statutes. *See* Exec. Order 13,526 § 1.7(d). The plaintiff essentially argues that it is the agency's burden under FOIA Exemption 1 to establish affirmatively in every instance whether information was classified before or after a FOIA request for that information was submitted.

The Court disagrees. As the Court has previously held, "an agency need only satisfy the requirements of Executive Order § 1.1(a) to classify information properly for purposes of FOIA Exemption 1." *Mobley*, 2013 WL 452932, at *20 (collecting cases). If the agency's release or other representations suggest that information may have been classified after the relevant FOIA request was submitted, the agency has the burden of coming forward with evidence to establish either (1) the information was classified prior to the FOIA request; or (2) the agency satisfied the requirements of § 1.7(d). *See, e.g.*, *TREA Senior Citizens League v. U.S. Dep't of State*, No. 10-1423, 2013 WL 458297, at *5 (D.D.C. Feb. 7, 2013) (agency required to demonstrate

compliance with § 1.7(d) where agency declaration stated that information "'was originally UNCLASSIFIED,' but 'is currently classified CONFIDENTIAL'").  It is the plaintiff's initial burden, however, to raise a genuine factual question regarding whether information was classified after a FOIA request was submitted for that same information, and only then would the burden shift to the agency to establish that either (1) the information was classified prior to the FOIA request; or (2) the agency satisfied the requirements of § 1.7(d).[33]  *See, e.g.*, *Larson*, 565 F.3d at 867 (where agency's affidavit demonstrates that information was properly classified under Executive Order, summary judgment is warranted so long as "[t]he affidavit is not controverted by any contrary evidence in the record or any evidence suggesting agency bad faith").

In this case, the plaintiff seeks to satisfy its initial burden by pointing to the fact that nine of the sixteen documents withheld under Exemption 1 by the CIA—all of which were responsive to the FOIA requests challenged in Counts One and Two in No. 11-445—"have 'Unclassified' written next to Classification in the *Vaughn* indices."  *See* Pl.'s First 445 Opp'n at 5 n.6.  According to the plaintiff, "[t]his suggests that the information was not classified until after CIA received these FOIA requests."  *Id.*  The Court agrees.  The denomination of these nine documents[34] as "Unclassified" in the CIA's *Vaughn* index raises a genuine factual question regarding whether the classified information contained in these documents was classified prior to the FOIA requests submitted by the plaintiff.  Accordingly, the burden is now on the CIA to establish that either (1) the information in these nine documents was classified prior to the

---

[33] The Court recognizes that satisfying this initial burden may be difficult in most cases because classifying authorities are not required to indicate the date of classification under Executive Order 13,526.  *See Judicial Watch*, 857 F. Supp. 2d at 58.

[34] The nine documents are identified in the CIA's *Vaughn* index by the following Bates numbers: C05366473, C01499710, C05403192, C05403194, C05403197, C05403198, C05403199, C05403203, and C05549838.  The first of these documents was responsive to the FOIA request at issue in Count One in No. 11-445, while the latter eight were responsive to the FOIA request at issue in Count Two in No. 11-445.

plaintiff's FOIA request; or (2) the agency satisfied the requirements of § 1.7(d) in classifying the information. The CIA may satisfy the burden by submitting a supplementary declaration. The plaintiff does not, however, raise any genuine factual question regarding whether the DIA properly classified the information contained in the two disputed documents related to Count Five in No. 11-445. The DIA has thus satisfied its burden of plausibly establishing that the information contained in those two documents was properly classified under Executive Order 13,526.

Therefore, with respect to information withheld under Exemption 1, the Court grants summary judgment to the DIA on Count Five in No. 11-445, and the Court also grants summary judgment to the CIA on Counts Three and Seven in No. 11-445. The Court denies summary judgment to the CIA, however, on Counts One and Two in No. 11-445 with respect to information withheld under Exemption 1. Specifically, the CIA has not satisfied its burden of demonstrating that nine records responsive to the FOIA requests at issue in Counts One and Two were properly classified, as discussed above.

### 2. *Exemption 1 Withholdings in No. 11-443*

The plaintiff also challenges the CIA's decision to withhold dozens of article titles from documents that were responsive to the plaintiff's May 12, 2010 FOIA request for "all Tables of Contents ('TOCs') from the [CIA] in-house journal *Studies in Intelligence*." *See* Second Lutz Decl. Ex. A at 1. The plaintiff's argument in this regard is two-fold. First, the plaintiff argues that the "CIA has exhibited the 'general sloppiness' of its FOIA review process in several ways," and therefore the plaintiff believes that "the Court should not afford substantial weight to the assertions made in the Lutz Declaration." *See* Pl.'s First 443 Opp'n at 6, 11. Second, the plaintiff makes essentially the same argument it made in No. 11-445: the CIA is not entitled to summary judgment "because CIA's *Vaughn* index entries consist generally of nothing more

informative than a parroting of the statutory standard."  *See id.* at 11–12.  With regard to both arguments, the plaintiff points to several pieces of information that the CIA withheld from disclosure, which are publicly available.  *See id.* at 6 ("NSC has identified no less than eighty-six pieces of information withheld by CIA which have been officially disclosed elsewhere."); *id.* at 12 (pointing to the "banal and generic" nature of "officially disclosed information . . . which was withheld under Exemption (b)(1)").

As to the first argument, the Court agrees with the CIA that the plaintiff's argument is "based on the faulty premise that agencies are required to exhaustively search public sources to determine whether information is publically available before asserting FOIA exemptions."  *See* Def.'s Reply in Supp. Mot. Summ. J. on Count Three ("Def.'s First 443 Reply") at 3, No. 11-443, ECF No. 43.  Agencies do not have an affirmative duty to ascertain whether information has been made publicly available before deciding to withhold it from release under the FOIA.  *See, e.g.*, *Davis v. Dep't of Justice*, 968 F.2d 1276, 1279 (D.C. Cir. 1992) ("[T]he task of proving the negative—that information has *not* been revealed—might require the government to undertake an exhaustive, potentially limitless search.").  Therefore, the fact that certain pieces of information withheld by the CIA had previously become publicly available does not demonstrate any "general sloppiness" on the part of the CIA that would undercut the "substantial weight" accorded to "an agency's affidavit concerning the details of the classified status of the disputed record."  *See Afshar v. Dep't of State*, 702 F.2d 1125, 1131 (D.C. Cir. 1983).[35]  This is especially

---

[35] It makes no difference that "a significant majority of the officially disclosed information is present on CIA's website . . . or in other official CIA publications."  *See* Pl.'s First 443 Opp'n at 7.  To meet its burden at summary judgment, an agency is not required to demonstrate that it exhaustively cross-referenced information responsive to a FOIA request with every officially disclosed piece of information to determine whether it is publicly available—even if the agency responding to the request is the same agency that previously disclosed the information.  *See Davis*, 968 F.2d at 1279.  Rather, the initial burden of production on the issue of official disclosure lies with the requester, who must "point to 'specific' information identical to that being withheld."  *Id.* at 1280.  If the requester carries its burden, of course the agency would then be required to produce the withheld information the requester, *see, e.g.*, *Fitzgibbon v. CIA*, 911 F.2d 755, 765 (D.C. Cir. 1990) ("[W]hen information has been 'officially

true in a case like the instant one where the CIA made eminently reasonable efforts to determine whether information contained in the withheld records had been previously made available through any form of official public disclosure. *See* Supp. Decl. of Martha M. Lutz (Nov. 15, 2012) ("Fourth Lutz Decl.") ¶¶6–7, No. 11-443, ECF No. 43-1. Therefore, the Court does not find the plaintiff's examples of withheld but publicly available information to be evidence of "general sloppiness" on the part of the CIA.[36]

The plaintiff's second argument does not fare any better. At the outset, the Court notes one point of confusion regarding the plaintiff's challenge with respect to the information withheld by the CIA under Exemption 1. As discussed above, the plaintiff points to dozens of pieces of information—including some article titles—that were withheld by the CIA under Exemption 1, but which are also publicly available. *See* Pl.'s First 443 Opp'n at 6–10, 12–13. It is unclear, however, whether the plaintiff seeks an order from the Court directing the CIA to provide copies of this publicly available information to the plaintiff in connection with its FOIA request. The CIA appears to indicate that if any information was released through a "form of official public disclosure," the CIA "released the identical information" to the plaintiff. *See* Fourth Lutz Decl. ¶ 7. The plaintiff appears only to be using these alleged official disclosures of information to undermine the credibility of the CIA's declarations. In any event, this issue now appears moot because the CIA has provided the plaintiff with any officially disclosed

---

acknowledged,' its disclosure may be compelled even over an agency's otherwise valid exemption claim."), but the agency does not bear the burden of establishing an exhaustive public records search in the ordinary course of seeking summary judgment in a FOIA case.

[36] As discussed below, *see infra* note 49, the plaintiff does not make clear in its briefing whether it is making an argument premised on "bad faith" or "general sloppiness" in No. 11-443. To the extent that the plaintiff presents the examples of withheld but publicly available information to be evidence of "bad faith," in addition to "general sloppiness," the Court concludes that such examples are not evidence of bad faith for the same reasons it concludes that they are not evidence of "general sloppiness."

information, and the plaintiff does not ask the Court to order the CIA to disclose any officially disclosed information.

The CIA justifies its withholding of information under FOIA Exemption 1 by stating, *inter alia*, that "the documents at issue implicate intelligence activities." *See* Second Lutz Decl. ¶ 28. Specifically, "the withheld information would reveal the Agency's presence in certain foreign countries, the location of certain covert operations, intelligence collection techniques, and clandestine relationships with certain foreign governments." *Id.* Unsurprisingly, the CIA avers that unauthorized disclosure of this information "could reasonably be expected to result in damage or serious damage to the national security." *Id.* The CIA's declarant also goes on to describe in more detail the nature of "intelligence activities" and "foreign relations and activities" and why the release of information about these activities would harm the national security of the United States. *See id.* ¶¶ 30–34.

Despite the CIA's explanation regarding the classified information that it withheld under Exemption 1, the plaintiff complains that "the Court has no way of knowing which of the withheld information actually meets the criteria for classification, because CIA's *Vaughn* index entries consist generally of nothing more informative than a parroting of the statutory standard." *See* Pl.'s First 443 Opp'n at 11–12. Once again, however, the plaintiff narrowly focuses its attention on the CIA's *Vaughn* index in isolation, without reading the *Vaughn* index in conjunction with the CIA's declaration. Reading the two documents together, the CIA has clearly established that the article titles it withheld under FOIA Exemption 1 plausibly fall within that exemption.[37]

---

[37] The plaintiff agreed to limit the scope of its challenge in Count Three of No. 11-443 to "the redaction of titles in the <u>Studies of Intelligence</u> [sic] tables of contents." Second Lutz Decl. ¶ 20. The plaintiff has stated that it "will abide by its agreement," but nevertheless urges this Court to "rule *sua sponte* on CIA's withholdings of authors'

The plaintiff attempts to undercut this conclusion by pointing to four examples of *Studies in Intelligence* article titles that were withheld by the CIA under Exemption 1 but that are also publicly available. *See* Pl.'s First 443 Opp'n at 12. The plaintiff notes that these are "banal and generic titles," which the plaintiff claims "further demonstrate[es] the lack of weight that should be given to CIA's assertions." *Id.* Once again, the Court disagrees. The fact that certain titles may appear to a lay person as "generic" or "banal" has no bearing on whether the information was properly classified. It is well understood in this Circuit that "the judiciary is in an extremely poor position to second-guess the executive's judgment in th[e] area of national security." *Ctr. for Nat'l Sec. Studies*, 331 F.3d at 928. Furthermore, this Circuit has recognized that "[m]inor details of intelligence information may reveal more information than their apparent insignificance suggests because, 'much like a piece of jigsaw puzzle, each detail may aid in piecing together other bits of information, even when the individual piece is not of obvious importance in itself.'" *Larson*, 565 F.3d at 864 (quoting *Gardels v. CIA*, 689 F.2d 1100, 1106 (D.C. Cir. 1982)). Since this Court lacks the expertise to second-guess the appropriateness of classifying certain information simply because it may appear harmless, the Court will not venture to do so here.

In one final attempt to avoid summary judgment, the plaintiff raises anew the argument, discussed above, that the CIA is required to demonstrate compliance with § 1.7(d) of Executive Order 13,526. *See* Pl.'s First 443 Opp'n at 13–14; *see also supra* Part III.E.1(a). This time, the plaintiff argues that the "CIA should be required to explain how its statement to the Court that its declaration only describes the classification status of this information *in December 2011* can be reconciled with the plain language of the Lutz Declaration, signed 8 August 2012, which states

---

names." Pl.'s First 443 Opp'n at 2. The Court declines the plaintiff's invitation and will rule only on those aspects of the CIA's withholding that are disputed by the plaintiff in Count Three of 11-443, *i.e.*, article titles.

*in the present tense*, "I have determined that . . . this information *is currently and properly classified*.'" Pl.'s First 443 Opp'n at 14 (emphasis in original) (citation omitted). The first CIA statement referenced by the plaintiff actually said that "[i]nformation that was properly classified and withheld from the CIA's FOIA production in December 2011, may no longer be classified." *See* Joint Status Report at 2. This is not the same as saying the CIA's declaration "only describes the classification status of this information in December 2011," as the plaintiff claims. *See* Pl.'s First 443 Opp'n at 14 (emphasis omitted). The fact that information that was withheld as classified in December 2011 "*may* no longer be classified," *see* Joint Status Report at 2 (emphasis added), is not inconsistent with the statement that such information currently remains classified. The plaintiff has thus failed to raise a genuine factual question regarding whether the article titles withheld by the CIA were classified after a FOIA request was submitted for them, and therefore the CIA carries no burden to demonstrate its compliance with § 1.7(d) of Executive Order 13,5256. Therefore, the Court grants summary judgment, in part, to the CIA on Count Three in No. 11-443 with respect to the information withheld by the agency under FOIA Exemption 1.

The Court denies summary judgment, in part, however, with respect to a single document withheld in part by the CIA under Exemption 1. That document was located and released in part by the CIA on November 15, 2012, when the CIA filed its reply brief in No. 11-443. *See* Fourth Lutz Decl. ¶ 11. The only information provided by the CIA about this document is that it is "a two-page classified TOC from volume 53 (number 2)" of *Studies in Intelligence*. *See id.* The plaintiff has clarified that it challenges these Exemption 1 redactions made by the CIA. *See* Notice of Clarification at 1, No. 11-443, ECF No. 60. The CIA has not provided sufficient information about this document to satisfy its burden under the FOIA, and therefore the CIA will

be required to submit a further supplemental affidavit to establish that the portions of this document withheld under Exemption 1 "are in fact properly classified." *See* 5 U.S.C. § 551(b)(1).

* * *

In sum, with respect to information withheld pursuant to Exemption 1, the Court grants summary judgment to the DIA on Count Five in No. 11-445, and to the CIA on Counts Three and Seven in No. 11-445. The Court grants in part and denies in part summary judgment to the CIA on Counts One and Two in No. 11-445 and on Count One in No. 11-443. With respect to Counts One and Two in No. 11-445, the Court denies summary judgment to the CIA as to the withholding of nine documents labeled with Bates numbers: C05366473, C01499710, C05403192, C05403194, C05403197, C05403198, C05403199, C05403203 and C05549838. The Court grants summary judgment to the CIA on Counts One and Two in No. 11-445 in all other respects related to the withholding of information pursuant to Exemption 1. With respect to Count One in No. 11-443, the Court denies summary judgment as to the "two-page classified TOC from volume 53 (number 2)" of *Studies in Intelligence*. *See* Fourth Lutz Decl. ¶ 11. The Court grants summary judgment to the CIA on Count One in No. 11-443 in all other respects related to the withholding of information pursuant to Exemption 1.

### G.    Exemption 2

The CIA withheld thirteen documents in full under FOIA Exemption 2.[38]  *See* Third Lutz Decl. Ex. K pt. 2, at 1, 8–14, 16–18, 22, 27, No. 11-445, ECF No. 29-3. Exemption 2 applies to matters that "related solely to the internal personnel rules and practices of an agency." 5 U.S.C. § 552(b)(2). The CIA states in its declaration that all thirteen documents withheld under

---

[38] The plaintiff previously indicated that it intended to challenge Exemption 2 withholding decisions made by the ODNI as well. *See* Hackett Decl. Ex. E at 1, ECF No. 29-8. The plaintiff, however, does not pursue that challenge in its opposition to the defendants' motions for summary judgment in No. 11-445.

Exemption 2 "are internal training documents containing the procedures and guidelines utilized by CIA officers in processing FOIA and Privacy Act requests."  Third Lutz Decl. ¶ 31.  The plaintiff concedes that "the withheld records . . . technically pertain to personnel, in that they are instructions for personnel to follow."  Pl.'s First 445 Opp'n at 9.  The plaintiff nevertheless contends that, "[i]n order to be properly withheld [under Exemption 2], the information must be of a relatively trivial nature."  *Id.* (citing *Dep't of Air Force v. Rose*, 425 U.S. 352, 369–70 (1976) and *Lesar v. DOJ*, 636 F.2d 472, 485 (D.C. Cir. 1980)).  This triviality requirement applies, according to plaintiff, because the rationale for Exemption 2 is "that the very task of processing and releasing some requested records would place an administrative burden on the agency that would not be justified by any genuine public benefit."  *Id.* at 9–10 (collecting cases).  The plaintiff contends that "public awareness of how the CIA processes FOIA requests is of *great* public benefit, especially to the FOIA requester community."  *Id.* at 10 (emphasis in original).  In an attempt to refute the viability of the plaintiff's triviality requirement, the CIA cites to *Milner v. U.S. Department of the Navy*, 131 S. Ct. 1259 (2011), which recently limited the reach of Exemption 2, as well as *Institute for Policy Studies v. CIA*, 885 F. Supp. 2d 120, 146 (D.D.C. 2012), which was a post-*Milner* case that permitted the CIA's withholding of "the signature of a CIA officer as well as internal filing instructions and administrative routing information" under Exemption 2.  While the CIA is correct in positing that the plaintiff's proposed triviality requirement has no basis in Exemption 2, the *Milner* case is otherwise not helpful to the CIA's effort to cloak its nondisclosure under this exemption.

The Supreme Court in *Milner* held that the phrase "personnel rules and practices" in Exemption 2 refers to an agency's "rules and practices dealing with employee relations or human resources."  *Milner*, 131 S. Ct. at 1265.  Without attempting to "formulate a comprehensive list,"

the Supreme Court held that "all the rules and practices referenced in Exemption 2 share a critical feature: They concern the conditions of employment in federal agencies—such matters as hiring and firing, work rules and discipline, compensation and benefits." *Id.* The Supreme Court in *Milner* also specifically considered the government's argument that Exemption 2 "'encompasses records concerning an agency's internal rules and practices for its personnel to follow in the discharge of their governmental functions.'" *Id.* at 1269. The Supreme Court rejected this "odd reading" of the statute, holding instead that "[t]he use of the term 'personnel' [in Exemption 2] connotes not that the . . . practice/rule is *for* personnel, but rather that [it] is *about* personnel—*i.e.*, that it relates to employee relations or human resources." *Id.* at 1269–70 (emphasis in original). Indeed, the Supreme Court in *Milner* said that the government's proposed construction of Exemption 2 would "strip[] the word 'personnel' of any real meaning," extending Exemption 2 to "all [an agency's] internal rules and practices" because "agencies necessarily operate through personnel, and so all their internal rules and practices are for personnel." *Id.* at 1269. The Court cautioned that the government's proposed construction "would produce a sweeping exemption, posing the risk that FOIA would become less a disclosure than 'a withholding statute' since "[m]any documents an agency generates in some way aid employees in carrying out their responsibilities." *Id.* at 1270.

The Supreme Court's guidance in *Milner* is crystal clear regarding the scope of Exemption 2, and it is equally clear, under *Milner*, that Exemption 2 does not apply to the "internal training documents" withheld by the CIA. *See* Third Lutz Decl. ¶ 31. These documents, which "contain[] the procedures and guidelines utilized by CIA officers in processing FOIA and Privacy Act requests," *id.*, are not human resources documents. Instead, they are the very "records concerning an agency's internal rules and practices for its personnel to

follow in the discharge of their governmental functions," which the Supreme Court specifically excluded from the scope of Exemption 2. *See Milner*, 131 S. Ct. at 1269. As a result, the Court will deny summary judgment to the CIA on Count Seven in No. 11-445, regarding the agency's decision to withhold thirteen documents under FOIA Exemption 2.[39]

\* \* \*

In sum, the Court denies summary judgment to the CIA on Count Seven in No. 11-445, regarding the agency's decision to withhold thirteen documents under FOIA Exemption 2. These documents are labeled in the CIA's *Vaughn* index as: C05520233, C05520227, C05520231, C05520236, C05520235, C05520226, C05520181, C05520232, C05520213, C05520218, C05520223, C05520228, and C05520234.

## H.    Exemption 3

Next, the plaintiff challenges the withholding of several hundred records by the CIA, DIA, and ODNI, in whole or in part, under FOIA Exemption 3.[40] That exemption, in the context of this case, applies to matters "specifically exempted from disclosure by statute . . . if that statute" either (1) "requires that the matters to be withheld from the public in such a manner as to leave no discretion on the issue," or (2) "establishes particular criteria for withholding or refers to particular types of matters to be withheld." *See* 5 U.S.C. § 552(b)(3).[41] Specifically, the plaintiff challenges (1) the CIA's Exemption 3 withholdings made under the authority of Section 6 of the CIA Act, 50 U.S.C. § 403g, in all three cases, (2) the DIA's Exemption 3 withholdings

---

[39] All of these documents were also withheld in full under FOIA Exemption 3. *See* Defs.' First 445 Mem. at 16 n.3; *see also infra* Part III.E.3 (discussing Exemption 3 withholdings of the CIA).

[40] The plaintiff also originally challenged the withholding of material under Exemption 3 by the State Department, *see* Pl.'s First 445 Opp'n at 23, but in the same brief the plaintiff "withdr[ew] its challenge . . . since it already has a copy of the full document," *id.* at 24. The Court will therefore not address the State Department's Exemption 3 withholding decisions.

[41] All of the withholding statutes invoked by the defendants in this case were enacted prior to 2009, and therefore the second subparagraph of Exemption 3 does not apply here. *See* 5 U.S.C. § 552(b)(3)(B).

made under the authority of the National Security Act, 50 U.S.C. § 403-1(i)(1), in No. 11-445,

and (3) the ODNI's Exemption 3 withholding of the domain portions of e-mail addresses, under

the authority of Section 6 of the CIA Act, in No. 11-445. The Court will discuss each category

of withholding decisions in turn.

### 1.    *CIA*

The plaintiff challenges the CIA's withholding of over 300 responsive records, in whole

or in part, under FOIA Exemption 3.[42] All of the information withheld by the CIA under

Exemption 3 in all three cases was withheld under the authority of Section 6 of the CIA Act, 50

U.S.C. § 403g, which states in relevant part that "the [CIA] shall be exempted from the . . .

provisions of any other law [including the FOIA] which require the publication or disclosure of

the organization, functions, names, official titles, salaries, or numbers of personnel employed by

the [CIA]." *See* Def.'s First 443 Mem. at 9-10; Def.'s First 444 Mem. at 24-25; Defs.' First 445

Mem. at 17. The threshold question presented by the plaintiff's Exemption 3 challenges against

the CIA is the scope of 50 U.S.C. § 403g. The CIA interprets the statute broadly, contending in

its declarations that the statute protects (1) "information revealing the organization, functions and

---

[42] The plaintiff states in its briefing that it challenges the CIA's withholding of two records, in part, in No. 11-443, *see* Pl.'s First 443 Opp'n at 14, and six documents, in part, in No. 11-444, *see* Pl.'s First 444 Opp'n at 30, 35. The plaintiff does not specify, however, exactly which Exemption 3 withholdings it challenges in No. 11-445, where the CIA withheld a total of 498 responsive records, in whole or in part, under this exemption. Rather, the plaintiff only provides general categories of records in No. 11-445 that it challenges with respect to Exemption 3. For example, the plaintiff states that he challenges the CIA's withholding of "internal templates utilized by the agency in tasking FOIA requests," "internal rules, policies and procedures governing FOIA processing including classification, referrals, coordinations, and fees," and "organizational information revealing CIA's internal systems of decentralized information management." *See* Pl.'s First 445 Opp'n at 11. The plaintiff also states that it "still challenges the withholdings in documents where both Exemptions (b)(3) and (b)(5) are claimed." *Id.* at 11 n.10. These general categories have left the Court to deduce which specific records the plaintiff is challenging under Exemption 3 in No. 11-445. The Court's comparison of the plaintiff's loose guidance with the CIA's *Vaughn* index yields the conclusion that the plaintiff is challenging at least 300 of the 498 records withheld by the CIA in No. 11-445 under Exemption 3 and the CIA Act. The plaintiff's failure to identify by Bates number the specific documents at issue, however, has made it much more difficult for the Court to ascertain the exact documents at issue and their description in the CIA's *Vaughn* index. As a result, the Court is unable to provide a document-specific parsing of which documents or portions thereof were properly or improperly withheld by the CIA under Exemption 3 and the CIA Act. It will be the parties' task to provide this document-specific summary of disputed documents within twenty days of the Court's decision. *See infra* Part IV.

other internal CIA information," Third Lutz Decl. ¶ 35; *see also* First Lutz Decl. ¶ 72 (asserting that "internal organizational data are absolutely protected by law"), and (2) "the 'functions' of the CIA," including "its core functions, which plainly include intelligence activities, intelligence sources and methods, and the collection, analysis, and dissemination of foreign intelligence," Second Lutz Decl. ¶ 36. The plaintiff, on the other hand, contends that the CIA Act's protections are much narrower, extending only to information about the CIA's personnel—*e.g.*, their names, their official titles, or how they are organized.

The CIA has invoked § 403g and Exemption 3 with respect to seven general categories of information: (1) "internal templates utilized by the [CIA] in tasking FOIA requests," Third Lutz Decl. ¶ 34; (2) "internal rules, policies and procedures governing FOIA processing including classification, referrals, coordinations, and fees," *id.*; (3) "administrative routing data and file paths," *id.*; (4) "organizational information revealing CIA's internal system of decentralized information management," *id.*; (5) "employee names and personal identifiers, including employee signatures, numbers, and initials," *id.*; (6) "[i]nternal information concerning ways in which CIA is able to store and retrieve information," First Lutz Decl. Ex. DD at 137, 142, No. 11-444, ECF No. 20-9; and (7) "information about the CIA's core functions," including "intelligence activities, intelligence sources and methods, and the collection, analysis, and dissemination of foreign intelligence," Second Lutz Decl. ¶ 36. The plaintiff concedes that categories (3) and (5) above fall within the scope of § 403g, *see* Pl.'s First 445 Opp'n at 11; Pl.'s First 444 Opp'n at 30, but challenges the other five categories of information as being outside § 403g's scope.

At the outset, one thing is clear: 50 U.S.C. § 403g is "precisely the type of statute[] comprehended by exemption (b)(3)." *Weissman v. CIA*, 565 F.2d 692, 694 (D.C. Cir. 1977).

The exact reach of § 403g, however, remains shrouded in some uncertainty. The clear purpose of § 403g is "further to implement [50 U.S.C. § 403-1(i)] that the Director of National Intelligence shall be responsible for protecting intelligence sources and methods from unauthorized disclosure." *See* 50 U.S.C. § 403g. Although the D.C. Circuit has held that "the CIA is not required under section 403g to make an independent showing of a nexus between the withholding of personnel data and the security of foreign intelligence activities or the protection of intelligence sources and methods" in order to withhold information under Exemption 3, *see Baker v. CIA*, 580 F.2d 664, 669 (D.C. Cir. 1978), the two provisions—§ 403-1(i) and § 403g— are often invoked together. In the instant case, however, the CIA solely invokes § 403g as a basis to withhold responsive information under Exemption 3.

In one of its first decisions to interpret the scope of § 403g in the context of Exemption 3, the D.C. Circuit delineated an outer limit: § 403g does not "allow[] the [CIA] to refuse to provide any information at all about anything it does." *Phillippi v. CIA*, 546 F.2d 1009, 1015 n.14 (D.C. Cir. 1976). In other words, § 403g does not "accord the [CIA] a complete exemption from the FOIA." *Id.* One other consistent limit applied to § 403g by the D.C. Circuit is that the provision applies only to "information about [the CIA's] internal structure." *Id.*; *accord Larson*, 565 F.3d at 865 n.2 (noting "the applicability of [§ 403g] to withhold internal CIA organizational data"); *Linder v. Dep't of Defense*, 133 F.3d 17, 25 (D.C. Cir. 1998) (stating that § 403g applies to "information concerning the [CIA's] personnel"); *Baker v. CIA*, 580 F.2d 664, 670 (D.C. Cir. 1978) ("[S]ection 403g creates a very narrow and explicit exception to the requirements of the FOIA. Only the specific information on the CIA's personnel and internal structure that is listed in the statute will obtain protection from disclosure."). The thrust of these cases is that § 403, standing alone, only protects "information on the CIA's personnel and internal structure," *see*

*Baker*, 580 F.2d at 670, such as the names of personnel, the titles and salaries of personnel, or how personnel are organized within the CIA.

From the D.C. Circuit's limited guidance, the Court concludes that the CIA's proposed construction of § 403g's scope is too broad, in much the same way as the CIA's proposed construction of FOIA Exemption 2 above was too broad. The CIA would have § 403g exempt from disclosure all "information about the [CIA's] functions." *See* Def.'s First 443 Mem. at 11; *accord* Def.'s First 444 Reply at 16 (contending that CIA Act exempts disclosure of "information that relates to the internal structure, organization, and functions of the CIA"); Defs.' Reply in Supp. Mot. Summ J. on Counts 1, 2, 3, 5, 6, 7, 8, 9, 10, and 13 ("Defs.' First 445 Reply") at 7, No. 11-445, ECF No. 35 ("[T]he CIA Act protects from disclosure information about the Agency's organization and functions."). The CIA relies heavily on the malleable terms "functions" and "organization" in § 403g to expand the provision's scope, and it is true that those are the two terms used in § 403g with potentially the broadest sweep. Nevertheless, the plain text of the statute limits protection from disclosure only to the functions and organization pertaining to or about personnel, *see* 50 U.S.C. § 403g (exempting from disclosure, *inter alia*, "the organization [and] functions . . . of personnel employed by the [CIA]"), not to all information that *relates* to such functions and organization.

It is this latter interpretive leap that renders the CIA's proposed construction of § 403g inappropriately broad. The D.C. Circuit has long held that § 403g is a "very narrow and explicit exception," *see Baker*, 580 F.2d at 670, yet the CIA's proposed construction of § 403g would come dangerously close to exempting from disclosure "any information at all about anything [the CIA] does," *see Phillippi*, 546 F.2d at 1015 n.14. It would be hard to imagine "anything [the CIA] does," *see id.*, that does not somehow "relate[] to the internal structure, organization, [or]

functions of the CIA," *see* Def.'s First 444 Reply at 16. Indeed, the term "functions" in § 403g would become particularly broad under the CIA's proposed construction because the CIA's functions would encompass any kind of activity appropriately carried out by the CIA. *See, e.g.*, Black's Law Dictionary 742 (9th ed. 2009) (defining "function" as "[a]ctivity that is appropriate to a particular business or profession"); Webster's Third New Int'l Dictionary 920 (1981) (defining "function" as "the action for which a person or thing is specially fitted, used, or responsible or for which a thing exists").

The CIA appears to recognize the breadth of its proposed interpretation in this regard, contending in multiple places that "it is not clear that there is any practical difference between the organization and functions of CIA personnel and those of the Agency" since "the CIA is composed of and acts entirely through its employees." *See* Def.'s First 443 Reply at 9; *see also* Def.'s First 445 Reply at 7 ("The CIA is composed of and functions entirely through its personnel."). This perspective, however, "strip[s] the word 'personnel' of any real meaning." *See Milner*, 131 S. Ct. at 1269. If "personnel" really just means "the Agency," then § 403g would essentially apply to "any information at all about anything [the CIA] does," *see Phillippi*, 546 F.2d at 1015 n.14, in contravention of the D.C. Circuit's limitation on that provision's scope. *Cf. Milner*, 131 S. Ct. at 1269 (observing that "[u]nder this interpretation, an agency's 'internal personnel rules and practices' appears to mean all its internal rules and practices," and thus "[t]he modifier 'personnel' . . . does no modifying work").

On this point, a distinction drawn by the Supreme Court in *Milner* is instructive. Although *Milner* dealt with Exemption 2, not Exemption 3, the scope of 50 U.S.C. § 403g is limited in a way similar to the way the Supreme Court limited Exemption 2 in *Milner*. As discussed above, in Exemption 2, "[t]he use of the term 'personnel' . . . connotes not that the file

or department or practice/rule is *for* personnel, but rather that the file or department or practice/rule is *about* personnel—*i.e.*, that it relates to employee relations or human resources." *Milner*, 131 S. Ct. at 1269 (emphasis in original). That distinction is apt with respect to § 403g as well. Congress did not intend § 403g to exempt all information *for* personnel, but only information *about* personnel, *i.e.*, their "organization, functions, names, official titles, salaries or numbers." 50 U.S.C. § 403g. Therefore, just because a piece of information relates to or concerns something CIA personnel do in carrying out their governmental responsibilities does not mean it is exempt from disclosure under § 403g.

The breadth of the CIA's proposed interpretation is also underscored by the D.C. Circuit's decision in *Hayden v. NSA*, 608 F.2d 1381 (D.C. Cir. 1979). In that case, the National Security Agency ("NSA") sought to withhold responsive records under FOIA Exemption 3 and Section 6 of the National Security Agency Act, Pub. L. No. 86-36, § 6(a), 73 Stat. 63, 64 (1959), 50 U.S.C. § 402 note. *See Hayden*, 608 F.2d at 1389–90. That provision provides that "nothing in this Act or any other law . . . shall be construed to require the disclosure of the organization or any function of the National Security Agency, [or] any information with respect to the activities thereof." 73 Stat. at 64. The FOIA requester in *Hayden* argued that this provision of the NSA Act "should be applied for Exemption 3 purposes in the same manner as similar statutes which concern the [CIA]." *Hayden*, 608 F.2d at 1389–90. The Circuit rejected this analogy, stating that, in contrast to the CIA Act, the NSA Act "protects not only organizational matters . . . but also 'any information with respect to the activities' of the NSA." *Id.* at 1390. The Circuit further stated that "[a]ny difference in FOIA Exemption 3 treatment of the CIA and NSA results necessarily from this difference in their respective exemption statutes." *Id.*

*Hayden* is apropos here because it highlights a material difference in language between the NSA Act and the CIA Act, which in turn illuminates Congress's intent to circumscribe the scope of the CIA Act. Although in *Hayden* the Circuit relied primarily on the NSA Act's language exempting from disclosure "any information with respect to the [NSA's] activities," *see id.* at 1390, another noticeable difference between the language of the two statutes is that the CIA Act exempts from disclosure "the organization, functions, names, official titles, salaries, or numbers *of personnel employed by the Agency*," 50 U.S.C. § 403g, while the NSA Act more broadly exempts from disclosure "the organization or any function *of the* [*NSA*]," 73 Stat. at 64. The CIA contends that the CIA Act exempts from disclosure, *inter alia*, "the 'functions' of the CIA," Second Lutz Decl. ¶ 36, but the NSA Act demonstrates that when Congress intends for a disclosure exemption statute to sweep that broadly, the statute will explicitly exempt the functions of *the agency*, rather than simply the functions (or organization) of *personnel employed by the agency*.[43]

Although the CIA characterizes the plaintiff's interpretation of § 403g as "hyper-semantic" and "extreme" in its narrowness, *see* Defs.' First 445 Reply at 6–7, the CIA's sweeping construction of § 403g is no less so in the opposite direction of breadth. The CIA cites three cases—two from within this Circuit—that it says support its reading of the statute, and it warns that "[t]his Court should reject NSC's invitation to become the first to adopt NSC's extreme interpretation of the CIA Act." *Id.* at 7. The Court will discuss each of these cases to

---

[43] Although the CIA does not specifically propose it, the Court reads the CIA's arguments to invite the following reading of 50 U.S.C. § 403g: "the Agency shall be exempted from . . . the publication or disclosure of the organization [of ], functions [of], names, official titles, salaries, or numbers of personnel employed by[,] the Agency." Crucially, the CIA's proposed reading of the statute would require the addition of a comma before the phrase "the Agency," which would permit the words "organization [of]" and "functions [of]" to modify "the Agency," rather than to modify "personnel employed by the Agency." Only by making these crucial alterations to the language of the statute could the text support the broad reading that the CIA proposes. It is not the job of the CIA or this Court, however, to amend statutory language.

examine whether the CIA's warning is worth heeding.[44]  The first case—an unreported decision from outside this Circuit—held that the CIA properly withheld certain information under § 403g because it "concerned the CIA's organization, functions, names and/or official titles, and therefore meet the requirements of 50 U.S.C. § 403g."  *See Roman v. NSA*, Nos. 09-2947, 09-4281, 09-3344, 09-2504, 09-5633, 2012 WL 569747, at *11 (E.D.N.Y. Feb. 22, 2012).  The extreme brevity of the court's analysis of the CIA Act in *Roman* (one sentence) gives this Court no foothold to agree or disagree with that court's reasoning.

The reasoning in the second case, *Schoenman v. FBI*, 841 F. Supp. 2d 69 (D.D.C. 2012), is similarly slim.  The court in *Schoenman* interpreted § 403g to "require the protection of 'intelligence sources and methods from unauthorized disclosure,'" *see id.* at 83, and although those are all words in § 403g, they are not the operative language of the statute.  Rather, those words are included in § 403g solely to reference the National Security Act, 50 U.S.C. § 403-1(i).  To the extent that the *Schoenman* court construed § 403g, rather than 50 U.S.C. § 403-1(i), broadly to protect the disclosure of "intelligence sources and methods," this Court does not find its reasoning persuasive.[45]

---

[44] The third case cited by the CIA, *ACLU v. Department of Justice*, 808 F. Supp. 2d 280, 288 (D.D.C. 2011), which is from this Circuit, held that the CIA could withhold "whether the CIA cooperates with, is interested in, or actually directs drone strikes" because such information "pertains to (possible) functions of CIA personnel."  The district court's holding in this regard was reversed by the D.C. Circuit on appeal, *see ACLU v. CIA*, 710 F.3d 422, 432 (D.C. Cir. 2013) (holding that "the CIA's broad *Glomar* response is untenable"), though the Circuit did not specifically address the district court's interpretation of the CIA Act.  It is unclear whether the lower court's reasoning regarding the scope of the CIA Act survived reversal, however.  Additionally, the *ACLU* case involved the application of the *Glomar* doctrine, which deals with an agency's refusal to confirm or deny the existence or non-existence of records responsive to a FOIA request.  *See, e.g.*, *id.* at 426.  Deciding the validity of a *Glomar* response presents a different set of considerations than deciding whether an agency is entitled to withhold responsive records, and therefore the reasoning of *ACLU* is inapposite to this case in any event.

[45] The CIA only cites *Schoenman* for the proposition that § 403g protects "internal organizational data," *see* Def.'s First 445 Reply at 7, which the Court does not dispute.  The nuance that neither the *Schoenman* court nor the CIA identifies, however, is that "internal organizational data," just like information about the CIA's "internal structure" are only protected from disclosure by § 403g insofar as such information is about the organization *of personnel* employed by the CIA, not about the structure or organization of any aspect of the agency.

Accordingly, the Court holds that certain specific categories of information withheld by the CIA in this case pursuant to § 403g clearly fall outside that provision's scope, including (1) internal templates utilized by the CIA in tasking FOIA requests, (2) internal rules, policies and procedures governing FOIA processing, and (7) information about the CIA's "core functions," including intelligence activities, intelligence sources and methods, and the collection, analysis, and dissemination of foreign intelligence.[46] This leaves two categories of information from the above list that need to be addressed: (4) "organizational information revealing CIA's internal system of decentralized information management," Third Lutz Decl. ¶ 34; and (6) "[i]nternal information concerning ways in which CIA is able to store and retrieve information," First Lutz Decl. Ex. DD at 137, 142.

Shorn of the gratuitous addition of the words "internal" and "organizational," it appears that the information referred to in these categories is information about how the CIA manages, stores, and retrieves information. The CIA, however, does not explain how disclosure of this information would reveal "the organization, functions, names, official titles, salaries, or numbers of personnel employed by the Agency." 50 U.S.C. § 403g. It is undoubtedly true that managing, storing, and retrieving information is a function of some, if not all, CIA personnel, but, as discussed above, the CIA is attempting to augment the scope of § 403g by withholding information that merely *relates to* or *concerns* that function. The language of the statute simply does not support such a broad reading.

---

[46] As to category (7) above, the Court does *not* hold that the CIA is necessarily required to disclose information about intelligence gathering in response to FOIA requests. Rather, the Court narrowly holds that *§ 403g* does not generally protect *all* information pertaining to intelligence gathering. There are numerous other ways that the CIA could protect such information from FOIA disclosure. Most notably, the CIA could invoke the National Security Act, 50 U.S.C. § 403-1(i), if the information would reveal intelligence sources or methods, or FOIA Exemption 1, if the information is properly classified.

The CIA contends in its reply brief that "information about how the [CIA], or [CIA] personnel, store and retrieve information is clearly information about the [CIA's] internal structure." Def.'s First 444 Reply at 21. Although the D.C. Circuit has interpreted § 403g to encompass "information about [the CIA's] internal structure," *see Phillippi*, 546 F.2d at 1015 n.14, later Circuit case law has clarified, in line with the statutory text, that "internal structure" refers to the structure or organization *of personnel employed by the Agency*, not the structure or organization of any aspect of the CIA,[47] *see, e.g., Baker*, 580 F.2d at 669 ("Congress intended to create an exemption in section 403g for certain personnel information that could be withheld from disclosure by the CIA without a separate intelligence or security justification."); *Linder*, 133 F.3d at 25 (§ 403g applies to "information concerning the [CIA's] personnel"). For example, the organization of the CIA's computer systems is not protected by § 403g, even though the organization of personnel would be. Accordingly, the Court holds that the CIA may not invoke § 403g to withhold information merely because that information may be used by CIA personnel to carry out their responsibilities or functions. The "functions . . . of personnel employed by the [CIA]" are protected from disclosure under § 403g, but *how* CIA personnel carry out those functions is not. The CIA Act does not protect *all* information about CIA functions generally; it more narrowly protects information that would reveal that a given function is one "of personnel employed by the Agency." 50 U.S.C. § 403g. The CIA may only invoke 50 U.S.C. § 403 to withhold information under the FOIA if it would reveal the specific categories of personnel-related information enumerated in the statute, *i.e.*,"the organization,

---

[47] Similarly to information about intelligence-gathering measures, information about how the CIA stores and retrieves information is likely in many cases to be highly sensitive and may accordingly warrant protection from disclosure under other provisions, such as Executive Order 13,526, FOIA Exemption 1, or the National Security Act, 50 U.S.C. § 403-1(i). *See supra* note 46.

functions, names, official titles, salaries, or numbers of personnel employed by the Agency."
*Id.*[48]

Although this resolves the primary, underlying legal question at the heart of the plaintiff's challenge to the CIA's Exemption 3 withholding decisions, the plaintiff has also raised five other issues regarding the CIA's Exemption 3 withholding decisions. The Court will discuss each of these issues in turn.

First, and related to the immediately preceding discussion, in No. 11-443 the plaintiff levels the serious allegation that the CIA is invoking 50 U.S.C. § 403g not just incorrectly but also in "bad faith." *See* Pl.'s First 443 Opp'n at 5.[49] To support this accusation, the plaintiff points to "five pieces of unclassified information" in two *Studies in Intelligence* indices (not Tables of Contents) that the plaintiff asserts are "evidence of CIA's bad faith invocation of exemptions."[50] The Court has reviewed these pieces of information *in camera* (they are redacted from the version of the documents on the public docket), and the Court does not believe that these redactions are evidence of bad faith. In fact, because the Court does not have the benefit of

---

[48] As a result of this holding, the Court is providing the plaintiff with the relief that it has requested on the CIA Act/Exemption 3 issue. The Court "find[s] that CIA has," at least in part, "improperly invoked the CIA Act as an Exemption (b)(3) withholding statute." *See* Pl.'s First 443 Opp'n at 19. Hence, the CIA will have the opportunity "to file a more sufficient declaration and *Vaughn* indices justifying the actual relationship between the withheld information" and the language of the 50 U.S.C. § 403g, in line with the Court's interpretation of that provision herein. *See id.*

[49] This accusation of bad faith appears to be related to, if not co-extensive with, the plaintiff's argument in No. 11-443, discussed above, regarding the supposed "general sloppiness" in the CIA's FOIA review process. *See supra* Part III.F.2; *see also supra* note 36. It is frankly unclear from its briefing whether the plaintiff is accusing the CIA of bad faith with respect to the invocation of Exemption 1 and Exemption 3, or only Exemption 3. The plaintiff says that it presents certain invocations of the CIA Act as "evidence of CIA's bad faith invocation of exemptions," *see* Pl.'s First 443 Opp'n at 6, and the plaintiff makes a passing reference later in its brief to the "specific evidence of bad faith as describe above," *id.* at 13, but the plaintiff does not clarify whether it considers "general sloppiness" and "bad faith" to be identical in this context. The Court, however, considers "general sloppiness" to be a separate concept from "bad faith" because the former does not indicate the sort of specific intent connoted by the latter, and therefore evidence of the former is not necessarily evidence of the latter.

[50] These indices are not records that were responsive to the plaintiff's FOIA request. Rather, these indices "c[a]me into the [plaintiff's counsel's] possession from a third party and included information which CIA considered to be either classified or protected by the CIA Act (or both)." Pl.'s First 443 Opp'n at 5. Thus, the plaintiff does not actually challenge the decision to withhold these five pieces of information. Instead, the plaintiff appears to present this evidence to the Court solely in an attempt to prove "bad faith" on the part of the CIA.

an explanation from the CIA regarding its rationale for redacting this information under the CIA Act,[51] the Court cannot say with certainty whether the CIA is even incorrect to rely on 50 U.S.C. § 403g to redact this information. Three of the five pieces of information are names, and the Court has no basis to determine whether these are not "personnel . . . employed by the Agency." *See* 50 U.S.C. § 403g. The other two pieces of information may not be covered by § 403g, and as discussed immediately above, the CIA has been reading that provision too broadly. There is no basis to conclude, however, that the CIA's overbroad reading of § 403g was in "bad faith," especially because prior interpretations of that provision's scope are few and far between. Even the plaintiff concedes that the scope of § 403g has been an unresolved question in this Circuit. *See* Pl.'s First 443 Opp'n at 17 ("The very argument [about the scope of § 403g] has been made by [plaintiff's counsel] in several other cases before this and other courts in this Circuit, but the question has yet to be decided in any of those cases."). It is highly unlikely that the CIA was or could be acting in "bad faith" regarding its interpretation of § 403g—a finding that would require a showing that the CIA invoked this statute to withhold information while being aware of (and choosing to ignore) a definitive interpretation of that statute's scope.

Second, the plaintiff contends that "the record demonstrates a general sloppiness in CIA's review process in this case" because the CIA has withheld "names of individuals *not* 'employed by the [CIA]'" under the CIA Act, 50 U.S.C. § 403g. *See* Pl.'s First 443 Opp'n at 10–11 (emphasis in original). Specifically, the plaintiff points to twelve instances of individual's names that were withheld under the CIA Act but who are not employees of the CIA, but rather are military, diplomatic, and academic personnel or employees of other agencies in the intelligence community. *See id.* at 10. The plaintiff asserts that these redactions indicate "general

---

[51] The Court has no explanation from the CIA (a *Vaughn* index or otherwise) regarding these withholdings because they were not produced in response to a FOIA request, and they are not the subject of this litigation.

sloppiness" because "CIA may not invoke [50 U.S.C. § 403g] to withhold names of individuals *not* 'employed by the Agency.'" *Id.* at 10–11. The CIA responds that the plaintiff "has not cited to even one case in support of its claim that the CIA Act does not allow the Agency to protect the names of individuals who perform services for the CIA—such as authoring and publishing articles in the CIA's internal journal—even if those individuals are employed by other entities." Def.'s First 443 Reply at 11.

This issue is not as clear-cut as the language of the statute might indicate or as the plaintiff appears to believe. The D.C. Circuit has held that the CIA is permitted to withhold "the names of attorneys retained for covert CIA activities and legal fees paid to them." *Halperin v. CIA*, 629 F.2d 144, 147–51 (D.C. Cir. 1980). In so holding, the Circuit interpreted the phrase "personnel employed by the agency" to include "the services of persons affiliated with the Agency only temporarily," such as "the services of private attorneys needed from time to time in connection with clandestine CIA activities." *Id.* at 151. The Circuit held that "congressional intent to protect 'the confidential nature of the Agency's functions' leaves no room for a fine and formalistic distinction between functions performed by CIA staff attorneys operating under cover and functions performed by private attorneys pursuant to contract," and thus § 403g contemplated "temporarily affiliated personnel." *Id.* Likewise, the Circuit held that the term "salaries . . . [of] personnel employed by the Agency" includes more than "only payments to regularly employed CIA staff personnel." *Id.* Based on the D.C. Circuit's holding in *Halperin*, it may be that the CIA is entitled to withhold the names of individuals who author and publish articles in the agency's internal journal, since they appear to be "temporarily affiliated personnel." *See id.* The answer to that question remains unclear, and the Court need not decide

it here.[52]  It suffices to conclude that the names withheld by the CIA are at least arguably

protected from disclosure under the interpretation of § 403g announced in *Halperin*, and thus

withholding those names does not rise to the level of "general sloppiness" that would caution

against conferring substantial weight to the CIA's declarations.

Third, although the plaintiff did not originally challenge the withholding of

"administrative routing information" with respect to Count Seventeen in No. 11-444, the plaintiff

contended in its opposition brief that, "given the sheer size of the redacted blocks, it seems

unlikely that they consist *solely* of administrative routing information."  Pl.'s First 444 Opp'n at

30 (emphasis in original).  In this regard, the plaintiff suggested to the Court that the CIA had

withheld certain other information in bad faith under the auspices of withholding administrative

routing information.  *See id.* at 31.  The CIA called this contention "factually inaccurate" in its

reply brief, but the CIA also admitted in its reply brief that it has adopted a very broad

understanding of "administrative routing information."  *See* Def.'s First 444 Reply at 16.

According to the CIA, "administrative routing information" includes not only "notations

indicating which offices and analysts ultimately received and processed [FOIA] requests," but

also "recommendations from FOIA analysts and attorneys about how requests should be

administratively processed and routed."[53]  *See id.* at 16–17.  After learning of what it calls the

---

[52] The Court need not decide this issue because, as discussed above, the plaintiff has agreed not to challenge the CIA's withholding of author names in No. 11-443.  *See supra* note 37 ("The plaintiff agreed to limit the scope of its challenge in Count Three of No. 11-443 to 'the redaction of titles in the <u>Studies of Intelligence</u> [sic] tables of contents.' (quoting Second Lutz Decl. ¶ 20)).

[53] The CIA had not indicated, prior to its reply brief in No. 11-444, that the term "administrative routing information" included recommendations about how to process FOIA requests.  Indeed, the CIA's opening brief strongly implied that it was only withholding such processing recommendations under Exemption 5 and the deliberative process privilege.  *See* Def.'s First 444 Mem. at 31.  The CIA's declaration simply stated that the information withheld under the CIA Act "contain[ed] information regarding the organization, functions, names, and official titles of personnel employed by the CIA, as well as internal organizational information such as file numbers."  First Lutz Decl. ¶ 73.  Likewise, the CIA's *Vaughn* index described the "administrative routing information" as "internal organizational data that could reveal directorate offices, substructures and/or the organizational structure of the CIA."  *See, .e.g.*, First Lutz Decl. Ex. DD at 2–3, 7, 11, 15.  If the "administrative

"remarkable breadth of [the CIA's] definition of such a mundane term," the plaintiff contended in its sur-reply brief that these recommendations and comments from FOIA analysts are beyond the scope of § 403g.  *See* Pl.'s Sur-Reply to Def.'s Mot. Summ. J. on Counts 1, 9, 10, 17, 18 and 20 ("Pl.'s 444 Surreply") at 2, No. 11-444, ECF No. 29.

The Court agrees.  As the above discussion makes plain, "administrative routing information" regarding FOIA requests only falls within § 403g if such information would reveal something about the CIA's personnel or internal structure, *e.g.*, the names or titles of employees handling or receiving FOIA requests and the organizational structure of personnel within CIA offices or components.  Recommendations from FOIA analysts about how to process FOIA requests, however, are not solely administrative, personnel-related, or structural.  Such recommendations are quite obviously substantive to the extent that they contain suggestions about what information to withhold and what information to disclose to the public.  Certain details within these recommendations may indeed be administrative or personnel-related in nature and thus exempt from disclosure under § 403g, but if the CIA wants to withhold such information, it must specifically describe the information in question and explain why it would reveal "the organization, functions, names, official titles, salaries, or numbers of personnel employed by the Agency."  *See* 50 U.S.C. § 403g.  This the CIA has not done, leaving the Court to speculate, without any basis in the record.  The CIA cannot simply lump all FOIA processing materials into the vague and expansive category of "administrative routing information."

Fourth, in discussing the CIA's Exemption 3 redactions with respect to Count Eighteen in No. 11-444, the plaintiff contends that the CIA also wrongfully redacted some responsive information as "non responsive."  *See* Pl.'s First 444 Opp'n at 39.  Essentially, the plaintiff

routing information" had indeed been limited to such items, the CIA's Exemption 3 withholdings all would have been appropriate.

complains that the CIA interpreted its request too narrowly. The Court has previously discussed the principles that apply in determining whether an agency properly interpreted the scope of a FOIA request. *See supra* Part III.E.4. The bottom line of those principles is that an agency "has a duty to construe a FOIA request liberally," *Nation Magazine*, 71 F.3d at 890, and is "bound to read it as drafted" not as "agency officials . . . might wish it was drafted," *Miller*, 730 F.2d at 777. The FOIA request at issue in Count Eighteen in No. 11-444 sought "a copy of all [CIA] records pertaining to the search tools and indices available to the Office of Information Management Services ('IMS') for conducting searches of its own records in response to FOIA requests." First Lutz Decl. Ex. Q at 1. To clarify the scope of the request, the plaintiff specified two categories of records that would be responsive to the request: (1) "Records which describe the search tools and indices," and (2) "The actual contents of the indices." *Id.* The CIA withheld the following information as non-responsive from two documents (C05665569 and C05665570): (a) "information relating to case management workflow, directorate level workflow, training available to CADRE users, and troubleshooting help with technical issues while using CADRE," and (b) "information relating to training and access to SMART2, creating a new job in SMART2, application of Records Control Schedules, and archiving capabilities." *See* First Lutz Decl. Ex. DD at 137, 141.

Keeping in mind the CIA's obligation to construe the plaintiff's FOIA request liberally, *see Nation Magazine*, 71 F.3d at 890, it appears that at least some of the information withheld as non-responsive is, in fact, responsive. Clearly, any record containing information about the capabilities of the search tools and indices in question would "describe" those search tools and indices, and thus would be responsive to the plaintiff's request. Similarly, any record containing information about how to use the search tools and indices in question (*e.g.*, training materials for

users) would also "describe" those search tools and indices.[54] The plaintiff's request for "[r]ecords which describe the search tools and indices," *see* First Lutz Decl. Ex. Q at 1, fairly contemplated any records containing information about the functionality and operation of these search tools and indices, and therefore the CIA must release such records to the plaintiff to the extent that they are not exempt from disclosure.[55]

Finally, the plaintiff challenges the CIA's decision to withhold the name of a CIA employee in one responsive document under the CIA Act and Exemption 3.[56] *See* Def.'s First 444 Mem. at 32–33; Pl.'s First 444 Opp'n at 30. The plaintiff contends, "given that the name is at most six characters in length," and "[g]iven the high likelihood that this is simply a first name," the CIA Act does not apply because that statute was "designed to protect the identities of people." *See* Pl.'s First 444 Opp'n at 30. The CIA responds that the plain language of the CIA Act exempts from disclosure "names . . . of personnel employed by the Agency," *see* 50 U.S.C. § 403g, and adopting the plaintiff's proposed rule regarding first names "would place an unreasonable burden on the CIA to determine whether a first name should be redacted based on how common the name is and whether the document at issue provides other potentially identifying information about the employee." Def.'s First 444 Reply at 15.

---

[54] The Court is unsure whether information about "workflow" or "application of Records Control Schedules" would be responsive to the plaintiff's request without a better understanding of what those terms mean.

[55] The plaintiff also asks the Court to "order [the CIA] to distinguish between the Exemption (b)(3) redactions and the 'non-responsive' redactions." Pl.'s First 444 Opp'n at 35. This issue, however, has not been briefed by the parties specifically with respect to the FOIA request at issue in Count Eighteen of No. 11-444. This is likely because the CIA has previously instituted a categorical policy of indicating the basis for redactions at a document level, rather than a redaction level, as discussed above. *See supra* Part III.C.2. In light of the Court's holding that "[t]he CIA must make a case-by-case determination regarding the technical feasibility of indicating a claimed exemption associated with a deletion 'at the place in the record where such deletion is made,'" *id.* (quoting 5 U.S.C. § 552(b)), the CIA will be required to make such a case-by-case determination with respect to the request at issue in Count Eighteen.

[56] The CIA did not invoke Exemption 6 in its *Vaughn* index or its declaration to withhold the employee's name, though the plaintiff discusses in its opposition brief Exemption 6 as a potential basis for withholding the name. *See* Pl.'s First 444 Opp'n at 30.

The Court agrees with the CIA on this issue. First, although the plaintiff asserts that "it would be virtually impossible to use [a first name] to identify someone," *see* Pl.'s First 444 Opp'n at 30, the CIA is correct that the ability to identify a person by a first name alone depends on how common the first name is and whether the record provides other information that, in combination with a first name, would permit someone to identify the employee. Second, the plaintiff contends that the CIA Act was "not designed to be used to withhold such things as first names, nicknames, pseudonyms, or initials," Pl.'s First 444 Opp'n at 30,[57] but the D.C. Circuit has held otherwise. *See Military Audit Project v. Casey*, 656 F.2d 724, 749 (D.C. Cir. 1981) ("[D]ocuments that might disclose the names, initials, pseudonyms and official titles of CIA personnel . . . are properly withheld by the government." (footnote omitted)). Since the disclosure of a CIA employee's first name may disclose the employee's identity, the CIA is permitted to withhold such information under the CIA Act, 50 U.S.C. § 403g.

\* \* \*

In sum, the Court holds that the CIA's proposed construction of 50 U.S.C. § 403g is overly broad. As a result, the CIA has inappropriately withheld information under FOIA Exemption 3. Specifically, the following categories of information referred to by the CIA in its declarations and briefs are presumptively not exempt from disclosure under § 403g, although, as noted below, may be subject to other exemptions: (1) "internal templates utilized by the [CIA] in tasking FOIA requests," Third Lutz Decl. ¶ 34; (2) "internal rules, policies and procedures governing FOIA processing including classification, referrals, coordinations, and fees," *id.*; (3)

---

[57] The plaintiff also makes a similar contention in No. 11-443, asserting that "[p]seudonyms simply do not count" as "names . . . of personnel employed by the Agency," "especially when they are clearly identified as such." *See* Pl.'s First 443 Opp'n at 10. This argument is incorrect under *Military Audit Project* for the same reasons the plaintiff's related argument in No. 11-444 is incorrect. *See Military Audit Project v. Casey*, 656 F.2d 724, 749 (D.C. Cir. 1981) ("[D]ocuments that might disclose the names, initials, *pseudonyms* and official titles of CIA personnel . . . are properly withheld by the government." (emphasis added) (footnote omitted)).

"organizational information revealing CIA's internal system of decentralized information management," *id.*; (4) "[i]nternal information concerning ways in which CIA is able to store and retrieve information," First Lutz Decl. Ex. DD at 137, 142; (5) "information about the CIA's core functions," including "intelligence activities, intelligence sources and methods, and the collection, analysis, and dissemination of foreign intelligence," Second Lutz Decl. ¶ 36; and (6) "recommendations from FOIA analysts and attorneys about how requests should be administratively processed and routed," Def.'s First 444 Reply at 16–17. Accordingly, the Court denies summary judgment to the CIA, in part, with respect to Count Three in No. 11-443; Counts Seventeen and Eighteen in No. 11-444; and Counts One, Two, Three, Seven, and Thirteen in No. 11-445. The Court denies summary judgment to the CIA on these counts only with respect to the CIA's decision to withhold information in the above six categories under § 403g and Exemption 3 and the CIA's decision to withhold responsive information as "non responsive" information, as discussed above. Finally, the Court grants summary judgment to the CIA in part on Count Seventeen in No. 11-444, with respect to the agency's decision to withhold the first name of a CIA employee from one document under the CIA Act.

Some of the information in the above six categories, however, may in fact be properly exempt from disclosure under § 403g—a possibility that the plaintiff itself recognizes. *See, e.g.*, Pl.'s First 445 Opp'n at 17 n.13. The Court will therefore provide the CIA another opportunity to justify, consistent with this opinion, the agency's decision to withhold the information in the above six categories under § 403g and FOIA Exemption 3. In this regard, conclusory or generalized descriptions will not suffice. The CIA must specifically describe the withheld information and explain why it would reveal "the organization, functions, names, official titles, salaries, or numbers of personnel employed by the Agency." *See* 50 U.S.C. § 403g. The CIA is

also directed to release to the plaintiff any information in documents C05665569 and C05665570 which describes how the search tools and indices available to IMS operate to the extent such information is not exempt from disclosure.

### 2. DIA

Next, the plaintiff challenges the DIA's decision to withhold responsive information under Exemption 3 by invoking the National Security Act, 50 U.S.C. § 403-1(i). *See* Pl.'s First 445 Opp'n at 17–22. The plaintiff argues that the DIA "lacks the authority to invoke the National Security Act on its own to withhold information not protected by 10 U.S.C. § 424." *Id.* at 17. The premise of this contention is that, although the National Security Act originally "vested the Director of Central Intelligence ('DCI') with the authority to protect 'intelligence sources and methods,'" the act was amended in 2004. *See id.* This amendment, according to the plaintiff, "divest[ed] this authority from the DCI," and transferred the authority to the ODNI. *See id.* at 17–18. Thus, the plaintiff argues that "after 2004 the ODNI is the only agency authorized by statute to claim the National Security Act as a withholding statute, and any other agency seeking to invoke that statute to withhold records under Exemption (b)(3) must be expressly authorized to do so by that office." *Id.* at 18.

This challenge by the plaintiff is now moot, however, because the DIA "has decided to withdraw its assertions of Section 403-1(i)" since "the National Security Act was asserted in each instance as an alternative ground for withholding." *See* Defs.' First 445 Reply at 14.[58]

---

[58] In its supplemental declaration, the DIA is non-specific about the alternative grounds for withholding the information that was originally also withheld pursuant to the National Security Act. All that the DIA says in its supplemental declaration is that "each assertion of Section 403-1(i) was made in conjunction with another FOIA exemption" and thus "this Exemption 3 statute is not a critical element of DIA's defense." *See* Second Williams Decl. ¶ 3. It appears from a review of the DIA's supplemental *Vaughn* index that any information previously withheld under the National Security Act is now being withheld by the DIA pursuant to Exemption 1; 10 U.S.C. § 424 and Exemption 3; Exemption 5; and/or Exemption 6. *See* Second Williams Decl. Ex. A.

Therefore, the Court need not decide whether the DIA has the independent authority to invoke the National Security Act as an Exemption 3 withholding statute.

### 3. *ODNI*

Finally, the plaintiff challenges the ODNI's decision to withhold certain portions of e-mail addresses of CIA and ODNI employees under the CIA Act. *See* Pl.'s First 445 Opp'n at 22–23. Although the plaintiff "does not challenge ODNI's invocation of the CIA Act to withhold names and full email addresses of CIA and ODNI employees," the plaintiff "ask[s] that the *domains* (i.e., that part after the '@' sign) of the email addresses be released." *Id.* at 22 (emphasis in original). The plaintiff contends that "[r]elease of enough data to determine the agency affiliations of the respective participants in these email chains—the only information deducible from such a release—will not violate the CIA Act." *Id.* at 22–23. The plaintiff likewise contends that "Exemption (b)(6) does not apply to the challenged ODNI withholdings." *Id.* at 23. In the interest of efficiency, the Court will discuss the plaintiff's arguments under both Exemption 3 and Exemption 6 in assessing the ODNI's withholding of domain name information from e-mail addresses.[59]

The ODNI makes two responses to the plaintiff's Exemption 3 and Exemption 6 arguments. First, the ODNI argues that "NSC cannot cite to a single case in which a court has held that the CIA Act does not protect CIA and ODNI employees' full email addresses." Defs.' First 445 Reply at 17. Second, the ODNI argues that "NSC also fails to show why the full email addresses are not protected by Exemption (b)(6)." *Id.* At the outset, both of these arguments misperceive the allocation of the burden on the parties in the summary judgment context. As discussed above, when an agency's response to a FOIA request is to withhold responsive

---

[59] As discussed below, FOIA Exemption 6 applies to "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6).

records, either in whole or in part, the *agency* "bears the burden of proving the applicability of claimed exemptions." *ACLU/DOD*, 628 F.3d at 619. It is not the requester's burden to disprove the applicability of claimed exemptions, as the ODNI frames its opposition.

That said, the only case that the Court can find to address this question held that "[t]he CIA Act . . . plainly protects . . . employee names, titles, signatures and identification numbers; telephone numbers, fax numbers, *e-mail addresses* and street addresses; internal URLs; and other internal organizational information." *James Madison Project v. CIA*, 607 F. Supp. 2d 109, 126 (D.D.C. 2009) (emphasis added). The *James Madison Project* case, however, did not specifically address the applicability of the CIA Act to e-mail *domain* information, as opposed to full e-mail addresses. Such domain information, as the plaintiff points out, is likely "shared by a large group of federal employees." Pl.'s Sur-Reply to Defs.' Mot. Summ. J. on Counts 1, 2, 3, 5, 6, 7, 8, 9, 10, and 13 ("Pl.'s 445 Surreply") at 3, No. 11-445, ECF No. 38. As a result, the domains likely do not constitute "personal identifiers," which was the ODNI's stated reason for withholding the full e-mail addresses. *See* Hackett Decl. ¶ 20. Likewise, domain information would not reveal the "names . . . of personnel employed by the [CIA]." 50 U.S.C. § 403g.

It is plausible, however, that even domain information could reveal information about the CIA's "internal structure." *See Phillippi*, 546 F.2d at 1015 n.14. For example, e-mail domain information could reveal how personnel are organized within the CIA, and in that event such information would fall within the protection of 50 U.S.C. § 403g. The ODNI, however, does not advance this argument in attempting to justify its withholding of e-mail addresses. Additionally, the ODNI makes no attempt to argue or establish that e-mail domain information, as distinct from the rest of the information in employees' e-mail addresses "would constitute a clearly unwarranted invasion of personal privacy." *See* 5 U.S.C. § 552(b)(6). Therefore, the Court will

deny summary judgment to the ODNI on Count Six in No 11-445 with respect to the withholding of e-mail domain information under Exemption 3 and/or Exemption 6 and will permit the agency to submit a supplementary declaration explaining why e-mail domain information is exempt from disclosure under either or both exemptions.

### J.     **Exemption 5**

The plaintiff next challenges the withholding of information by the CIA, DOJ, DIA, and ODNI under FOIA Exemption 5.  *See* Pl.'s First 445 Opp'n at 24–34; Pl.'s First 444 Opp'n at 31–35.  FOIA Exemption 5 protects from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  To be properly withheld under Exemption 5, "a document must . . . satisfy two conditions: its source must be a Government agency, and it must fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it."  *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001).  The four defendant agencies listed above cited Exemption 5 to withhold information under the deliberative process privilege, and the attorney-client privilege, both of which are incorporated into Exemption 5.  *See, e.g.*, *Loving v. Dep't of Def.*, 550 F.3d 32, 37 (D.C. Cir. 2008).  The DIA has also apparently invoked the attorney work-product doctrine in its sworn declaration, though the DIA did not advance this argument in its summary judgment motion.  *Compare* Williams Decl. ¶ 24 ("DIA asserted Exemption 5 to withhold this information pursuant to the attorney client privilege and/or the attorney-work product privilege . . . ."), *with* Defs.' First 445 Mem. at 25 ("DIA has withheld information on the basis of the deliberative process and attorney-client privileges.").  The Court will first discuss the plaintiff's challenges regarding material withheld under the deliberative-process privilege before turning to the attorney-client privilege and the attorney work-product doctrine.

## 1.    *Deliberative-Process Privilege*

"The deliberative process privilege protects 'documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'" *Loving*, 550 F.3d at 38 (quoting *Klamath Water*, 532 U.S. at 8). "To qualify for Exemption 5 protection under the deliberative process privilege, 'an agency's materials must be both predecisional and a part of the deliberative process.'" *Nat'l Inst. of Military Justice v. U.S. Dep't of Def.*, 512 F.3d 677, 680 n.4 (D.C. Cir. 2008) (quoting *Formaldehyde Inst. v. Dep't of Health & Human Servs.*, 889 F.2d 1118, 1121 (D.C. Cir. 1989)). The Supreme Court has acknowledged that "[t]he deliberative process privilege rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news," and the privilege's "object is to enhance 'the quality of agency decisions,' by protecting open and frank discussion among those who make them within the Government." *Klamath Water*, 532 U.S. at 8–9 (citations omitted); *see also Tax Analysts v. IRS*, 117 F.3d 607, 617 (D.C. Cir. 1997) ("[T]he deliberative process privilege . . . reflect[s] the legislative judgment that 'the quality of administrative decision-making would be seriously undermined if agencies were forced to operate in a fishbowl because the full and frank exchange of ideas on legal or policy matters would be impossible.'" (quoting *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 256 (D.C. Cir. 1977) (internal quotation marks omitted)).

"The need to describe each withheld document when Exemption 5 is at issue is particularly acute because 'the deliberative process privilege is so dependent upon the individual document and the role it plays in the administrative process.'" *Animal Legal Def. Fund, Inc. v. Dep't of Air Force*, 44 F. Supp. 2d 295, 299 (D.D.C. 1999) (quoting *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 867 (D.C. Cir. 1980)). In other words, unlike other exemptions

where the agency declaration and *Vaughn* index may be read in conjunction to provide an adequate justification for application of an exemption to a class or category of records, to sustain its burden of showing that records were properly withheld under Exemption 5, an agency must provide in its declaration and *Vaughn* index precisely tailored explanations for each withheld record at issue. "The agency must establish 'what deliberative process is involved, and the role played by the documents in issue in the course of that process.'" *Senate of P.R. v. U.S. Dep't of Justice*, 823 F.2d 574, 585–86 (D.C. Cir. 1987) (quoting *Coastal States*, 617 F.2d at 868). "In addition to explaining the 'function and significance of the document[s] in the agency's decisionmaking process,'" the agency "must describe 'the nature of the decisionmaking authority vested in the office or person issuing the disputed document[s], and the positions in the chain of command of the parties to the documents.'" *Elec. Frontier Found. v. U.S. Dep't of Justice* ("*EFF*"), 826 F. Supp. 2d 157, 168 (D.D.C. 2011) (quoting *Arthur Andersen & Co. v. IRS*, 679 F.2d 254, 258 (D.C. Cir. 1982)).

a)     *CIA*

The plaintiff challenges the CIA's withholding of 310 responsive records,[60] in whole or in part, under Exemption 5, the majority of which were withheld under the deliberative-process privilege. *See* Pl.'s First 445 Opp'n at 25–34; Pl.'s First 444 Opp'n at 31–35; *see also* First Lutz Decl. Ex. DD; Third Lutz Decl. Ex. K. In challenging these withholding decisions by the CIA, the plaintiff makes five related arguments. First, the plaintiff argues that the CIA's "declaration[] and *Vaughn* ind[ex] [is] virtually devoid of any non-conclusory information." *See* Pl.'s First 445 Opp'n at 25; *see also* Pl.'s First 444 Opp'n at 32. Second, the plaintiff contends that, in order for the deliberative-process privilege to apply, "release of the information must

---

[60] These are documents that were withheld either only under Exemption 5 or were withheld under Exemption 5 and Exemptions 3 and/or 6.

inaccurately reflect or prematurely disclose the views of the agency." Pl.'s First 445 Opp'n at

28; Pl.'s First 444 Opp'n at 33. Yet, the plaintiff contends, "[t]he views of the agency regarding

these [FOIA] requests are clear from the text of the response letters, so it is unreasonable to think

that someone reading these notes would mistake which conclusions were adopted as the official

agency position." Pl.'s First 444 Opp'n at 33. Third, the plaintiff implies that some of the

withheld material may have been "'adopted formally or informally, as the agency position on an

issue, or used by the agency in its dealings with the public.'" *Id.* (quoting *Judicial Watch v. U.S.

Postal Serv.*, 297 F. Supp. 2d 252, 261 (D.D.C. 2004)); *see also* Pl.'s First 445 Opp'n at 28–29.

Fourth, the plaintiff argues that the deliberative-process privilege does not apply because

"whether or not the author will be exposed is a significant factor" in applying the privilege, and

the names of the agency employees involved in the communications could be redacted. *See* Pl.'s

First 444 Opp'n at 34; Pl.'s First 445 Opp'n at 29. Finally, the plaintiff contends that three of the

documents withheld by the CIA under the deliberative-process privilege (C05520230,

C05520207, and C05520221) are "neither predecisional nor deliberative" because, as described

in the *Vaughn* index, they "are policy documents which merely inform the target audience (FOIA

analysts and managers) of CIA's procedures and policies." Pl.'s First 445 Opp'n at 29–30.

 The plaintiff's first argument alone succeeds in defeating summary judgment for the CIA

with respect to the deliberative-process privilege. Unlike some other FOIA Exemptions (*e.g.*,

Exemption 1), when an agency claims the deliberative-process privilege under Exemption 5, the

factual context surrounding the withheld document is critical. As stated above, "[t]he need to

describe *each withheld document* when Exemption 5 is at issue is particularly acute because 'the

deliberative process privilege is so dependent upon the individual document and the role it plays

in the administrative process.'" *Animal Legal Def. Fund*, 44 F. Supp. 2d at 299 (emphasis

added) (quoting *Coastal States*, 617 F.2d at 867). At a minimum, the agency must provide three basic pieces of information in order for the deliberative-process privilege to apply: (1) the nature of the specific deliberative process involved, (2) the function and significance of the document in that process, and (3) the nature of the decisionmaking authority vested in the document's author and recipient. *See, e.g.*, *Senate of P.R.*, 823 F.2d at 585–86; *Arthur Andersen*, 679 F.2d at 257–58; *Coastal States*, 617 F.2d at 867–68. The Court will discuss each of these pieces of information in turn with respect to the CIA.

As to the first piece of information, in No. 11-445, the CIA states generally in its declaration that "[t]he deliberative information contained in these documents was solicited, received, or generated as part of the process by which the [CIA] comes to a final determination in response to FOIA requests." Third Lutz Decl. ¶ 39. The individual entries in the CIA's *Vaughn* index, however, do not elaborate on the "*specific* deliberative process to which the withheld [document] contributed." *See EFF*, 826 F. Supp. 2d at 168 (emphasis added). Providing only a general description like "the process by which the [CIA] comes to a final determination in response to FOIA requests," Third Lutz Decl. ¶ 39, is particularly problematic in the FOIA processing context because, in responding to a FOIA request, an agency often must make several different types of decisions, *e.g.*, withholding decisions, fee-waiver decisions, expedited processing decisions, and others.

As to the second piece of information regarding the role played by the document in the deliberative process, in No. 11-445 the CIA lists four kinds of information that it withheld as deliberative and predecisional, which include: (1) "recommendations on withholdings and exemptions to be applied to particular requests," (2) "preliminary search results generated in response to a FOIA or Privacy Act tasking," (3) "the status of requests in processing," and

(4) "inter-agency memoranda containing the CIA's proposals and recommendations." Third

Lutz Decl. ¶ 39. The CIA provides similarly generic descriptions in No. 11-444, stating only

that information "includes FOIA analysts' recommendation [sic] about how to process this

request" and "suggests a course of action relating to this FOIA request." *See* First Lutz Decl. Ex.

DD at 17, 130. These descriptions are too vague for the Court to discern "the 'function and

significance of the documents in the agency's decisionmaking process.'" *Arthur Andersen*, 679

F.2d at 258 (quoting *Taxation with Representation Fund v. IRS*, 646 F.2d 666, 678 (D.C. Cir.

1981)). Indeed, the CIA does not describe in any amount of detail how "the process by which

the [CIA] comes to a final determination in response to FOIA requests" works and how these

withheld pieces of information fit into that process. *See* Third Lutz Decl. ¶ 39. Taking

"preliminary search results" as just one example: Are "preliminary search results" generated by a

lower-level analyst and then transmitted to a higher-level analyst for approval to perform further

searching? How does the agency use such "preliminary search results" in making decisions

about responding to FOIA requests? Do "preliminary search results" contribute to decisions

about the appropriate scope of a search, the burdens triggered by the search, or whether

information is responsive or subject to withholding?

Finally, the overwhelming majority of the CIA's *Vaughn* entries provide no information

whatsoever regarding "the nature of the decisionmaking authority vested in the office or person

issuing the disputed documents" or "the positions in the chain of command of the parties to the

documents" withheld under the deliberative process privilege. *See Arthur Andersen*, 679 F.2d at

258 (internal quotation marks omitted); *see also, e.g.*, Third Lutz Decl. Ex. K pt. 1, at 3, 12, 19,

106, 114; Third Lutz Decl. Ex. K pt. 3, at 1–19, 25–26, 30–31, 65–66. The CIA does provide

this information about the two documents withheld in part under the deliberative-process

privilege in No. 11-444, *see* First Lutz Decl. Ex. DD at 17, 141, but the descriptions of the decisionmaking authority are generic, stating that the withheld information is a "recommendation from the [FOIA] analyst to his/her supervisor," *id.* at 17, and a "recommendation from the analysts to senior reviewers," *id.* at 141. The CIA, however, does not describe the decisionmaking authority of the "supervisor" or "senior reviewers," such as whether these personnel had the authority to approve withholding decisions, scope-of-search decisions, or other decisions "about how to process this [FOIA] request," *see id.* at 17, 141. Without this information made explicit, the Court is unable to conclude that these communications were both deliberative and pre-decisional.

In its *Vaughn* index in No. 11-445, in the instances where the CIA provides some description of the identities of the parties to a document withheld under the deliberative process privilege, the descriptions do not disclose the decisionmaking authority vested in those individuals. *See, e.g.*, Third Lutz Decl. Ex. K pt. 1, at 14 (withholding "1 page memorandum from Information Review Officer to IRO group regarding preliminary determinations in the processing of F-2010-00467"); *id.* at 63 (withholding "a 1 page e-mail between Information Review Officers regarding the processing of a FOIA request"); *id.* at 92 (withholding "1-page e-mail between CIA officers regarding the processing of a FOIA request"). Although the CIA's descriptions suggest that these communications may be among peers about a FOIA request, the CIA does not say what decisionmaking authority is vested in Information Review Officers or the "IRO group," such that the Court can discern whether these communications "reflect the give and take of the deliberative process." *See Pub. Citizen v. OMB*, 598 F.3d 865, 876 (D.C. Cir.

2010).[61]  The CIA also does not specify the "the positions in the chain of command of" the generic "CIA officers" referred to in other withheld documents.  *See Arthur Andersen*, 679 F.2d at 258 (internal quotation marks omitted).  Accordingly, the Court denies summary judgment to the CIA with respect to the information that the agency withheld under the deliberative process privilege.  If the CIA chooses to continue to withhold this information, the agency must submit a supplemental *Vaughn* index that adequately justifies that withholding.

b)  *DIA, ODNI, and DOJ*

The submissions of the DIA, ODNI, and DOJ suffer from similar deficiencies.  For starters, neither the ODNI nor the DOJ submitted a *Vaughn* index that describes the factual context of each withheld document.  The ODNI states in its declaration that "[i]nformation was withheld pursuant to FOIA Exemption 5 on 13 of the 34 pages released to the plaintiff," Hackett Decl. ¶ 24, and the ODNI attaches redacted versions of these thirty-four pages to its declaration, *see* Hackett Decl. Exs. C–D, No. 11-445, ECF No. 29-8.  The ODNI's declaration, however, does not identify which of the thirty-four pages contains information withheld under Exemption 5, and only nine of the thirty-four redacted pages explicitly indicate (b)(5) as a basis for withholding information.  The ODNI thus apparently leaves it to the Court to infer which portions of which of the thirty-four heavily redacted (and sometimes illegibly blurry) pages were withheld under Exemption 5.  This sort of submission is utterly unhelpful to the Court in determining whether a FOIA exemption applies to particular portions of particular records, especially in the absence of a document-by-document *Vaughn* index that could explain the

---

[61] This deficiency is exacerbated by the other deficiencies previously discussed, such as the lack of any information about the particular decision at issue and the function and significance of these communications in that particular decisionmaking process.

factual context of each withheld record.[62]  When a document-specific explanation is required, as

it is when claiming the deliberative process privilege, *see Coastal States*, 617 F.2d at 867, the

government needs to specify exactly which records (and portions of records) are exempt, as well

as provide a document-specific explanation for why the material is exempt.

Additionally, similar to the CIA, the ODNI provides only generic summaries of the

documents withheld, stating that they "contain[] information that reflects the pre-decisional

deliberations of ODNI employees on the proper handling of certain FOIA requests."  *See* Hackett

Decl. ¶ 27.  In this regard, both the CIA and the ODNI consistently tack on conclusory labels like

"internal," "deliberative," "candid," and "pre-decisional," *see id.*; Third Lutz Decl. ¶ 39; Third

Lutz Decl. Ex. KK *passim*, but such "buzz-word adjectives" are no substitute for "a meaningful

description of the factual context surrounding a document."  *See Muttitt v. Dep't of State*, No. 10-

202, 2013 WL 781709, at *18 (D.D.C. Mar. 4, 2013).  The same holds true for the DIA, which

provides a generic description of withheld material in its declaration, *see* Second Williams Decl.

¶ 11 (stating that documents "involve detailed deliberations between elements of DIA and

outside agencies about the appropriate FOIA responses"), and boilerplate labels in its *Vaughn*

entries, *see, e.g.*, Second Williams Decl. Ex. A at 1 (withholding letter that "contains comments

and recommendations, and its content speaks to the deliberative process").  Finally, the DOJ's

declaration is perhaps the most barebones of them all with regard to the deliberative process

privilege, stating that the withheld documents "are deliberative because they . . . aid [Executive

Branch officials'] deliberations about whether to take certain actions in performing their duties

---

[62] For example, the ODNI claims Exemption 5 to withhold information from an e-mail with the subject line "Re:
FOIA requests—Do these belong to CIA or ODNI?"  *See* Hackett Decl. Ex. D at 3, No. 11-445, ECF No. 29-8.  It is
not clear whether ODNI is claiming the attorney-client privilege, the deliberative process privilege, or both with
respect to this communication.  Almost the entire text of the e-mail is redacted, other than the subject line and the
salutation to the recipient, and the Court has no document-specific context to determine whether any privilege
applies to this communication.

or prerogatives" and "are pre-decisional because they were prepared for the consideration of those Executive Branch officials before they had decided whether to take such actions." Colborn Decl. ¶ 14. This kind of conclusory and circular description of withheld documents is woefully insufficient to meet the FOIA summary judgment standard.

Accordingly, these deficiencies in the submissions of the CIA, ODNI, DIA, and DOJ regarding their invocation of the deliberative-process privilege make it impossible for the Court to grant these agencies summary judgment on that issue. Accordingly, the Court concludes "'not that the documents are not exempt as a matter of law, but that the agenc[ies] ha[ve] failed to supply' in [their] *Vaughn* submissions 'the minimal information necessary to make a determination' concerning applicability of the deliberative process privilege." *EFF*, 826 F. Supp. 2d at 173 (quoting *Coastal States*, 617 F.2d at 861). To the extent that the CIA, ODNI, DIA, or DOJ withhold any documents, in whole or in part, under Exemption 5 solely on the basis of the deliberative-process privilege, the Court denies summary judgment to those agencies with respect to the withholding of those documents, or portions of documents, pursuant to Exemption 5.[63]

### 2. *Attorney-Client Privilege*

The CIA, DIA, ODNI, and DOJ also invoke the attorney-client privilege to withhold certain information under Exemption 5. "The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). "Its purpose is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Id.* "[T]he privilege applies only if the person

---

[63] The DOJ clearly relies on both the deliberative process privilege and the attorney-client privilege, in the alternative, as to all sixteen disputed OLC opinions that were withheld under Exemption 5. *See* Colborn Decl. ¶¶ 14–15.

to whom the communication was made is 'a member of the bar of a court' who 'in connection with the communication is acting as a lawyer' and the communication was made 'for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding.'" *In re Lindsey*, 158 F.3d 1263, 1270 (D.C. Cir. 1998) (quoting *In re Sealed Case*, 737 F.2d 94, 98–99 (D.C. Cir. 1984)). The Supreme Court has also clearly recognized that "the privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice." *Upjohn*, 449 U.S. at 390. "In the governmental context, the 'client' may be the agency and the attorney may be an agency lawyer." *Tax Analysts*, 117 F.3d at 618.

        a)     *CIA*

Beginning with the CIA's submissions, the CIA states in its declaration submitted in No. 11-445 that "[s]ome of the records for which information has been withheld pursuant to Exemption (b)(5) contain confidential communications between CIA staff and attorneys within the CIA's Office of General Counsel about the processing of certain FOIA requests." Third Lutz Decl. ¶ 37. The CIA also states in this declaration that "[t]hese communications relate to matters for which the attorneys provided legal advice, and were prepared with the joint expectation that they would be held in confidence." *Id.* In its declaration submitted in No. 11-444, the CIA declarant provides an almost identical statement. *See* First Lutz Decl. ¶ 79. Turning to the CIA's *Vaughn* indices, the index provided in No. 11-445 contains the repeated statement that the document in question "contains advice from legal counsel." *See* Third Lutz Decl. Ex. K pt. 3, at 151, 153; Third Lutz Decl. Ex. K pt. 4, at 1–4, 8, 25, 143; Third Lutz Decl. Ex. K pt. 5 at 10, 13, 26–28, 36–39, 42. The *Vaughn* index provided by the CIA in No. 11-444 parrots the same language contained in the CIA's declarations, stating for each withheld document that it "contains confidential communications between a CIA attorney and CIA officers relating to a

matter for which the officers sought legal advice." *See* First Lutz Decl. Ex. DD at 54, 66, 102, 121.[64]

The statements in the CIA's submissions are largely insufficient for the Court to conclude that the documents in question were sent "for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding." *In re Grand Jury*, 475 F.3d 1299, 1304 (D.C. Cir. 2007) (internal quotation marks omitted). Specifically, there are three deficiencies in the CIA's submissions that prevent the Court from granting summary judgment regarding the majority of the CIA's invocations of the attorney-client privilege. First, in both Nos. 11-445 and 11-444, the repeated and carefully circumscribed statement that communications "relate to matters for which attorneys provide legal advice," *see, e.g.*, First Lutz Decl. ¶ 79; Third Lutz Decl. ¶ 37, does not necessarily support the conclusion that such communications are privileged. For example, if an attorney provided legal advice about a certain matter at a given point in time, and a staff member separately communicated about that matter at a later point in time, that latter communication is not privileged simply because it is "relate[d] to" the matter for which advice was previously given. Rather, to be privileged, the later communication must be made for the primary purpose of *seeking legal advice* on that matter. The language of the CIA's declaration addresses only the general *subject* of the communications in question, but this description is too imprecise to establish the primary *purpose* of the communications. As a result, the Court cannot grant summary judgment to the

---

[64] The CIA's *Vaughn* index in No. 11-445 also states, without any elaboration, that three documents "contain[] . . . attorney-client privileged information." *See* Third Lutz Decl. Ex. K pt. 4, at 64, 67, 70. Each of these three documents were only withheld in part. Additionally, the same *Vaughn* index describes eight other documents as withheld in full under Exemptions 3 and/or 5 because they purportedly contain "attorney work product," *see* Third Lutz Decl. Ex. K pt. 3, at 122, 128, 132–33, 137, 142, 147, 149, but the CIA does not assert the attorney work-product doctrine in its declaration or in its briefing. Therefore, the Court construes these passing references in the CIA's *Vaughn* index to be assertions of the attorney-client privilege, rather than the attorney work-product doctrine. To the extent they are attempts to invoke the attorney work-product doctrine, they are insufficient because the CIA provides no justification for invoking that doctrine in these eight documents.

CIA regarding communications that merely "relate to matters for which the attorneys provided legal advice." The CIA must provide more information about these communications to establish that they were sent or received for the primary purpose of seeking or providing legal advice.

Second, the CIA's declarations in Nos. 11-444 and 11-445 state that the information withheld under the attorney-client privilege "was prepared with the joint expectation of the attorneys and CIA staff that they would be held in confidence." First Lutz Decl. ¶ 79; *see also* Third Lutz Decl. ¶ 37. "The government," however, "must demonstrate confidentiality in fact, whatever its subjective intentions may have been." *Am. Immigration Council v. U.S. Dep't of Homeland Sec.*, No. 12-856, 2013 WL 3186061, at *18 (D.D.C. June 24, 2013) (citing *In re Sealed Case*, 737 F.2d at 100). The "subjective intentions" of confidentiality put forth by the CIA are therefore insufficient to establish "confidentiality in fact." *Id.*

The third and final deficiency manifests only in the CIA's submissions in No. 11-445. Twenty-three of the thirty-two documents withheld from release by the CIA under the attorney-client privilege in No. 11-445 were withheld in their entirety.[65] *See* Third Lutz Decl. Ex. K pt. 1, at 3; Third Lutz Decl. Ex. K pt. 3, at 122, 128, 132–33, 137, 142, 147, 149, 151–53; Third Lutz Decl. Ex. K pt. 4, at 1–4, 8, 25, 143; Third Lutz Decl. Ex. K pt. 5, at 26–28, 42. Although the CIA's *Vaughn* index states that these twenty-three records "contain[] legal advice," that fact does not necessarily support the wholesale withholding of such documents. Some portions of these documents may be protected by the attorney-client privilege, but the CIA's explanation does not support the withholding of entire documents. What is more, for the twenty-three documents that were withheld in full in No. 11-445, the CIA's submissions do not specify whether Exemption 5

---

[65] The twenty-three documents withheld by the CIA in full under the attorney-client privilege are identified in the CIA's *Vaughn* index by the following Bates numbers: C01255579, C05360946, C05360952, C05360956, C05362492, C05363265, C05363815, C05365820, C05366449, C05366894, C05366895, C05366902, C-5371430, C05371431, C05371432, C05371433, C05375987, C05403192, C05549840, C05486085, C05498760, C05498761, and C05548237.

is claimed as to entire documents or only portions of documents.  Particularly in light of the Court's holding above regarding the scope of the CIA Act and the fact that the CIA also cited the CIA Act to withhold each of these twenty-three documents, the CIA must explain whether it is asserting the attorney-client privilege as to all or only a portion of the twenty-three documents in which that privilege is asserted.  Further, if the CIA is only asserting the privilege as to certain portions of a given record, the CIA must provide an explanation for why the privilege applies to each portion that is withheld.

The three deficiencies described above preclude summary judgment to the CIA as to the invocation of the attorney-client privilege to withhold twenty-three documents in full in No. 11-445 as well as to withhold four documents in No. 11-444.[66]  The Court thus will not grant summary judgment to the CIA with respect to these twenty-seven documents.  As a result, the Court denies summary judgment to CIA regarding its Exemption 5 withholdings in No. 11-444 and 11-445, with the exception of the nine documents that were withheld in part under the attorney-client privilege in No. 11-445.[67]  As to those nine documents, the Court concludes that the CIA has provided a sufficiently logical and plausible explanation as to why the attorney-client privilege applies, and therefore summary judgment is appropriate.  *See ACLU/DOD*, 628 F.3d at 619.

Accordingly, the Court will deny summary judgment to the CIA with regard to Count Seventeen in No. 11-444 and Counts One and Seven in No. 11-445, insofar as the CIA moved for summary judgment on those counts with respect to its Exemption 5 withholding decisions. Additionally, the Court will grant in part and deny in part summary judgment to the CIA with

[66] These four documents are identified in the CIA's *Vaughn* index by the following Bates numbers: C01489077, C05289038, C05430872 and C01335771.

[67] These documents have the following Bates numbers in the CIA's *Vaughn* index:  C05520575, C05520577, C05520579, C05461394, C05464372, C05520566, C05520567, C05520571 and C05520573.

regard to Counts Two and Three in No. 11-445. The Court will grant summary judgment on these two counts with respect to the information redacted from nine documents under the attorney-client privilege,[68] and will deny summary judgment regarding Exemption 5 withholdings as to all other documents at issue in Counts Two and Three in No. 11-445.

b)    *DIA and ODNI*

As with the deliberative-process privilege, the submissions of the DIA and ODNI regarding the invocation of the attorney-client privilege mirror many of the same deficiencies contained in the CIA's submissions. Beginning with the DIA, that agency's *Vaughn* index repeats the exact same boilerplate language in each entry—often using identical boilerplate phrases twice in the same entry. *See, e.g*, Second Williams Decl. Ex. A at 1–4. Also, curiously, the DIA's *Vaughn* index does not reference the attorney-client privilege or any element of that privilege, but instead only references the attorney work-product doctrine. *See, e.g.*, *id.* (stating that documents were "withheld . . . as . . . attorney work product" because they were "prepared in anticipation or in response to civil litigation").[69] Thus, although the DIA's declaration references the attorney-client privilege in passing, *see* First Williams Decl. ¶ 24, and the defendants' briefing states that the DIA withheld documents under the attorney-client privilege, *see* Defs.' First 445 Mem. at 25; Defs.' First 445 Reply at 15–16, the DIA does not attempt to establish the applicability of the attorney-client privilege in its *Vaughn* index. Nothing in the DIA's submissions establish that any of the withheld communications were made "for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance

---

[68] *See supra* note 67.

[69] The Supreme Court established the work-product doctrine in *Hickman v. Taylor*, 329 U.S. 495, 510 (1947), in which the Court recognized that "it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel." Therefore, any attempt to obtain the work product of any attorney, such as "interviews, statements, memoranda, correspondence, briefs, mental impressions,[or] personal beliefs," simply "fall[s] outside the arena of discovery and contravenes the public policy underlying the orderly prosecution and defense of legal claims." *Id.* at 510–11. Generally, the work product of an attorney is unavailable in civil litigation if it was "prepared in anticipation of litigation." *See* FED. R. CIV. P. 26(b)(3).

in some legal proceeding." *In re Grand Jury*, 475 F.3d at 1304 (internal quotation marks omitted). Hence, the Court denies summary judgment to the DIA regarding its Exemption 5 withholding decisions insofar as they were based upon the attorney-client privilege. The Court will discuss the DIA's apparent invocation of the attorney work-product doctrine below. *See infra* Part III.J.3.

As to the ODNI, as discussed above, that agency did not submit a document-by-document *Vaughn* index, and therefore the Court can only reference the generally applicable statements contained in the agency's declaration to determine whether the attorney-client privilege properly applies to any of its Exemption 5 withholding decisions. The ODNI's declarant avers that the documents withheld under the attorney-client privilege and Exemption 5 "contain confidential communications between ODNI staff and an attorney in the ODNI's Office of General Counsel." Hackett Decl. ¶ 25. According to the ODNI's declarant, "[t]he staff of the [ODNI's Information Data and Management Group] routinely relies on OGC for legal advice on a wide variety of FOIA matters," and in the withheld communications, "IDMG's FOIA staff provides OGC with relevant information in order for OGC to evaluate and provide legal advice." *Id.* The ODNI's declarant further states that "[t]he information and advice was prepared with the joint expectation of the attorneys and IDMG staff that they would be held in confidence." *Id.* As discussed above, "[t]he government must demonstrate confidentiality in fact, whatever its subjective intentions may have been." *Am. Immigration Council*, 2013 WL 3186061, at *18 (citing *In re Sealed Case*, 737 F.2d at 100). The Court thus cannot grant summary judgment on the grounds that ODNI personnel "expect[ed]" their communications to be held in confidence. Accordingly, the Court denies summary judgment to the ODNI on Count Six in No. 11-445 regarding its Exemption 5 withholding decisions.

c) *DOJ*

Finally, as to the DOJ, the plaintiff does not seriously contend that the attorney-client privilege is inapplicable to the sixteen OLC opinions withheld under Exemption 5. Indeed, the Court concludes that the attorney-client privilege does apply to the sixteen OLC opinions because they "embody legal advice that was provided in confidence at the request of and to Executive Branch officials." Colborn Decl. ¶ 15. The DOJ's declarant explains that the OLC's "principal function" is to provide legal advice to the President and Executive agencies, *id.* ¶ 2, and "[a]lthough OLC publishes some opinions and makes discretionary releases of others, OLC legal advice is generally kept confidential," *id.* ¶ 3. It is clear from the DOJ's declaration that the primary purpose of these opinions was to convey legal advice to the Executive branch, and therefore so long as the communications were confidential, the attorney-client privilege applies to protect them from FOIA disclosure.

The plaintiff contends, however, that the DOJ should be foreclosed from invoking the attorney-client privilege as to at least five of the sixteen OLC opinions withheld under that privilege because the plaintiff says that these five opinions have been officially disclosed in the public domain.[70] *See* Pl.'s First 445 Opp'n at 32–33. Similar to the plaintiff's argument above as to the CIA's Exemption 1 withholdings, *see supra* Part III.F.1, the plaintiff contends that "[t]his evidence casts significant doubt on the good faith of OLC, and the Court should order DOJ to immediately confirm that *none* of the information in *any* of these withheld opinions has been previously officially disclosed." Pl.'s First 445 Opp'n at 33 (emphasis in original). As the Court discussed above, however, it is a requester's burden to "point to specific information in the

---

[70] It is unclear from the plaintiff's argument whether it contends that the attorney-client privilege does not apply because the advice in question was not confidential, or whether the plaintiff relies solely on a theory of official acknowledgement, *see Fitzgibbon*, 911 F.2d at 765 ("[W]hen information has been 'officially acknowledged,' its disclosure may be compelled even over an agency's otherwise valid exemption claim."). The Court will proceed to address both potential bases for denying summary judgment.

public domain" that is "identical to that being withheld." *Davis*, 968 F.2d at 1280. To secure summary judgment, an agency is not required to demonstrate that it performed an exhaustive search of publicly available records. *See id.* at 1279. Hence, the fact that certain withheld information exists in the public domain does not suggest bad faith on the part of an agency because an agency is not obligated to "prov[e] the negative—that information has *not* been revealed." *See id.* For these reasons, the Court concludes that the public availability of certain records withheld by the DOJ is not evidence of bad faith on the part of that agency. The Court will proceed to discuss whether the plaintiff has met its burden to "point to specific information in the public domain" that is "identical to that being withheld." *Id.* at 1280.

The plaintiff contends that five of the withheld OLC opinions have been officially disclosed in the public domain. *See* Pl.'s First 445 Opp'n at 31–32. The plaintiff is only able to produce evidence that *one* of these sixteen opinions (Document 11, *see* Colborn Decl. Ex. G, No. 11-445, ECF No. 29-11) has been actually and officially disclosed in the public domain. That opinion is apparently contained in the National Archives in an unredacted form, *see id.* at 32, and the defendants "assume NSC is no longer challenging the withholding of" this opinion, Defs.' First 445 Reply at 21 n.6.[71]

The rest of the publicly available information cited by the plaintiff is comprised of references to or summaries of four other OLC opinions that were withheld by the DOJ in this case. *See* Pl.'s First 445 Opp'n at 32–33. As to the second of the OLC opinions (Document 3), the plaintiff cites meeting minutes from the Interagency Classification Review Committee ("ICRC"), which "record[] in great detail the summary [of an OLC opinion] . . . as well as a

---

[71] The plaintiff does not clarify whether it continues to challenge the withholding of Document 3. Since the plaintiff does not address this issue in its sur-reply brief in No. 11-445, and because the plaintiff does not ask the Court to direct the DOJ to produce Document 3 to the plaintiff, the plaintiff does not appear to continue to challenge the DOJ's decision to withhold Document 3.

recorded decision to implement the opinion." *Id.* at 32. These meeting minutes, which the plaintiff attaches as an exhibit to its summary judgment opposition, do contain a summary of a summary of Document 3, provided by then-OLC attorney Antonin Scalia at an ICRC meeting. *See* Pl.'s First 445 Opp'n Ex. K at 3–4, No. 11-445, ECF No. 33-11. These meeting minutes appear to convey the thrust of the legal advice provided by the OLC in Document 3, stating, for example, that "with respect to the second question, it was the [DOJ's] opinion that the CIA's response to Mr. Slocombe was inadequate." *Id.* at 4.

The D.C. Circuit's decisions on official acknowledgement under the FOIA require a requester to establish that "the information requested [is] as specific as the information previously released" and that "the information . . . match[es] the information previously disclosed." *See, e.g.*, *Wolf*, 473 F.3d at 378 (quoting *Fitzgibbon*, 911 F.2d at 765). Additionally, "voluntary disclosure of privileged material subject to the attorney-client privilege to unnecessary third parties in the attorney-client privilege context 'waives the privilege, not only as to the specific communication disclosed but often as to all other communications relating to the same subject matter.'" *In re Sealed Case*, 121 F.3d 729, 741 (D.C. Cir. 1997). With regard to Document 3, although the information disclosed in the public record about that opinion appears to reveal at least some of the legal opinion's conclusions, the plaintiff is unable to establish that "the information requested [is] as specific as the information previously released." *See Wolf*, 473 F.3d at 378. This is because "the information requested" was the OLC opinion itself, and not just a summary of certain conclusions contained in the opinion. Nevertheless, the public disclosure of at least a portion of the contents of Document 3 waives the attorney-client privilege as to that portion of the opinion, *see In re Sealed Case*, 121 F.3d at 741, and therefore the DOJ cannot assert attorney-client privilege to withhold it. Accordingly, the Court will direct

the DOJ to disclose to the plaintiff those portions of Document 3 (a memorandum entitled "Applicability of User's Fee Statute to Mandatory Declassification Review," *see* Colborn Decl. Ex. G) that were disclosed in the meeting minutes submitted by the plaintiff.[72]

As to the third of the five opinions (Document 4), the plaintiff has submitted "a cable from the U.S. Embassy in Tokyo to Washington, D.C.," which the plaintiff says "sum[s] up" the conclusions of Document 4. *See* Pl.'s First 445 Opp'n at 32. The plaintiff also asserts that this cable contains "an express citation to the opinion." *Id.* The cable submitted by the plaintiff cites to an "unclassified telegram" dated December 23, 1975 from the Drug Enforcement Administration ("DEA") headquarters, not to an OLC opinion. *See* Pl.'s First 445 Opp'n Ex. L at 1, No. 11-445, ECF No. 33-12. The cable goes on to quote from this telegram, summarizing "the opinion of Mary Lawton" regarding the status of government employees assigned to diplomatic or consular missions for purposes of the Privacy Act. *See id.* It may very well be that this cable is indirectly summarizing Document 4, which was a legal opinion authored by the OLC on May 6, 1975. *See* Colborn Decl. Ex. G. The cable does not, however, include "an express citation to the opinion," as the plaintiff asserts, Pl.'s First 445 Opp'n at 32, and the only connection to the OLC is the cable's reference to "the opinion of Mary Lawton, Deputy Asst Attorney General, Office of Legal Counsel," Pl.'s First 445 Opp'n Ex. L at 1. This sparse information is insufficient for the Court to conclude that the cable submitted by the plaintiff discloses any of the contents of Document 4 in particular, and therefore the Court cannot conclude that Document 4 has been officially disclosed in whole or in part or that the DOJ has waived the attorney-client privilege as to any portion of Document 4.

---

[72] Portions of Document 3 may not have been disclosed in the meeting minutes submitted by the plaintiff and thus need not be disclosed to the plaintiff. On the other hand, disclosure of Document 3 in its entirety is appropriate if the entire substance of which is reflected in those publicly available meeting minutes.

Next, as to the fourth of the OLC opinions (Document 13), the plaintiff submits a subsequent, publicly available OLC opinion that "directly reference[s]" a conclusion contained in Document 13. The publicly available OLC opinion submitted by the plaintiff specifically cites Document 13, stating "[w]e . . . opined in 1982 that advisory committee documents are available through FOIA requests made to the supervising agency and that the advisory committee must cooperate." Pl.'s First 445 Opp'n Ex. M at 3, No. 11-445, ECF No. 33-13. This brief discussion of Document 13 clearly discloses at least one conclusion of that OLC opinion, and therefore the DOJ once again cannot rely on the attorney-client privilege to withhold that disclosed material. *See, e.g.*, *In re Sealed Case*, 121 F.3d at 741. The Court will therefore direct the DOJ to disclose to the plaintiff the specific portion or portions of Document 13 which "opine[] . . . that advisory committee documents are available through FOIA requests made to the supervising agency and that the advisory committee must cooperate." *See* Pl.'s First 445 Opp'n Ex. M at 3.

Finally, as to the fifth OLC opinion challenged by the plaintiff (Document 2), the plaintiff submits "systematic declassification review guidelines" promulgated by the Information Security Oversight Office ("ISOO"), "pertaining to, among other things, foreign government information," which is the general subject of Document 2. *See* Pl.'s First 445 Opp'n at 33. The plaintiff has also submitted a letter from an OLC official providing the ISOO "with [OLC's] full concurrence concerning these guidelines." Pl.'s First 445 Opp'n Ex. N at 9, No. 11-445, ECF No. 33-14. The plaintiff contends that "OLC's concurrence suggest that these guidelines relied in part on the conclusions of Doc[ument] 2." Pl.'s First 445 Opp'n at 33 n.26. The plaintiff's argument attempting to connect the ISOO's guidelines with Document 2, however, is a stretch to say the least. Although it is possible that the ISOO guidance submitted by the plaintiff *may* have

relied upon some or all of the legal advice contained in Document 2, that conclusion is far from clear. Even had the ISOO relied on the OLC's legal advice in Document 2, the disclosure of guidelines *based on* legal advice does not constitute a disclosure of the legal advice itself. The connection is simply too attenuated to constitute either an official acknowledgement or a waiver of the attorney-client privilege. The Court therefore concludes that the plaintiff's thin evidence does not establish any official disclosure of the contents of Document 2 or any waiver of the attorney-client privilege as applied to that document, and therefore the DOJ was entitled to withhold Document 2 under the attorney-client privilege.

In summary, the Court grants summary judgment to the DOJ on Count Eight in No. 11-445 as to thirteen of the sixteen withheld OLC opinions in their entirety (Documents 1–2, 4–10, 12, 14–16, *see* Colborn Decl. Ex. G). The Court concludes that the plaintiff's challenge to Document 11 is now moot because the plaintiff has obtained an unredacted copy of that opinion and has not asked the Court to direct the DOJ to produce a further copy pursuant to the plaintiff's FOIA request. The Court will deny summary judgment in part to the DOJ as to the portions of Documents 3 and 13 that were publicly disclosed in the documents submitted by the plaintiff. The DOJ will be required to disclose the portions of Documents 3 and 13 that correspond to the pieces of privileged information that were made publicly available by the agencies who received the legal advice in question from the OLC.[73]

### 3.    *Attorney Work-Product Doctrine*

Finally, the Court will address the DIA's apparent invocation of the attorney work-product doctrine to withhold responsive records under Exemption 5. *See Judicial Watch, Inc. v.*

---

[73] The Court will not, however, "order DOJ to immediately confirm that *none* of the information in *any* of these withheld opinions has been previously officially disclosed," as the plaintiff requests. *See* Pl.'s First 445 Opp'n at 33 (emphasis in original). The burden remains on the plaintiff "point to specific information in the public domain" that is "identical to that being withheld." *Davis*, 968 F.2d at 1280.

*Dep't of Justice*, 432 F.3d 366, 369 (D.C. Cir. 2005) ("FOIA Exemption 5 incorporates the work-product doctrine and protects against the disclosure of attorney work product."). "The work-product doctrine shields materials 'prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent).'" *Id.* (quoting FED. R. CIV. P. 26(b)(3)). When reviewing an agency's withholding of material under the work-product doctrine, the "'testing question' . . . is 'whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation.'" *In re Sealed Case*, 146 F.3d 881, 884 (D.C. Cir. 1998) (quoting *Senate of P.R.*, 823 F.2d at 586 n.42). "For a document to meet this standard, the lawyer must have at least had a subjective belief that litigation was a real possibility, and that belief must have been objectively reasonable." *Id.* Hence, at a minimum, an agency claiming the attorney work-product doctrine to withhold responsive material under the FOIA must (1) "provide a description of the nature and contents of the withheld document," (2) "identify the document's author or origin (by job title or otherwise)," (3) "describe the factual circumstances that surround the document's creation," and (4) "provide some indication of the type of litigation for which the document's use is at least foreseeable." *Am. Immigration Council*, 2013 WL 3186061, at *16.

In its declarations, the DIA states that "a significant portion of the responsive records identified in this case related to other civil cases that arose from FOIA requests submitted by requesters referenced in [the plaintiff's] request." First Williams Decl. ¶ 24. The DIA's declarant further averred that "[t]hese records consist of the active discussions between counsel assigned by the Office of the General Counsel with DIA and other government employees in

preparation of the agency's defense in litigation." *Id.* Accordingly, the DIA asserts that

"disclosure of this information would reveal the case preparation, legal advice, and review

recommendations of agency counsel." *Id.* The DIA's declarant states that "[i]n each instance

where Exemption [5] is asserted to protect the attorney work-product, I have concluded that

agency counsel was providing specific legal guidance related to an actual or potential litigation

matter." Second Williams Decl. ¶ 12. The DIA's *Vaughn* index provides (1) the date that each

withheld document was created, (2) a very brief description of the document (*e.g.*, "2-page

letter"), (3) the agency that originated the document, and (4) a boilerplate statement that the

document "contains comments and recommendations" and that it was withheld "as an attorney

work product" because it "was prepared in anticipation of litigation." *See* Second Williams

Decl. Ex. A.

The Court concludes that the DIA's submissions do not provide enough factual context

regarding each of the withheld documents for the Court to conclude that each document is

entitled to the protections of the attorney work-product doctrine. Specifically, the DIA fails to

provide any document-specific information about "the factual circumstances that surround the

document's creation." *See Am. Immigration Council*, 2013 WL 3186061, at *16. In this regard,

the DIA's *Vaughn* index does not specify whether the document was created with regard to a

case currently in litigation or a case that was likely to enter litigation. The DIA's *Vaughn* index

also provides nearly no information about the nature of each specific document, which is critical

in determining whether the protections of the attorney work-product doctrine apply. *See Senate

of P.R.*, 823 F.2d at 586 n.42. Although the DIA's declarant states generally that each withheld

document contains "legal guidance related to an actual or potential litigation matter," Second

Williams Decl. ¶ 12, the DIA has the burden to establish that fact with respect to *each document*.

This is particularly important for documents created with an eye toward "potential litigation" because, when litigation is only a possibility, the Court is required to assess "whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." *Senate of P.R.*, 823 F.2d at 586 n.42. The Court has no way to make that document-by-document assessment based on the DIA's submissions. Indeed the Court has no way of knowing which documents withheld by the DIA were prepared with respect to "actual . . . litigation" and which were prepared with respect to "potential litigation." *See* Second Williams Decl. ¶ 12. Accordingly, the Court denies summary judgment to the DIA on Count Five in No. 11-445 with respect to its Exemption 5 withholdings.

\* \* \*

In sum, the Court denies summary judgment to the CIA, ODNI, DIA, and DOJ with respect to each agency's decision to withhold responsive material under Exemption 5. Specifically, with respect to each agency's Exemption 5 withholding decisions, the Court denies summary judgment to the CIA with regard to Count Seventeen in No. 11-444 and Counts One, Two, Three, and Seven in No. 11-445, to the ODNI with regard to Count Six in No. 11-445, and to the DIA with regard to Count Five in No. 11-445. These agencies may either renew their summary judgment motion with supplementary declarations and *Vaughn* indices, or else they must disclose to the plaintiff the responsive records or portions thereof that were withheld under Exemption 5. Finally, the Court grants in part and denies in part summary judgment to the DOJ on Count Eight in No. 11-445. The Court denies summary judgment to the DOJ on Count Eight as to the portions of Documents 3 and 13 that were publicly disclosed in the documents

submitted by the plaintiff, and the Court grants summary judgment to the DOJ in all other respects.

## K.   Electronic Records

The plaintiff next opposes a grant of summary judgment to the CIA and the State Department regarding those agencies' refusal to provide responsive records in electronic format. *See* Pl.'s First 444 Opp'n at 39–40; Pl.'s First 445 Opp'n at 37.  The FOIA provides, "[i]n making any record available to a person . . . an agency shall provide the record in any form or format requested by the person if the record is readily reproducible by the agency in that form or format."  5 U.S.C. § 552(a)(3)(B).  In this regard, "[e]ach agency shall make reasonable efforts to maintain . . . records in forms or formats that are reproducible for purposes of this section."  *Id.* Finally, the FOIA requires that "a court shall accord substantial weight to an affidavit of an agency concerning . . . reproducibility under paragraph (3)(B)."  *Id.* § 552(a)(4)(B).

There are two separate issues under the FOIA's "readily reproducible" provision.  The first issue is whether or not a particular record "is readily reproducible by the agency in [the] form or format [requested by the person]," 5 U.S.C. § 552(a)(3)(B), and the "form or format" in this case is an electronic format.  The second issue is whether the State Department has "ma[d]e reasonable efforts to maintain its records in forms or formats that are reproducible" in electronic format.  *Id.*[74]  Both of these provisions were added to the FOIA as a part of the 1996 Electronic

---

[74] The CIA has previously asserted that "[i]n determining whether an agency has met this [second] requirement, courts look at whether agency records can be reproduced, not whether they can be readily reproduced in the format requested by a particular requester."  Def.'s Supplemental Mem. & Decl. at 2, No. 11-443, ECF No. 21.  The Court disagrees.  The statute reads:  "In making any record available to a person under this paragraph, an agency shall provide the record in any form or format requested by the person if the record is readily reproducible by the agency *in that form or format*.  Each agency shall make reasonable efforts to maintain its records in forms or formats that are reproducible *for purposes of this section*."  5 U.S.C. § 552(a)(3)(B) (emphasis added).  The only two references to the word "reproducible" in the FOIA are in subsection  552(a)(3)(B), and therefore the Court reads the phrase "reproducible for purposes of this section" to mean "reproducible [in the form or format requested by the person seeking the records]."  The Court has previously stated on the record in this case that this is how it interprets the language of 5 U.S.C. § 552(a)(3)(B).  *See* Tr. of Status Conference (Dec. 16, 2011) at 20:20–21:4 (excerpt available at ECF No. 22-4, No. 11-443).

FOIA Amendments ("E-FOIA Amendments"). *See* Pub. L. No. 104-231, § 5, 110 Stat. 3048, 3050 (1996). The E-FOIA Amendments were intended to "maximize the usefulness of agency records and information collected, maintained, used, retained, and disseminated by the Federal Government," and they were specifically intended to encourage government agencies to "use new technology to enhance public access to agency records and information." *Id.* § 2, 110 Stat. at 3048–49. The legislative history of the E-FOIA Amendments elaborated on this purpose, observing that the objective of "promoting greater efficiency in responding to FOIA requests . . . includes using technology to let requesters obtain information in the form most useful to them." H.R. Rep. 104-795, at 11 (1996).

1.      *CIA*

With respect to the CIA, the Court first observes that the electronic records issue is not properly before the Court on summary judgment. The CIA has not moved for summary judgment on this issue, or at least does not specifically address this issue in moving for summary judgment in No. 11-443 or 11-444. Additionally, although the plaintiff contends in its opposition brief in No. 11-444 that "[t]he Court should order [the CIA] to promptly produce [certain] records in electronic format and to make provisions for the production in electronic format of records responsive to the remainder of NSC's requests at issue in this case," Pl.'s First 444 Opp'n at 40, the plaintiff likewise has not cross-moved for summary judgment on the electronic records issue.

The plaintiff first raised the electronic records issue in these related cases in the context of a discovery dispute with the CIA in No. 11-443. *See* Pl.'s Mot. for Status Conference Regarding Count 3, No. 11-443, ECF No. 15. In particular, the plaintiff "request[ed] a status conference regarding [the] CIA's refusal to provide electronic records in response to [the] FOIA Request [at issue in Count Three in No. 11-443]." *Id.* at 1. The Court granted the plaintiff's

148

request and held a status conference on this issue on December 16, 2011. *See* Minute Order dated Dec. 8, 2011, No. 11-443. The Court also permitted the parties to submit authority in support of their respective positions, *see id.*, and, following the status conference, directed the CIA to submit further explanation of three specific issues that were raised but not satisfactorily resolved at the status conference, *see* Minute Order dated Dec. 16, 2011, No. 11-443. The plaintiff subsequently moved for a second status conference, *see* Mot. for Supplemental Status Conference Regarding Count 3 & Electronic Records, No. 11-443, ECF No. 22, but the Court denied this request. *See* Minute Order dated Jan. 31, 2012, No. 11-443. The Court observed that the CIA's declarations on the electronic records issue "are not a model of clarity," but the Court concluded that "another status conference on this same topic will divert judicial resources from the pending motion [to dismiss] in this case and the issues raised may be more efficiently addressed in the context of the pending motion for summary judgment in [No. 11-444]." *Id.*

Unfortunately, the electronic records issue cannot be "more efficiently addressed in the context of the pending motion for summary judgment in [No. 11-444]." *See id.* As discussed above, the CIA has not specifically addressed that issue in moving for summary judgment in No. 11-444, and the CIA only submitted a declaration on that issue in its reply brief in that case. *See* Def.'s First 444 Reply at 23–4. To the extent that the CIA implicitly moved for summary judgment on the electronic records issue by submitting a declaration attached to its reply brief, the Court denies summary judgment to the CIA because the declarations submitted by the CIA on this issue appear to the Court as unclear and internally inconsistent. Of particular note, the first declaration, submitted by Susan Viscuso, the former chief of the CIA's PIPD, stated that "the CIA maintains two different IT systems, a classified system and an unclassified system." *See* Decl. of Susan Viscuso (Dec. 13, 2011) ("First Viscuso Decl.") ¶ 5, No. 11-443, ECF No.

19-1.  The declarant also averred that "[w]hen records responsive to Plaintiff's FOIA request were located, they were scanned and uploaded to the classified system."  *Id.* ¶ 6.  This statement strongly implies that responsive records were located somewhere other than the CIA's classified system and, after being located, were "scanned and *uploaded to* the classified system."  *See id.* (emphasis added).  Yet, in her second declaration, Ms. Viscuso averred that "[t]he CIA *does not transfer* documents from the unclassified system to the classified system for review and redaction pursuant to a FOIA request," and "[i]nstead, the unclassified records *are already stored* on the classified system."  Supplemental Decl. of Susan Viscuso (Jan. 13, 2012) ("Second Viscuso Decl.") ¶ 3, No. 11-443, ECF No. 21-1(emphasis added).

The CIA's declarant does not reconcile how it is that the agency "does not transfer documents from the unclassified system to the classified system," Second Viscuso Decl. ¶ 3, while, at the same time, records responsive to the plaintiff's FOIA request were "scanned and *uploaded to* the classified system" after being located, First Viscuso Decl. ¶ 5 (emphasis added).  Relatedly, if responsive records are located elsewhere before being "scanned and uploaded to the classified system," *see* First Viscuso Decl. ¶ 5, but "all CIA systems of records are located on the Agency's classified system," Second Viscuso Decl. ¶ 4, the CIA does not explain in which system of records the potentially responsive records were "located" prior to being "scanned and uploaded to the classified system," *see* First Viscuso Decl. ¶ 5.[75]  These statements, read together, appear inconsistent with one another, or at the very least these statements raise further questions about how the CIA stores, locates, and internally transfers potentially responsive records during the processing of FOIA requests.  These lingering questions prevent the Court from being able to grant summary judgment to the CIA on the issue of refusing to produce

---

[75] Additionally, if some potentially responsive records are located in places other than "systems of records," the CIA does not explain where such repositories of records are located or why they are not required to be located on the CIA's classified system.  *See* Second Viscuso Decl. ¶ 4.

electronic records.[76]  Therefore, the Court denies summary judgment to the CIA on Count Three in No. 11-443 and on Counts Seventeen and Eighteen in No. 11-444 regarding the CIA's refusal to produce responsive records in an electronic format.[77]

## 2.    *State Department*

With respect to the State Department, the plaintiff contends that the agency "has now implemented a FOIA processing system which only resides on its classified network, making it impossible for it to easily produce electronic records in response to a FOIA request." Pl.'s First 445 Opp'n at 37.  The plaintiff claims that "State converted to this system only within the past two years," making State's decision "even more questionable." *Id.*  The State Department explains in its sworn declaration that it "processes and reviews documents potentially responsive to a FOIA or Privacy Act request on its classified network, which is also where the [State] Department's redaction capabilities exist." First Walter Decl. ¶ 25.  The State Department avers that processing potentially responsive documents on its classified system is necessary for three reasons.  First, the State Department avers that "the Department must conduct a line-by-line classification review of all information responsive to a FOIA request regardless of how such documents are marked, and regardless of whether, in the abstract, they are likely to contain classified information." *Id.* ¶ 26.  Second, the State Department claims that it must review all potentially responsive documents on its classified system because "the software the Department uses to review potentially responsive material also contains its only ability to redact

---

[76] The Viscuso declarations only addressed "the records responsive to Plaintiff's FOIA request [in Count Three of No.11-443]." *See* First Viscusco Decl. ¶ 3.  The CIA submitted a separate declaration authored by Scott Koch, the chief of the CIA's Information Review and Release Group, regarding the FOIA requests at issue in Counts Seventeen and Eighteen in No. 11-444. *See* Decl. of Scott Koch (Feb. 27, 2012) ("Koch Decl.") ¶ 4, No. 11-444, ECF No. 27-1.  The Koch Declaration, however, adds nothing to the information contained in the Viscuso declarations and therefore does not resolve any of the lingering questions raised by those declarations.

[77] It may be that these and other lingering factual questions in these cases will have to be resolved in the traditional manner of resolving factual disputes in the federal judicial system—a hearing or trial. *See* Margaret B. Kwoka, *The Freedom of Information Act Trial*, 61 AM. U. L. REV. 217, 268 (2011) (contending that "[a] look at the records in those rare FOIA trials demonstrates both that FOIA trials are possible and that they are useful").

information." *Id.* ¶ 27. Third, the State Department states that processing FOIA requests on its classified network is necessary because "[a] significant portion of the Department's business is classified," and "a large number of the documents responsive to FOIA requests received by the Department are classified documents," and thus "the Department's software for processing information access requests was designed for and installed on the Department's classified system." *Id.*

Additionally, the State Department's declarant explains in detail why "[p]roviding Plaintiff with electronic versions of responsive documents would be very costly and time-consuming because of the additional steps the Department would have to take to comply with its information security procedures." *Id.* ¶ 29. First, these "information security procedures" would require "that an analyst within IPS locate and identify all non-exempt, releasable records within the processing system and then submit a formal, written request to the internal systems support staff in IPS stating that all such records have been deemed suitable for transfer." *Id.* Second, "[u]sing special extraction software, the systems support staff would . . . have to remove the releasable records from the Department's processing system and place them in a folder on the classified network for further review by the Bureau's Information Systems Security Officer ('ISSO')." *Id.* Third, according to the State Department, "[t]he ISSO would then have to inspect each and every document [a second time] on a line-by-line basis to ensure that only the releasable, unclassified records were captured." *Id.* Fourth, "a request for support . . . would have to be opened with the Department's Bureau of Information Resource Management ('IRM')." *Id.* ¶ 30. Fifth, "[a]fter a virus scan of the unclassified medium, IRM would then transfer each of the documents onto the medium and return the medium to the IPS analyst." *Id.* Finally, "the analyst would have to compare the contents of each of the downloaded files with

the contents of each of the records in the classified processing system to ensure that each and every releasable record was properly downloaded." *Id.* The State Department avers that "this entire process would potentially take weeks or months for each tranche of releasable documents." *Id.*

Regarding the question of whether or not State Department records responsive to the plaintiff's FOIA request were "readily reproducible by the agency in [an electronic] form or format," 5 U.S.C. § 552(a)(3)(B), the Court is somewhat skeptical regarding the State Department's explanation of the labyrinthine steps that are necessary to move a document from the classified system to an unclassified piece of electronic media. Specifically, the State Department does not explain why an ISSO would need to perform a *second* line-by-line review of responsive documents after such documents had already been reviewed by IPS. *See* First Walter Decl. ¶ 29. Since the State Department "must conduct a line-by-line classification review of all information responsive to a FOIA request" in the ordinary course of responding to FOIA requests, *see id.* ¶ 26 the line-by-line review by an ISSO would either be completely duplicative and unnecessary or, if the ISSO's line-by-line review were the only one performed, it would not add anything to the State Department's normal burden in responding to FOIA requests.

Other than this second, redundant line-by-line review of documents by the ISSO, none of the additional steps required to produce documents in electronic format appear unduly burdensome.[78] The only one of the additional steps that would appear to involve a substantial amount of time or effort would be the requirement that the IPS analyst compare the contents of

---

[78] The State Department also does not explain why it must call on multiple middlemen to effect the transfer of information from one network to another. In this regard, it strikes the Court as extremely inefficient for the State Department to pass documents from IPS analysts to "systems support staff" to an ISSO, to the IRM, and then back to the IPS analyst. The implication of the State Department's declaration is that, in the ordinary course, an IPS analyst is usually the only person to review documents for release, notwithstanding any requirement for approval from superiors. It would presumably minimize the risk of error (and the risk of releasing classified information) by limiting the number of people who handle releasable information, yet the State Department appears to do just the opposite.

the electronic medium to the contents of the classified processing system to ensure that all releasable records are included. *See id.* ¶ 30. Yet, even this task would be almost entirely ministerial, since the State Department does not claim that this final step would require a line-by-line or even page-by-page review.

Therefore, the Court concludes that, even considering the "substantial weight" owed to the State Department's declaration on the issue, *see* 5 U.S.C. § 552(a)(4)(B), the State Department has not carried its burden of establishing that the records requested by the plaintiff are not "readily reproducible" in an electronic format. Accordingly, the Court will not reach the second issue of whether the State Department has "ma[d]e reasonable efforts to maintain records in forms or formats that are reproducible" in electronic format. *See id.* § 552(a)(3)(B). The Court thus denies summary judgment to the State Department on Count Nine in No. 11-445 regarding the agency's decision not to produce responsive records to the plaintiff in an electronic format. The Court will permit the State Department either to submit a further declaration describing in more detail the exact burden involved in reproducing responsive records in an electronic format or to release the records responsive to the plaintiff's FOIA request in an electronic format.

### L.      <u>Segregability</u>

Finally, the Court will address whether the defendants have met their burden of demonstrating that "[a]ny reasonably segregable portion of a record [was] provided to [the plaintiff] after deletion of the portions which are exempt under [the FOIA]." 5 U.S.C. § 552(b). At various points throughout its briefing, the plaintiff contends that the defendants have failed to satisfy this burden. *See, e.g.*, Pl.'s First 443 Opp'n at 13, 19; Pl.'s First 444 Opp'n at 29; Pl.'s First 445 Opp'n at 9, 23. The CIA, ODNI, DIA, and State Department have averred that all reasonably segregable portions of withheld material have been provided to the plaintiff. *See*

First Lutz Decl. ¶ 81; Third Lutz Decl. ¶ 43; Hackett Decl. ¶ 33; First Walter Decl. ¶ 38; First

Williams Decl. ¶ 26.  The DOJ and NSA, however, have not provided any similar

representations to the Court.

The D.C. Circuit has acknowledged that establishing adequate segregation of non-exempt

material "presents problems for the agency since . . . segregability depends entirely on what

information is in a document and how it is presented." *Mead Data*, 566 F.2d at 261.  Therefore,

although "agencies should not be forced to provide such a detailed justification that would itself

compromise the secret nature of potentially exempt information," agencies "must be required to

provide the reasons behind their conclusions in order that they may be challenged by FOIA

plaintiffs and reviewed by the courts." *Id.*  To this end, the Circuit has said that "[i]n addition to

a statement of its reasons, an agency should also describe what proportion of the information in a

document is non-exempt and how that material is dispersed throughout the document." *Id.*

Under *Mead Data*, if a small proportion of the information is non-exempt, the agency's

explanatory burden is less, and if a larger proportion of the information is non-exempt, "the

courts should require a high standard of proof for an agency claim that the burden of separation

justifies nondisclosure or that disclosure of the non-exempt material would indirectly reveal the

exempt information." *Id.*

On the other hand, however, the Circuit has more recently held that "[a]gencies are

entitled to a presumption that they complied with the obligation to disclose reasonably

segregable material," which must be overcome by some "quantum of evidence" by the requester.

*Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007).  Indeed, more recent

decisions from the D.C. Circuit have indicated that the standard first articulated in *Mead Data*

has been relaxed.  Those decisions have held that an agency may satisfy its segregability

obligations by (1) providing a *Vaughn* index that adequately describes each withheld document and the exemption under which it was withheld; and (2) submitting a declaration attesting that the agency released all segregable material.  *See, e.g.*, *Loving*, 550 F.3d at 41 (stating that "the description of the document set forth in the *Vaughn* index and the agency's declaration that it released all segregable material" is "sufficient for [the segregability] determination"); *Johnson v. Exec. Office for U.S. Attorneys*, 310 F.3d 771, 776 (D.C. Cir. 2002) (upholding agency's segregation efforts based on "comprehensive *Vaughn* index" and "the affidavits of [agency officials]").

Under the segregability standards more recently articulated by the D.C. Circuit in *Loving* and *Johnson*, the Court first concludes that the DOJ has failed to satisfy its segregability burden because it has failed to submit a declaration attesting that it released all segregable, non-exempt material.  This is a basic requirement, and without it the Court cannot conclude that the DOJ has satisfied its segregability obligations.  Furthermore, although the CIA, ODNI, and DIA *have* averred that all reasonably segregable portions of withheld material have been provided to the plaintiff, the Court has also concluded above that all three of these agencies, as well as the DOJ, have deficiencies in their *Vaughn* indices.  *See supra* Part III.H, III.J.  In light of these deficiencies, the Court concludes that the segregability efforts of the CIA, ODNI, DIA, and DOJ do not meet even the more lenient standard articulated in *Loving* and *Johnson*.  Those cases require, at a minimum, that an agency submit a "comprehensive *Vaughn* index," *see Johnson*, 310 F.3d at 776, which sufficiently describes each document withheld and the reasons for the withholding, *see Loving*, 550 F.3d at 41.  Although the Court does not doubt the sworn statements from the CIA, ODNI, and DIA about their segregability efforts, *see* First Lutz Decl. ¶ 81; Third Lutz Decl. ¶ 43; Hackett Decl. ¶ 33; First Williams Decl. ¶ 26, absent a sufficient

*Vaughn* index, an agency must provide other facts, beyond its good-faith assurances, that would establish that it released all reasonably segregable, non-exempt material. Such information could include, for example, a description of "what proportion of the information in a document is non-exempt and how that material is dispersed throughout the document." *See Mead Data*, 566 F.2d at 261.

Finally, as to the State Department, that agency has sufficiently demonstrated that it has satisfied its segregability obligations with respect to the one responsive document that it has thus far withheld, in whole or in part, which is disputed in this case. As to that document, the State Department has provided a detailed description, averring that it is a 91-page "guide to the procedures used for processing information access requests received by the [State] Department." First Walter Decl. ¶ 35. The only portion of the document that the State Department withheld was "a three-line footnote describing an exception to the guidelines for handling material referred by the [State] Department to another government agency." *Id.* ¶ 36. The Court is satisfied from this detailed description, in tandem with the State Department's good-faith assurance that "[t]here is no additional meaningful non-exempt material that may be segregated and released," *id.*, that the State Department has satisfied its segregability obligations under the FOIA. *See Loving*, 550 F.3d at 41; *Johnson*, 310 F.3d at 776.[79]

## IV.     CONCLUSION

For the reasons discussed above, in summary, the Court rules on the defendants' motions for summary judgment, the plaintiff's cross-motions for summary judgment, the plaintiff's

---

[79] The Court need not assess the segregability efforts of the NSA because the plaintiff does not challenge any withholding decisions made by the NSA, and thus the Court need not review any such withholding decisions. *See, e.g.*, *Sussman*, 494 F.3d at 1116 (holding that "the district court must make specific findings of segregability regarding the documents to be withheld" only "[b]efore approving the application of a FOIA exemption").

motion for leave to file an amended complaint, and the plaintiff's motion for sanctions as follows:

<u>**Civil Action No. 11-443**</u>

- The Court grants summary judgment to the plaintiff on Count One in No. 11-443. *See supra* Part III.C.1.

- The Court grants summary judgment to the plaintiff on Count Two in No. 11-443. *See supra* Part III.C.1.

- The Court grants in part and denies in part summary judgment to the CIA on Count Three in No. 11-443. The Court denies summary judgment to the CIA on Count Three with respect to (1) the CIA's withholding of responsive information under FOIA Exemption 3 and the CIA Act, 50 U.S.C. § 403g, *see supra* Part III.H.1; (2) the CIA's refusal to produce responsive records in an electronic format, *see supra* Part III.K.1; and (3) the CIA's withholding of the "two-page classified TOC from volume 53 (number 2)" of *Studies in Intelligence*, *see* Fourth Lutz Decl. ¶ 11, pursuant to Exemption 1, *see supra* Part III.F.2. The Court grants summary judgment to the CIA on Count Three in all other respects.

- The Court denies the plaintiff's Motion for Sanctions, No. 11-443, ECF No. 50. *See supra* Part III.B.

<u>**Civil Action No. 11-444**</u>

- The Court grants summary judgment to the CIA on Count One in No. 11-444. *See supra* Part III.E.3.

- The Court grants summary judgment to the CIA on Count Eight in No. 11-444. *See supra* Part III.E.2.

- The Court grants summary judgment to the CIA on Count Nine in No. 11-444. *See supra* Part III.E.1.

- The Court grants summary judgment to the CIA on Count Ten in No. 11-444. *See supra* Part III.E.4.

- The Court denies summary judgment to the CIA on Count Seventeen in No. 11-444. The Court denies summary judgment to the CIA on Count Seventeen with respect to (1) the CIA's withholding of responsive information under FOIA Exemption 3 and the CIA Act, 50 U.S.C. § 403g, *see supra* Part III.H.1; (2) the CIA's withholding of responsive information under FOIA Exemption 5, *see supra* Part III.J.1(a), III.J.2(a); and (3) the CIA's refusal to produce responsive records in an electronic format, *see supra* Part III.K.1.

- The Court denies summary judgment to the CIA on Count Eighteen in No. 11-444. The Court denies summary judgment to the CIA on Count Eighteen with respect to (1) the adequacy of its search efforts, *see supra* Part III.D.1; (2) the CIA's withholding of responsive information under FOIA Exemption 3 and the CIA Act, 50 U.S.C. § 403g, *see supra* Part III.H.1; (3) the CIA's withholding of responsive information as "non responsive," *see id.*; and (4) the CIA's refusal to produce responsive records in an electronic format, *see supra* Part III.K.1.

- The Court grants in part and denies in part summary judgment to the CIA on Count Twenty in No. 11-444. The Court denies summary judgment to the CIA on Count Twenty regarding the adequacy of its search efforts, *see supra* Part III.D.2, and grants summary judgment to the CIA on Count Twenty in all other respects.

- The Court grants summary judgment to the CIA on Count Twenty-One in No. 11-444. *See supra* note 5.

**Civil Action No. 11-445**

- The Court grants in part and denies in part summary judgment to the CIA on Count One in No. 11-445. The Court denies summary judgment to the CIA with respect to (1) the CIA's withholding of responsive information under FOIA Exemption 3 and the CIA Act, 50 U.S.C. § 403g, *see supra* Part III.H.1; (2) the CIA's withholding of responsive information under FOIA Exemption 5, *see supra* Parts III.J.1(a), III.J.2(a); and (3) the CIA's withholding of document C05366473 pursuant to Exemption 1, *see supra* Part III.F.1. The Court grants summary judgment to the CIA in all other respects.

- The Court grants in part and denies in part summary judgment to the CIA on Count Two in No. 11-445. The Court denies summary judgment to the CIA with respect to (1) the CIA's withholding of responsive information under FOIA Exemption 3 and the CIA Act, 50 U.S.C. § 403g, *see supra* Part III.H.1; (2) the CIA's withholding of responsive information under FOIA Exemption 5, *see supra* Parts III.J.1(a), III.J.2(a); and (3) the CIA's withholding of eight documents pursuant to Exemption 1: C01499710, C05403192, C05403194, C05403197, C05403198, C05403199, C05403203, and C05549838, *see supra* Part III.F.1. The Court grants summary judgment to the CIA in all other respects.

- The Court grants in part and denies in part summary judgment to the CIA on Count Three in No. 11-445. The Court denies summary judgment to the CIA with respect to (1) the CIA's withholding of responsive information under FOIA Exemption 3 and the CIA Act, 50 U.S.C. § 403g, *see supra* Part III.H.; and (2) the CIA's withholding of responsive

information under FOIA Exemption 5, *see supra* Parts III.J.1(a), III.J.2(a). The Court grants summary judgment to the CIA in all other respects.

- The Court grants in part and denies in part summary judgment to the DIA on Count Five in No. 11-445. The Court denies summary judgment to the DIA with respect to the DIA's withholding of responsive information under FOIA Exemption 5, *see supra* Parts III.J.1(b), III.J.2(b), and the Court grants summary judgment to the DIA in all other respects.

- The Court denies summary judgment to the ODNI on Count Six in No. 11-445. *See supra* Parts III.H.3, III.J.1(b), III.J.2(b).

- The Court grants in part and denies in part summary judgment to the CIA on Count Seven in No. 11-445. The Court denies summary judgment with respect to (1) the CIA's withholding of thirteen documents pursuant to FOIA Exemption 2: C05520233, C05520227, C05520231, C05520236, C05520235, C05520226, C05520181, C05520232, C05520213, C05520218, C05520223, C05520228, and C05520234, *see supra* Part III.G; (2) the CIA's withholding of responsive information under FOIA Exemption 3 and the CIA Act, 50 U.S.C. § 403g, *see supra* Part III.H.1; and (3) the CIA's withholding of responsive information under FOIA Exemption 5, *see supra* Parts III.J.1(a), III.J.2(a). The Court grants summary judgment to the CIA in all other respects.

- The Court grants in part and denies in part summary judgment to the DOJ on Count Eight in No. 11-445. The Court denies summary judgment to the DOJ with respect to the portions of Documents 3 and 13 that were publicly disclosed in the documents submitted by the plaintiff. *See supra* Part III.J.2(c). The Court finds the plaintiff's challenge to the

DOJ's withholding of Document 11 to be moot. *Id.* The Court grants summary judgment to the DOJ in all other respects.

- The Court grants in part and denies in part summary judgment to the State Department in Count Nine in No. 11-445. The Court denies summary judgment to the State Department with respect to (1) the adequacy of its search efforts, *see supra* Part III.D.3; and (2) the State Department's refusal to produce responsive records in an electronic format, *see supra* Part III.K.2. The Court grants summary judgment to the DOJ in all other respects.

- The Court denies summary judgment to the NSA on Count Ten in No. 11-445. *See supra* Part III.D.4.

- The Court grants summary judgment to the CIA on Count Twelve in No. 11-445. *See supra* note 3.

- The Court denies summary judgment to the CIA on Count Thirteen in No. 11-445. The Court denies summary judgment to the CIA on Count Thirteen with respect to (1) the CIA's withholding of responsive information under FOIA Exemption 3 and the CIA Act, 50 U.S.C. § 403g, *see supra* Part III.H.1; (2) the CIA's withholding of responsive information under FOIA Exemption 5, *see supra* Part III.J.1(a), III.J.2(a).

- The Court grants summary judgment to the plaintiff on Count Twenty in No. 11-445. *See supra* Part III.C.2.

The Court directs the parties to jointly file, within twenty days of this decision, the following: (1) a status report that sets forth a list of the records that remain in dispute, in light of the Memorandum Opinion accompanying this Order, and that identifies each such disputed record by a Bates number, or other unique identifier, and by citation to the particular page(s) of the *Vaughn* index where the disputed record is described; and (2) a proposed briefing schedule

for any further proceedings in this matter, including deadlines for the submission of any renewed

dispositive motions, supplementary *Vaughn* indices, or supplementary declarations.

An appropriate Order accompanies this Memorandum Opinion.

Date: August 15, 2013

/s/ *Beryl A. Howell*
BERYL A. HOWELL
United States District Judge